IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

_____

MUADHDHIN COUSIN,

                       Plaintiff,

                                       Civ. Action No.
    vs.                             9:08-CV-0848 (LEK/DEP)

SCOTT DODRILL, *et al.,*

                       Defendants.

_____

APPEARANCES:                  OF COUNSEL:

FOR PLAINTIFF:

MUADHDHIN COUSIN, *Pro Se*
2314 Tasker Street
Philadelphia, PA  19145

FOR DEFENDANTS:

HON. RICHARD S. HARTUNIAN     CHARLES E. ROBERTS, ESQ.
United States Attorney             Assistant U.S. Attorney
Northern District of New York
P.O. Box 7198
100 S. Clinton Street
Syracuse, New York 13261-7198

DAVID E. PEEBLES
U.S. MAGISTRATE JUDGE

## REPORT AND RECOMMENDATION

    Plaintiff Muadhdhin Cousin, a former federal prison inmate, has

commenced this action against various employees of the United States Bureau of Prisons ("BOP") alleging deprivation of his civil rights.  In his complaint plaintiff asserts that his procedural due process rights were violated when, following his participation in an inmate altercation, he was removed from the prison in which the fight occurred and placed into a special management unit ("SMU") at another facility.  As relief, plaintiff's complaint demands an award of damages in the amount of eight million dollars.

In response to plaintiff's complaint defendants have moved for summary judgment dismissing his claims, asserting that 1) plaintiff's due process claim is procedurally barred because he failed to exhaust available administrative remedies before commencing suit; 2) his claim is legally deficient; 3) the court lacks personal jurisdiction over some of the defendants; and 4) in any event all of the defendants are entitled to qualified immunity from suit.

Having carefully considered the record now before the court in light of defendants' motion and plaintiff's arguments in opposition, I find that there are issues of fact as to whether plaintiff properly exhausted available remedies precluding dismissal on this procedural basis.  I further find,

however, that Cousin has failed to demonstrate that he was deprived of a cognizable liberty interest without due process, and thus recommend dismissal of his complaint on the merits.

I.     BACKGROUND[1]

During the time of his incarceration plaintiff was entrusted to the care and custody of the BOP and, at the times relevant to his claim, was confined first at the Ray Brook Federal Correctional Institution ("FCI Ray Brook"), located in Ray Brook, New York, and later the United States Penitentiary at Lewisburg, Pennsylvania ("USP Lewisburg").  Complaint (Dkt. No. 1) § IV; *see also* Magnusson Decl. (Dkt. No. 34-3) ¶¶ 5-6 and Exh. C.

On July 19, 2006, plaintiff was a participant in a brawl that erupted during the course of an inmate basketball game.  *See* Complaint (Dkt. No. 1) § IV; Magnusson Decl. (Dkt. No. 34-3) ¶ 7 and Exh. E.  As a result of the incident, which involved approximately seventy-five of the two hundred inmates in attendance, prison officials instituted a full lock down of FCI Ray Brook.  Magnusson Decl. (Dkt. No. 34-3) Exh. E.

---

[1]     In light of the procedural posture of the case the following recitation is derived from the record now before the court, with all inferences drawn and ambiguities resolved in favor of the plaintiff.  *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003).

Based upon both video evidence and eye witness accounts revealing his participation in the fight, plaintiff was issued an incident report accusing him of violating BOP Offense Code 201, which prohibits fighting with another person.  Magnusson Decl. (Dkt. No. 34-3) ¶ 8 and Exh. F.  A disciplinary hearing addressed to the charges, held on August 10, 2006, resulted in a finding of guilt and the imposition of a penalty including thirty days of disciplinary segregation, disallowance of twenty-seven days of good conduct time, and a one hundred and eighty-day restriction on visitation and commissary privileges.  *Id.*  The hearing officer further recommended a disciplinary transfer of Cousin to another facility. *Id.*

Following the incident FCI Ray Brook Superintendent T.R. Craig, a defendant in the action, requested in writing that BOP officials authorize a transfer of the plaintiff to the SMU at USP Lewisburg.  Magnusson Decl. (Dkt. No. 34-3) Exh. D.  In that unit inmates involved in gang activities or other similar conduct participate in a remedial program designed to address behavior modification and permit participants to function successfully in a general population prison setting.  *Id.* ¶ 10, n. 2 and Exh. N.  The program includes self-study as well as individual and group

activities, and the inmate is assigned a unit team that consists of a counselor, case manager, and unit manager. *Id.* After citing plaintiff's prior disciplinary history, including actions in 2003 and 2006 for fighting, Warden Craig requested that plaintiff "be transferred from [FCI Ray Brook] to a facility where he can function in general population without fear of reprisal", adding a specific request that he be transferred to the SMU program at USP Lewisburg. Magnusson Decl. (Dkt. No. 34-3) Exh. D. Plaintiff was subsequently transferred to USP Lewisburg on October 27, 2006, where he remained until October 30, 2007, when he was transferred to the Federal Correctional Institution at Schuylkill, Pennsylvania. Magnusson Decl. (Dkt. No. 34-3) ¶ 10 and Exh. C.

On or about June 27, 2007, plaintiff availed himself of the BOP internal administrative grievance process by filing a Request for Administrative Remedy, designated as No. 457490-F1, challenging his transfer. Magnusson Decl. (Dkt. No. 34-3) ¶ 12 and Exh. I. That request was denied in writing on July 5, 2007 by Assistant USP Lewisburg Warden Frank Strada, a named defendant, who noted, in pertinent part, the following rationale for his decision:

> Your placement into [the SMU] program was based on a transfer referral submitted by staff at FCI, Ray

> Brook, New York.  Staff at FCI Ray Brook indicated
> that you were involved in a large scale disturbance
> that involved approximately 75 inmates in the
> gymnasium area.  This disturbance involved
> inmates from the Albany, New York area against
> inmates from the Philadelphia, Pennsylvania area.
> You were specifically identified as a participant in
> the disturbance by staff and video surveillance with
> [sic] being involved in a fight with another inmate.
> This disturbance dangered  both staff and inmates
> and resulted in an institutional lock-down.
> Therefore, based upon your active participation in
> a large scale disturbance at FCI, Ray Brook, your
> placement in the SMU Program is appropriate and
> warranted.

*Id.,* Exh I.  Despite being due by July 25, 2007, Cousin did not pursue an

appeal of that grievance denial until August 13, 2007, when he submitted

a Regional Administrative Remedy Appeal No. 457490-RI to the Regional

Director.  *Id.* ¶ 13 and Exh. H.  That appeal was rejected as untimely,

however, and plaintiff was instructed that he should submit a written

verification from staff indicating that the untimeliness of his administrative

appeal was not due to his fault.  *Id.*

  While confined at FCI Schuylkill plaintiff again challenged his

transfer to the SMU at USP Lewisburg by filing Request for Administrative

Remedy No. 479634-F1 on January 15, 2008.  Magnusson Decl. (Dkt. No.

34-3) ¶ 14 and Exh. J.  Following the denial of that grievance, on January

23, 2008 plaintiff filed Request for Administrative Remedy No. 480052-F1, alleging that officials at USP Lewisburg intentionally withheld his appeal from the denial of No. 457490-F1 until after the time to seek review had expired, causing the appeal to be rejected as untimely.  *Id.* ¶ 15 and Exh. K.  Plaintiff appealed the denial of that request by the filing of Regional Administrative Remedy Appeal No. 480052-R1.  *Id.* ¶ 16 and Exh. L.  That appeal, which was also unsuccessful, was followed by a request by the plaintiff for review of the Regional Director's decision to the General Counsel in the form of Central Office Administrative Remedy Appeal No. 479634-A2; that appeal was similarly unsuccessful.  *Id.* ¶ 17 and Exh. M.

II.    <u>PROCEDURAL HISTORY</u>

Plaintiff commenced this action in the United States District Court for the Eastern District of Pennsylvania on or about July 2, 2008, asserting a civil rights claim pursuant to *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388, 91 S.Ct. 1999 (1971) (allowing claims for damages by those alleged to be the victims of constitutional violations committed by federal employees).  Plaintiff's complaint, which appears to set forth a single cause of action for deprivation of a liberty interest without procedural due process, names as defendants FCI Ray

Brook Warden Timothy Craig; USP Lewisburg Warden Troy Williamson;

USP Lewisburg Assistant Warden Frank Strada; and USP Lewisburg

Warden Eric Bradley, as well as an unnamed assistant warden and

captain, both allegedly stationed at FCI Ray Brook "from 2006". *Id.* The

case was subsequently ordered transferred to this district, pursuant to 28

U.S.C. § 1404(a), by order issued by District Judge Norman L. Shapiro on

August 4, 2008. Dkt. No. 4.

In response to plaintiff's complaint, which has not yet been

answered, by motion filed on April 30, 2009 the defendants seek summary

judgment dismissing plaintiff's claim.[2] Dkt. No. 34. In support of their

motion defendants argue that 1) plaintiff's claim is procedurally barred for

failure to exhaust available administrative remedies; 2) plaintiff's

procedural due process claim lacks merit because he has failed to

establish the deprivation of a cognizable liberty interest; 3) plaintiff's

---

[2]     Unlike its Rule 12(b) dismissal motion counterpart, a summary judgment motion does not have the affect of automatically staying the requirement of answering a plaintiff's complaint. *Compare* Fed. R. Civ. P. 12(b)(6) with Fed. R. Civ. P. 56. Despite the lack of a specific rule recognizing such a stay, some courts have deemed the interposition of a pre-answer summary judgment motion as an act of defending in the case, negating a finding of a default, while others have not. *Compare Rashidi v. Albright,* 818 F. Supp. 1354, 1355-56 (D. Nev. 1993) *with* Poe V. Cristina Copper Mines, Inc., 15 F.R.D. 85, 87 (D. Del. 1953). In this instance, exercising my discretion, I will *sua sponte* order a stay of defendants' time to answer plaintiff's complaint until twenty days after a final determination is issued with respect to defendants' motion, in the event that the action survives. *See Snyder v. Goord,* 9:05-CV-01284, 2007 WL 957530, at * 5 (N.D.N.Y. Mar. 29, 2007) (McAvoy, S. J. and Peebles, M. J.).

claims against defendants Williamson, Strada, and Bradley are subject to dismissal based upon lack of personal jurisdiction; and 4) in any event the defendants are entitled to qualified immunity from suit. *Id.* Plaintiff has since responded in opposition to defendants' motion, submitting both a declaration with supporting exhibits and a memorandum of law. Dkt. No. 37.

Defendants' motion, which is now fully briefed and ripe for determination has been referred to me for the issuance of a report and recommendation, pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c). *See* Fed. R. Civ. P. 72(b).

III.   DISCUSSION

    A.   Plaintiff's Failure To File A Local Rule 7.1(a)(3) Responsive Statement

In support of their motion defendants properly filed with the court a statement of material facts alleged not to be in dispute as required by Northern District of New York Local Rule 7.1(a)(3). That rule imposes a corresponding requirement upon a party who, like the plaintiff, opposes a summary judgment motion, providing that

> [t]he opposing party shall file a response to the
> Statement of Material Facts. The non-movant's response shall
> mirror the movant's Statement of Material Facts by admitting

and/or denying each of the movant's assertions in matching numbered paragraphs.  Each denial shall set forth a specific citation to the record where the factual issue arises.  The non-movant's response may also set forth any additional material facts that the non-movant contends are in dispute in separately numbered paragraphs.  <u>The Court shall deem admitted any facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert.</u>

N.D.N.Y.L.R. 7.1(a)(3) (emphasis in original).

In opposing defendants' motion plaintiff did not submit the responding statement required by Local Rule 7.1(a)(3).  For purposes of this report I have therefore assumed the truth of each of the statements set forth in defendants' statement of material facts when making my recommendations to the assigned district judge.  *See*, *e.g.*, *Elgamil v. Syracuse Univ.*, No. 99-CV-611, 2000 WL 1264122, at *1 (Aug. 22, 2000) (McCurn, S.J.) (listing cases); *see also Monahan v. New York City Dep't of Corr.*, 214 F.3d 275, 292 (2d Cir. 2000) (discussing district courts' discretion to adopt local rules like 7.1(a)(3)).[3,4]

---

[3]     As to those facts not contained in the defendants' Local Rule 7.1(a)(3) statements, I assume for purposes of this motion that plaintiff's version of those facts is true, as plaintiff is entitled to the benefit of all inferences at this stage.  *Wright v. Coughlin*, 132 F.3d 133, 137 (2d Cir. 1998).

[4]     Copies of all unreported decisions cited in this document have been appended for the convenience of the *pro se* plaintiff.

B.    Summary Judgment Standard

Summary judgment motions are governed by Rule 56 of the Federal

Rules of Civil Procedure.  Under that provision,  summary judgment is

warranted when "the pleadings, the discovery and disclosure materials on

file, and any affidavits show that there is no genuine issue as to any

material fact and that the movant is entitled to judgment as a matter of

law."  Fed. R. Civ. P. 56(c); *see Celotex Corp. v. Catrett*, 477 U.S. 317,

322, 106 S. Ct. 2548, 2552 (1986); *Anderson v. Liberty Lobby, Inc.*, 477

U.S. 242, 247, 106 S. Ct. 2505, 2509-10 (1986); *Security Ins. Co. of*

*Hartford v. Old Dominion Freight Line, Inc.*, 391 F.3d 77, 82-83 (2d Cir.

2004).  A fact is "material", for purposes of this inquiry, if it "might affect

the outcome of the suit under the governing law."  *Anderson*, 477 U.S. at

248, 106 S. Ct. at 2510; *see also Jeffreys v. City of New York*, 426 F.3d

549, 553 (2d Cir. 2005) (citing *Anderson*).  A material fact is genuinely in

dispute "if the evidence is such that a reasonable jury could return a

verdict for the nonmoving party."  *Anderson*, 477 U.S. at 248, 106 S. Ct. at

2510.

A party moving for summary judgment bears an initial burden of

demonstrating that there is no genuine dispute of material fact to be

decided with respect to any essential element of the claim in issue; the failure to meet this burden warrants denial of the motion.  *Anderson*, 477 U.S. at 250 n.4, 106 S. Ct. at 2511 n.4; *Security Ins.*, 391 F.3d at 83.  In the event this initial burden is met, the opposing party must show, through affidavits or otherwise, that there is a material issue of fact for trial.  Fed. R. Civ. P. 56(e); *Celotex*, 477 U.S. at 324, 106 S. Ct. at 2553; *Anderson*, 477 U.S. at 250, 106 S. Ct. at 2511.  Though *pro se* plaintiffs are entitled to special latitude when defending against summary judgment motions, they must establish more than mere "metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S. Ct. 1348, 1356 (1986); *but see Vital v. Interfaith Med. Ctr.*, 168 F.3d 615, 620-21 (2d Cir. 1999) (noting obligation of court to consider whether *pro se* plaintiff understood nature of summary judgment process).

When deciding a summary judgment motion, a court must resolve any ambiguities and draw all inferences from the facts in a light most favorable to the nonmoving party.  *Jeffreys*, 426 F.3d at 553; *Wright v. Coughlin*, 132 F.3d 133, 137-38 (2d Cir. 1998).  The entry of summary judgment is warranted only in the event of a finding that no reasonable

trier of fact could rule in favor of the non-moving party.  *See Building Trades Employers' Educ. Ass'n v. McGowan*, 311 F.3d 501, 507-08 (2d Cir. 2002) (citation omitted); *see also Anderson,* 477 U.S. at 250, 106 S. Ct. at 2511 (summary judgment is appropriate only when "there can be but one reasonable conclusion as to the verdict").

C.    Exhaustion of Remedies

As a threshold matter, defendants assert that plaintiff's due process claim is barred because he failed to meet the procedural requirement that he fully exhaust available administrative remedies before commencing suit.  In opposition plaintiff argues that his failure to complete the BOP grievance process was the result prison officials' delay in forwarding his administrative appeal to the appropriate recipient.

The Prison Litigation Reform Act of 1996 ("PLRA"), Pub. L. No. 104-134, 110 Stat. 1321 (1996), which imposes several restrictions on the ability of prisoners to maintain federal civil rights actions, expressly requires that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."  42 U.S.C. §

1997e(a); *see Woodford v. Ngo,* 548 U.S. 81, 84, 126 S. Ct. 2378, 2382 (2006); *Hargrove v. Riley,* No. CV-04-4587, 2007 WL 389003, at *5-6 (E.D.N.Y. Jan. 31, 2007).  "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong."  *Porter v. Nussle*, 534 U.S. 516, 532, 122 S. Ct. 983, 992 (2002) (citation omitted).

The failure of a prisoner to satisfy the PLRA's exhaustion requirement is not jurisdictional, but instead gives rise to a defense which must affirmatively be raised by a defendant in response to an inmate suit. *Jones v. Block*, 549 U.S. 199*, 212,* 127 S. Ct. 910, 919 (2007).  In the event a defendant named in such an action establishes that the inmate plaintiff failed properly to exhaust available remedies prior to commencing the action, his or her complaint is subject to dismissal.  *See Pettus v. McCoy*, No. 04-CV-0471, 2006 WL 2639369, at *1 (N.D.N.Y. Sept. 13, 2006) (McAvoy, J.); *see also Woodford*, 548 U.S. at 94-95, 126 S. Ct. at 2387-88 (holding that the PLRA requires "proper exhaustion" of available remedies).  "Proper exhaustion" requires a plaintiff to procedurally exhaust his or her claims by "compl[ying] with the system's critical procedural

rules." *Woodford*, 548 U.S. at 95, 126 S. Ct. at 2388; *see also Macias v. Zenk*, 495 F.3d 37, 43 (2d Cir. 2007) (citing *Woodford*).[5]

In a series of decisions rendered since the enactment of the PLRA, the Second Circuit has crafted a three-part test for determining whether dismissal of an inmate plaintiff's complaint is warranted for failure to satisfy the PLRA's exhaustion requirement.[6] *Macias*, 495 F.3d at 41; *see Hemphill v. New York*, 380 F.3d 680, 686 (2d Cir. 2004). Under the prescribed algorythm, a court must first determine whether administrative remedies were available to the plaintiff at the relevant times. *Macias*, 495 F.3d at 41; *Hemphill*, 380 F.3d at 686. If such a remedy existed and was available, the court must next examine whether the defendants have forfeited the affirmative defense of non-exhaustion by failing to properly raise or preserve it or whether, through their own actions preventing the exhaustion of plaintiff's remedies, they should be estopped from asserting

---

[5]     While placing prison officials on notice of a grievance through less formal channels may constitute claim exhaustion "in a substantive sense", an inmate plaintiff nonetheless must meet the procedural requirement of exhausting his or her available administrative remedies within the appropriate grievance construct in order to satisfy the PLRA. *Macias*, 495 F.3d at 43 (quoting *Johnson v. Testman*, 380 F.3d 691, 697-98 (2d Cir. 2004) (emphasis omitted).

[6]     Whether the *Hemphill* test survives following the Supreme Court's decision in *Woodford*, has been a matter of some speculation, *see, e.g.*, *Newman v. Duncan*, NO. 04-CV-395, 2007 WL 2847304, at * 2 n.4 (N.D.N.Y. Sept. 26, 2007) (McAvoy, S.J. and Homer, M.J.), but has yet to be determined by the Second Circuit.

failure to exhaust as a defense.  *Macias*, 495 F.3d at 41; *Hemphill*, 380

F.3d at 686.  In the event the proffered defense survives these first two

levels of scrutiny, the court lastly must examine whether special

circumstances nonetheless exist and "have been plausibly alleged" to

justify the plaintiff's failure to comply with the applicable administrative

procedural requirements.[7]  *Macias*, 495 F.3d at 41; *Hemphill*, 380 F.3d at

686.

### 1.   Availability of Remedy

As a federal prison inmate, plaintiff had available to him a three-

tiered internal administrative grievance system adopted by the BOP, for

the stated purpose of "allow[ing] an inmate to seek formal review of an

issue relating to any aspect of his/her own confinement.  *Macias*, F.3d at

42 (citing 28 C.F.R. § 542.10).  The established protocol requires first that

an inmate formally report his or her complaint to staff at the appropriate

facility to attempt informal resolution and, if not successful, to follow that

with the submission of a written remedy request to the prison warden.  28

C.F.R. § 542.13-15; *see also Johnson v. Testman,* 380 F.3d 691, 693 (2d

---

[7]      In practicality these three prongs of the prescribed test, though perhaps
intellectually distinct, plainly admit of significant overlap.  *See Hargrove v. Riley,* No.
CV-04-4587, 2007 WL 389003, at *8 n.14 (E.D.N.Y. Jan. 31, 2007); *see also Giano v.
Goord*, 380 F.3d 670, 677 n.6 (2d Cir. 2004).

Cir. 2004).  The third tier of the process is completed through the filing of
appeals to the appropriate Regional Director and, if not satisfied with the
response, then to the General Counsel.  *Macias*, F.3d at 42 (citing
*Johnson*, 380 F.3d at 693).  Only upon completion of all three steps in the
process does a federal inmate fully exhaust available administrative
remedies.  *Id.* at 44; *see also Strong v. Lapin*, No. 90-CV-3522, 2010 WL
276206, at * 4 (E.D.N.Y. 2010) ("Until the BOP's Central Office considers
the appeal, no administrative remedy is considered to be fully
exhausted.").

Despite these provisions allowing for pursuit of an administrative
grievance, there are circumstances under which the grievance procedure
nonetheless may be deemed unavailable to an inmate plaintiff.  *See
Hemphill*, 380 F.3d at 687-88.  Thus, for example, "[e]xhaustion may be
considered unavailable in situations where plaintiff is unaware of the
grievance procedures or did not understand it, . . . or where defendants'
behavior prevents plaintiff from seeking administrative remedies."
*Hargrove,* 2007 WL 389003, at *8 (citations omitted) (noting, for example,
that a defendant's failure to advance plaintiff's grievances or the issuance
of threats against an inmate to deter the filing of a grievance may

effectively render the administrative process unavailable).  When testing

the availability of administrative remedies in the face of claims that undue

influence from prison workers has caused a plaintiff inmate to forego the

formal grievance process, courts employ an objective test, examining

whether "a similarly situated individual of ordinary firmness [would] have

deemed them available."  *Id.* at 688 (quotations and citations omitted); *see*

*Hargrove,* 2007 WL 389003, at *8.

### 2.    Presentation of Defense/Estoppel

The second prong of the *Hemphill* analysis focuses upon "whether

the defendants may have forfeited the affirmative defense of non-

exhaustion by failing to raise or preserve it, or whether the defendants'

own actions inhibiting the inmate's exhaustion of remedies may estop one

or more of the defendants from raising the plaintiff's failure to exhaust as a

defense."  *Hemphill,* 380 F.3d at 686 (citations omitted).

### 3.    Special Circumstances

The third, catchall factor to be considered under the Second

Circuit's prescribed exhaustion rubric focuses upon whether special

circumstances have been plausibly alleged which, if demonstrated, would

justify excusing a plaintiff's failure to exhaust administrative remedies.

*Hemphill,* 380 F.3d at 689; *see also Giano v. Goord,* 380 F.3d 670, 676-77 (2d Cir. 2004); *Hargrove,* 2007 WL 389003, at *10.  Among the circumstances potentially qualifying as "special" under this prong of the test include where a plaintiff's reasonable interpretation of applicable regulations regarding the grievance process differs from that of prison officials and leads him or her to conclude that the dispute is not grievable. *Giano*, 380 F.3d at 676-77; *see also Hargrove,* 2007 WL 389003, at *10 (quoting and citing *Giano*).

        In this instance plaintiff does not dispute the fact that the first grievance filed challenging his transfer into the SMU at USP Lewisburg was not pursued to completion through all three tiers of the BOP remedial system.  As was previously noted, however, plaintiff attributes his failure to file a timely appeal of the warden's unfavorable determination with the appropriate Regional Director to the conduct of prison workers at USP Lewisburg.  While prison officials assert that plaintiff's request for review was not filed until August 13, 2007, Cousin claims to have given that document to a Mr. Reeves, a prison official with an unidentified title at USP Lewisburg, on July 12, 2007 for mailing.[8]  *See* Cousin Decl. (Dkt. No.

---

        [8]        The date listed on the court's copy of the regional administrative remedy appeal is obscured, and I am therefore unable to determine whether it supports

37-1) ¶ B.

Under these circumstances, a material issue of fact exists which must be resolved before the court can determine whether defendants should be estopped from asserting failure to exhaust as an affirmative defense, based upon their interference with the grievance process.  *See Hemphill,* 380 F.3d at 686.  I therefore recommend against dismissal of plaintiff's complaint at this juncture on the basis of failure to exhaust available remedies.

### D.   Merits Of Procedural Due Process Claim

Plaintiff's complaint does not challenge the adequacy of the procedures leading up to the finding that he violated prison rules by engaging in fighting with one or more other inmates nor does he challenge the resulting penalty, which included thirty days of disciplinary segregation.  Instead, plaintiff's complaint centers upon his subsequent transfer to the SMU at USP Lewisburg, arguing that the transfer amounted to an additional disciplinary sanction that was "'disproportionate' to the offense committed'", "very unusually and extremely harsh" and "atypical" of sanctions imposed for the offense that he was found to have

———————————————

plaintiff's version of the relevant chronology.  *See* Cousin Decl. (Dkt. No. 37-1) Exh. A.

committed.  Complaint (Dkt. No. 1) § IV.  Defendants contend that the claim should be summarily dismissed because plaintiff has no cognizable liberty interest in avoiding transfer to SMU.

To successfully state a claim under 42 U.S.C. § 1983 for the denial of procedural due process, a prison inmate must show that he or she 1) possessed an actual liberty interest, and 2) was deprived of that interest without being afforded sufficient process.  *See Tellier v. Fields*, 280 F.3d 69, 79-80 (2d Cir. 2000) (citations omitted); *Hynes v. Squillace*, 143 F.3d 653, 658 (2d Cir. 1998); *Bedoya v. Coughlin*, 91 F.3d 349, 351-52 (2d Cir. 1996).   If a plaintiff fails to establish the deprivation of a cognizable liberty interest the inquiry ends, and the court need not address the procedural safeguards that accompanied that alleged deprivation.  *Giano v. Kelly*, No. 89-CV-727, 2000 WL 876855, at * 2 (W.D.N.Y. 2000).

### 1.   Liberty Interest

A prison inmate's liberty interest may arise out of the Due Process Clause of the Fourteenth Amendment, or by virtue of a statute or regulation.  *Arce v. Walker*, 139 F.3d 329, 333 (2d Cir. 1998) (citing *Kentucky Dep't of Corr. v. Thompson*, 490 U.S. 454, 460, 109 S.Ct. 1904, 1908 (1989)).  Recognizing that lawful imprisonment necessarily restricts

the rights and privileges of inmates, the Supreme Court has narrowly circumscribed the scope of liberty interests arising out of the Due Process clause to protect only the most basic liberty interests of prisoners. *Hewitt v. Helms*, 459 U.S. 460, 467, 103 S.Ct. 864, 869 (1983). Accordingly, the Due Process Clause does not guard against every change in the conditions of confinement having a substantial adverse impact on inmates, but only those conditions or restraints that "exceed[ ] the sentence in . . . an unexpected manner." *Arce*, 139 F.3d at 333 (quoting *Sandin v. Conner*, 515 U.S. 472, 484, 115 S.Ct. 2293, 2300 (1995)).

The liberty interest analysis in this case begins with the settled principle that a prison inmate has no liberty interest in serving a sentence at a particular location. *Halloway v. Goord*, No. 9:03-CV-01524, 2007 WL 2789499, at * 5 (N.D.N.Y. Sept. 24, 2007) (Kahn, J. and Treece, J.) (citing *Wilkinson v. Austin*, 545 U.S. 209, 221-22 (2005)) (other citation omitted); *see also*, *Johnson v. Rowley*, 569 F.3d 40, 43 (2d Cir. 2009) (per curiam); *Davis v. Kelly*, 160 F.3d 917, 920 (2d Cir. 1998). Nor do prison inmates have any liberty interest in a particular classification. *Green v. Armstrong*, 189 F.3d 460, *Moody v. Daggett*, 429 U.S. 78, 88 n.9, 97 S. Ct. 274, 279 n.9 ( 1976); *see also, Pugliese v. Nelson*, 617 F.2d 916, 923 (2d Cir.

1980).  By statute, BOP officials retain the right to designate where a

federal prisoner will serve his or her sentence and the security level of the

facility at which that will occur.  18 U.S.C. § 3621(b); *see Fournier v.*

*Zickefoose*, 620 F. Supp.2d 313, 318 (D. Conn. 2009).

    In his complaint plaintiff alleges that his transfer into an SMU was

punitive in nature and was not preceded by the requisite due process.

Defendants' position in this regard is not entirely clear.  While admitting

that plaintiff's move was precipitated by the disciplinary action, defendants

also assert that plaintiff's SMU confinement was for administrative

reasons and was nonpunitive.  The record before the court establishes

that after conducting a disciplinary hearing and determining that plaintiff

was guilty of fighting, in addition to the disciplinary sentence imposed the

hearing officer recommended plaintiff's transfer.  *Id.*  Following this

recommendation, the warden at FCI Ray Brook requested approval from

the regional direct to transfer plaintiff to SMU, citing not only his

involvement in the "bench clearing brawl" and prior disciplinary history but

also stating that the transfer was being requested so "[Cousin] can

function in general population without fear of reprisal."  Magnusson Decl.

(Dkt. No. 34-3) Ex. D.  The undisputed evidence, therefore, establishes

that plaintiff's transfer was, at least in part, motivated by administrative

concerns.[9]

As the Second Circuit has observed,

The line between civil and criminal sanctions is often hard to draw, and this is nowhere more true than in the context of prisons, where the punitive character of the environment may make even purely regulatory sanctions appear punitive in nature. The need to maintain order, however, is a legitimate nonpunitive interest, even if it sometimes requires that prison officials take action of a punitive character.

*Porter v. Couglin*, 421, 141, 148 (2d Cir. 2005).  Accordingly, "[w]here a

prisoner's placement in restrictive confinement has both a punitive and an

administrative, non-punitive basis, the placement decision will not be

found to have impaired a protected liberty interest."  *Rosenberg v. Meese*,

622 F. Supp. 1451, 1468-69 (S.D.N.Y. 1985) (citing *Sher v. Coughlin*, 739

F.2d 77, 81-82 (2d Cir. 1984)) (other citations omitted).

Here, even if plaintiff's transfer to SMU was punitive, it is was also

clearly driven by safety and security concerns.  Under these

circumstances, plaintiff has failed to allege a cognizable liberty interest.[10]

---

[9]     Federal regulations expressly permit administrative detention "when an inmate's continued presence in the general population poses a serious threat to life, property, self, staff, or other inmates or to the security or orderly running of the institution . . . ."  28 C.F.R. § 541.22(a).

[10]     Under *Sandin* and its progeny, "[a] prisoner's liberty interest is implicated by prison discipline, such as [special housing unit] confinement, only if the discipline

2.    Procedural Protections

Even assuming that plaintiff were able to prove the deprivation of a

cognizable liberty interest, his procedural due process claim would

nonetheless fail because, based on the record now before the court, it is

clear that he was afforded ample due process.  The procedural

protections to which a prison inmate is entitled before being deprived of a

constitutionally cognizable liberty interest are both modest and well-

established, the contours of the required protections having been

articulated in *Wolff v. McDonnell*, 418 U.S. 539, 563-67, 94 S.Ct. 2963,

2978-80 (1974).  Under *Wolff*, the constitutionally mandated due process

requirements include 1) written notice of the charges; 2) the opportunity to

──────────────────

'imposes [and] atypical and significant hardship on the inmate in relation to the
ordinary incidents of prison life,' . . .."  *Palmer v. Richards,* 364 F.3d 60, 64 (2d Cir.
2004) (quoting *Sandin*, 515 U.S. at 484, 115 S. Ct. at 2300) (alteration in original).  In
order to establish his due process claim plaintiff retains the burden of demonstrating
that while in the SMU at USP Lewisburg he was exposed to an "atypical and significant
hardship" as compared to prisoners in general population.  *Taylor v. Rodriguez*, 282
F.3d 188, 198 (2d Cir. 2001).  That determination is exceedingly fact-specific, requiring
the court to identify the conditions experienced by the plaintiff and compare them with
those existing in general population.  *Davis v. Barrett*, 576 F.3d 129, 134-135 (2d Cir.
2009).  In this instance plaintiff has failed to carry this burden.  Neither plaintiff's
complaint nor his papers in opposition to defendants' motion allege any facts
suggesting that the conditions that he experienced while in the SMU program differed
materially from those to which prisoners in the general population were exposed.
Moreover, a review of limited relevant materials available in the record, including an
SMU inmate handbook applicable to USP Lewisburg, *see* Magnusson Decl. (Dkt. No.
34-3) Exh. N, fails to disclose any such conditions.

appear at a disciplinary hearing and present witnesses and evidence,

subject to legitimate safety and penological concerns; 3) a written

statement by the hearing officer explaining his or her decision and the

reasons for the action being taken; and 4) in some circumstances, the

right to assistance in preparing a defense.  *Wolff*, 418 U.S. at 564-70, 94

S.Ct. at 2978-83.  In order to pass muster under the Fourteenth

Amendment, a hearing officer's disciplinary determination must garner the

support of at least "some evidence".[11]  *Superintendent v. Hill*, 472 U.S.

445, 105 S.Ct. 2768 (1985).

The record establishes that plaintiff received a copy of the incident

report setting forth the charges against him on August 3, 2006, in advance

of the hearing.  Defendants' Statement of Material Facts (Dkt. No. 34-2);

*see also* Magnusson Decl. (Dkt. No. 34-3) Exhs. D and F.  A hearing was

held on August 10, 2006.  Defendants' Statement of Material Facts (Dkt.

---

[11]     The "some evidence" standard under *Hill* has been described as considerably tolerant.  *See Friedl v. City of New York,* 210 F.3d 79, 85 (2d Cir. 2000). To be sure, the Fourteenth Amendment requires that at least some "reliable evidence" be contained in the record supporting the hearing officer's determination.  *Sira v. Morton,* 380 F.3d 57, 69 (2d Cir. 2004) (*quoting*, *inter alia*, *Luna v. Pico*, 356 F.3d 356, 488 (2d Cir. 2004)).  Based upon the court's review of the hearing transcript, and in particular plaintiff's admissions during the hearing, I conclude that no reasonable factfinder could determine that the hearing officer's conclusion was not based upon "some evidence".

No. 34-2); *see also* Magnusson Decl. (Dkt. No. 34-3) Exhs. D and F.  At the hearing plaintiff was advised of his rights, he denied the charges, and opted to proceed without a staff representative after being advised that he was entitled have one present.  Magnusson Decl. (Dkt. No. 34-3) Exhs. F. Another inmate testified at the hearing, and, although he was given the opportunity to do so, Cousin declined to call his own witnesses.  *Id.*  The hearing officer's determination of guilt of the charges was supported by at least some evidence; it was based upon the incident report, an additional eye witness account that plaintiff punched and kicked another inmate, plaintiff's refusal to provide a statement to the investigating officer, and a videotape of the melee.  *Id.*  The hearing officer's written report detailed what occurred at the hearing as well as the basis for his determination and the penalty imposed.  In addition, the hearing officer specifically noted that fighting "threatens the security and orderly running of the institution. . . [as well as] the safety of both staff and inmates alike" and advised plaintiff, "[b]ased upon your actions, the [disciplinary hearing officer] finds that you are no longer suitable for this compound and recommends a Disciplinary Transfer to a more appropriate facility."  *Id.*  A copy of the hearing officer's report was delivered to Cousin on the day after the hearing.  As these

27

facts demonstrate, the procedures that were provided were thus adequate to afford plaintiff the minimal process to which he was entitled.

In view of the foregoing, I find that plaintiff has failed to sufficiently allege the deprivation of defendants of a cognizable liberty interest, and further that even if he had he was provided with the minimal due process to which he was entitled.  I therefore recommend dismissal of plaintiff's complaint as a matter of law.

IV.    SUMMARY AND RECOMMENDATION

As a result of a large scale prison fight in which he was found to have participated, following a disciplinary proceeding, plaintiff was transferred out of FCI Ray Brook and into an SMU program at USP Lewisburg.  The record reflects that the transfer was the result of plaintiff's participation in the altercation as well as his prior disciplinary record and that his placement into the SMU program was calculated by prison officials to result in a modification in his behavior to a point where he could be returned into a general prison population setting without further incident.  Even assuming that the transfer was, in part, disciplinary in nature, in keeping with well established principle that a prison inmate has no liberty interest in a particular security classification or placement in a

particular prison facility, I conclude that the transfer into the SMU program did not implicate a cognizable liberty interest deprivation.  I further find that irrespective of whether plaintiff was deprived of a constitutionally significant liberty interest, he was provided with the minimal due process guaranteed under the Fourteenth Amendment.  Accordingly, I recommend dismissal of plaintiff's procedural due process claim as a matter of law.[12] Based upon the foregoing, it is hereby respectfully

RECOMMENDED that defendants' summary judgment motion (Dkt. No. 34) be granted and that plaintiff's claims in this action be dismissed in all respects.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report.  Such objections must be filed with the Clerk of the Court within FOURTEEN days of service of this report.  FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P.  6(a), 6(d), 72; *Roldan v. Racette,* 984 F.2d 85 (2d Cir. 1993).

It is hereby ORDERED that the clerk of the court serve a copy of this

---

[12]     In light of that recommendation I find it unnecessary to address plaintiff's additional arguments, including lack of personal jurisdiction and qualified immunity.

report and recommendation upon the parties in accordance with this

court's local rules.

David E. Peebles
U.S. Magistrate Judge

Dated:      February 25, 2010
            Syracuse, NY



Not Reported in F.Supp.2d, 2007 WL 957530 (N.D.N.Y.)
(Cite as: 2007 WL 957530 (N.D.N.Y.))

Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
Shawn Michael SNYDER, Plaintiff,
v.
Glenn S. GOORD, et al., Defendants.
**Civil Action No. 9: 05-CV-01284.**

March 29, 2007.

Shawn Michael Snyder, Pro Se.

Hon. Andrew M. Cuomo, Attorney General of the State of New York, Christopher W. Hall, Esq., Assistant Attorney General, of counsel, Albany, NY, for Defendants.

**DECISION & ORDER**

THOMAS J. McAVOY, Senior United States District Judge.

**\*1** This *pro se* action brought pursuant to 42 U.S.C. § 1983 was referred by this Court to the Hon. David E. Peebles, United States Magistrate Judge, for a Report-Recommendation pursuant to 28 U.S.C. § 636(b) and Local Rule N.D.N.Y. 72.3(c). The Report, Recommendation and Order dated February 27, 2007 recommended

that defendants' motion for summary judgment dismissing plaintiff's complaint (Dkt. No. 20) be GRANTED, in part, and that plaintiff's legal mail claim be DISMISSED in its entirety, and further that all remaining claims be DISMISSED as against defendants Goord, Roy, Plescia and Miller, but that it otherwise be

DENIED, and that the matter proceed with regard to plaintiff's constitutional claims against defendants Whittier and Funnye based upon events occurring at the Washington Correctional Facility.

Rep., Rec. & Ord., p. 33.

Plaintiff and Defendants have filed objections to the Report-Recommendation. When objections to a magistrate judge's Report-Recommendation are lodged, the Court reviews the record *de novo. See*28 U.S.C. § 636(b)(1). After such a review, the Court may "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate [judge]. The [Court] may also receive further evidence or recommit the matter to the magistrate [judge] with instructions." *Id.*

Having reviewed the record *de novo* and having considered the issues raised in the objections, this Court has determined to accept and adopt the recommendation of Magistrate Judge Peebles for the reasons stated in the February 28, 2007 Report-Recommendation with one modification as set forth below.

In this regard, it is hereby

**ORDERED** that Defendants' motion for summary judgment [dkt. No. 20] is **GRANTED in part and DENIED in part.** Plaintiff's legal mail claim is **DISMISSED in its entirety.** Further all remaining claims against Defendants Goord, Roy, Plescia and Miller are **DISMISSED.** The motion is denied with regard to Plaintiff's constitutional claims against Defendants Whittier and Funnye based upon events occurring at the Washington Correctional Facility, but Defendants are **granted leave to renew** the motion following a period of discovery. Accordingly, Defendants may assert in their renewed motion, should they decide to file one, that Plaintiff failed to exhaust his administrative remedies by failing to promptly file a grievance once at Groveland Correctional Facility.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 957530 (N.D.N.Y.)
(Cite as: 2007 WL 957530 (N.D.N.Y.))

**IT IS SO ORDERED.**

*REPORT, RECOMMENDATION AND ORDER*

DAVID E. PEEBLES, U.S. Magistrate Judge.

Plaintiff Shawn Michael Snyder, an openly gay New York State prison inmate who is proceeding *pro se* and *in forma pauperis,* has commenced this action pursuant to 42 U.S.C. § 1983 to complain principally of a series of occurrences which he attributes to his sexual orientation, including harassment by prison workers and fellow inmates and, in one instance, an assault by a corrections officer. Plaintiff's complaint, which is comprehensive, asserts constitutional claims under the First, Fourth, Eighth and Fourteenth Amendments arising out of those incidents as well as his apparently unsuccessful efforts to contact the National Gay and Lesbian Task Force to elicit that agency's assistance.

**\*2** In lieu of answering his complaint, defendants have instead moved for summary judgment dismissing plaintiff's claims based upon his failure to exhaust available administrative remedies before commencing suit and, in the case of some of the defendants and one entire claim, plaintiff's failure to allege and establish their personal involvement in the constitutional deprivations at issue. For the reasons set forth below I recommend that plaintiff's claims against defendants Goord, Roy, Miller and Plescia, as well as his cause of action for alleged interference with his legal mail, be dismissed on the basis of a lack of sufficient personal involvement in the constitutional violations alleged. Finding the existence of a genuine issue of material fact surrounding plaintiff's efforts to exhaust administrative remedies, however, I recommend that the portion of defendants' motion seeking dismissal of plaintiff's remaining claims on this procedural basis be denied.

I. *BACKGROUND*[FN1]

FN1. The vast majority of the information serving as a backdrop for the court's decision is drawn from plaintiff's complaint which, as notarized, qualifies as a functional equivalent of an affidavit for purposes of the pending motion. 28 U.S.C. § 1746 (1994); Fed.R.Civ.P. 56(e); *Franco v. Kelly,* 854 F.2d 584, 587 (2d Cir.1998) (citations omitted); *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir .1995); *Yearwood v. LoPiccolo,* No. 95 CIV. 2544, 1998 WL 474073, at \*5-\*6 & n. 2 (S.D.N.Y. Aug. 10, 1998); *Ketchmore v. Gamache,* No. 96 CIV. 3004, 1997 WL 250453, at \*4 n. 1 (S.D.N.Y. May 12, 1997). As required, for the purpose of analyzing defendants' arguments I have drawn all inferences, and resolved any ambiguities, in favor of the plaintiff, as the non-moving party. *See Schwapp v. Town of Avon,* 118 F.3d 106, 110 (2d Cir.1997).

Plaintiff, who at the times relevant to his claims was a prison inmate entrusted to the custody of the New York State Department of Correctional Services ("DOCS"), has over time been confined in various DOCS facilities. Complaint (Dkt. No. 2) at 2. The bulk of plaintiff's claims were precipitated by events which transpired while he was housed in the Washington Correctional Facility ("Washington") although, as will later be seen, certain of the occurrences which followed his transfer out of Washington and ultimately into the Groveland Correctional Facility ("Groveland") are relevant to some of his claims, as well as to the issue of whether he properly exhausted available administrative remedies before commencing his action. *Id.; see also* O'Brien Aff. (Dkt. No. 20) ¶ 4. The plaintiff is gay, a fact which according to him was common knowledge within Washington during the time of his confinement within that facility. Complaint (Dkt. No. 2) ¶ 2.

The circumstances giving rise to plaintiff's centerpiece claim date back to May of 2005, when he was transferred from another location within Washington into the prison's B-2 housing dormitory. Complaint (Dkt. No. 2) ¶ 1. Immediately following that transfer Snyder began to experience verbal threats and abuse, attributed by the plaintiff to his sexual orientation, at the hands of defendant Whittier, a corrections officer. *Id.* ¶ 1. According to

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 957530 (N.D.N.Y.)
(Cite as: 2007 WL 957530 (N.D.N.Y.))

Snyder the abuse spread, fueled by encouragement from defendant Whittier, resulting in harassment from fellow inmates, who engaged in a variety of abusive and hostile acts which included the throwing of trash, objects, debris and body fluids at him. *Id.* ¶¶ 2-27.

Defendant Whittier's ongoing harassment of the plaintiff led to a confrontation between the two on June 1, 2005, during the course of which Snyder was physically assaulted by the officer, who thrust his elbow and forearm into plaintiff's throat, forcing him to the floor. *Id.* ¶¶ 24-36. Once plaintiff was on the floor, defendant Whittier placed his knees on Snyder's middle back area and neck, and pulled his left arm up behind his back. *Id.* Toward the end of the encounter defendant Whittier pulled the plaintiff up by his arm and hair and dragged him out of the area, pushing him into a wall and punching his kidney area several times in the process. *Id.* ¶¶ 33-39.

**\*3** On June 3, 2005 plaintiff was treated for injuries sustained during the encounter with Corrections Officer Whittier, and was transferred into the E-1 dormitory within Washington. Complaint (Dkt. No. 2) ¶¶ 47, 51. While housed in that unit Snyder was approached and advised by several inmates that they had been encouraged by other inmates, as well as by defendant Whittier, to assault him. *Id.* ¶¶ 51-54.

Plaintiff was again transferred within Washington on or about June 20, 2005, on this occasion having been re-assigned to the D-1 housing dormitory. Complaint (Dkt. No. 2) ¶ 57. While residing within that unit, plaintiff had his locker broken into and some of his personal property stolen, an event for which he blames fellow inmates. *Id.* ¶¶ 70.

Out of concern over reprisals which could result from his taking such action, plaintiff did not file a formal grievance regarding the assault by Corrections Officer Whittier while at Washington. Complaint (Dkt. No. 2) ¶¶ 51-54. As justification for that fear, plaintiff cites defendant Whittier's reported efforts to have him harmed by other inmates following his transfer out of the dormitory to which Whittier was assigned. *Id.* Plaintiff did, however, take other steps while at Washington to lodge complaints

regarding defendant Whittier's actions. After earlier complaints registered verbally to other prison employees, including Corrections Officers Funnye and Graves, went unaddressed, *see* Complaint (Dkt. No. 2) ¶¶ 21, 42, plaintiff sent a letter dated July 7, 2005 to Corrections Lieutenant Greene, complaining of the assault by defendant Whittier and expressing fear of retribution at the hands of that corrections officer; a copy of that letter was forwarded by Snyder to Corrections Lieutenant Hopkins.[FN2] Complaint (Dkt. No. 2) ¶ 60 & Exh. 1. Five days later, apparently precipitated by his letter to Lieutenant Greene, plaintiff was asked by Corrections Sergeant Belden to provide a formal, written statement regarding the assault, and was taken by Sergeant Belden to the prison infirmary for a medical evaluation. Complaint (Dkt. No. 2) ¶ 61.

> **FN2.** Plaintiff's complaint does not provide specifics regarding the official positions of Lieutenants Greene and Hopkins including, notably, whether either could properly be characterized as Corrections Officer Whittier's supervisor, nor does he indicate whether those individuals were officially designated by prison officials at Washington to receive inmate complaints regarding the actions of corrections workers.

On July 14, 2005, plaintiff was transferred temporarily into the Great Meadow Correctional Facility, where he was interviewed on the following day by defendant Miller, an Assistant Deputy Inspector General for the DOCS, regarding the alleged assault by defendant Whittier. Complaint (Dkt. No. 2) ¶¶ 62-64. During that session, defendant Miller advised Snyder that he had been transferred out of Washington for his safety, and that in light of his sexual orientation and the significant probability that similar acts would recur in the future, his contemplated transfer into the Greene Correctional Facility had been rescinded, and instead he would be moved "West and closer to home [.]" *Id.* ¶ 66. Later that day, plaintiff was transferred into the Groveland Correctional Facility. *Id.* ¶ 67.

Plaintiff reiterated his interest in pursuing his claims against Corrections Officer Whittier by letter dated July

Not Reported in F.Supp.2d, 2007 WL 957530 (N.D.N.Y.)
(Cite as: 2007 WL 957530 (N.D.N.Y.))

22, 2005 sent to Investigator Miller. Complaint (Dkt. No. 2) Exh. 3. Despite sending subsequent written communications to defendant Miller and others, however, as of the time of commencement of this action plaintiff still had not been apprised of the status of the Inspector General's investigation into his allegations regarding Corrections Officer Whittier. *Id.* ¶¶ 67-69; *see also* Complaint (Dkt. No. 2) Exhs. 9, 17.

**\*4** On August 24, 2005, while at Groveland, plaintiff filed a formal grievance regarding the physical assault involving Corrections Officer Whittier. Complaint (Dkt. No. 2) ¶ 76 and p. 60, ¶ B. That grievance was rejected, however, based upon the fact that it was filed beyond the fourteen day deadline for initiating such grievances, and did not recite any mitigating circumstances which would provide a ground for overlooking its lateness. [FN3] *Id.; see also* O'Brien Aff. (Dkt. No. 20) ¶ 8 & Exh. 2; Defendants' Local Rule 7.1(a)(3) Statement (Dkt. No. 22) ¶ 27. Plaintiff did not appeal that determination, or any other grievance alleging harassment, excessive force, or any other similar claims arising out of events at Washington, to the Central Officer Review Committee ("CORC"). Eagan Aff. (Dkt. No. 20) ¶¶ 5-6.

> [FN3.] DOCS Directive 4040, which governs the filing of inmate grievances, permits an Inmate Grievance Program Supervisor ("IGPS") to permit the late filing of grievances when presented with "mitigating circumstances." *See* O'Brien Aff. (Dkt. No. 20) ¶ 12.

On August 19, 2005 plaintiff endeavored to send a letter to the National Gay and Lesbian Task Force seeking the assistance of that organization; claiming that it qualified as legal mail, Snyder attempted to forward that communication without paying for postage. Complaint (Dkt. No. 2) ¶ 71. Prison officials rejected plaintiff's efforts, however, concluding that the communication did not fall within the prevailing definition of legal mail, and returned it to the plaintiff on August 22, 2005. *Id.* Plaintiff thereafter resent the letter on August 23, 2005, with proper postage affixed. *Id.* ¶ 72. The letter was later returned to the plaintiff on September 2, 2005, marked as "undeliverable". *Id.* ¶ 73. When the letter was returned plaintiff found that it had been opened, apparently by

personnel within the Groveland mailroom. *Id.*

On August 29, 2005 plaintiff filed a grievance at Groveland seeking, as relief, a determination that the National Gay and Lesbian Task Force constituted a legal entity and that, as such, he should be permitted to send and receive correspondence from that organization as "legal mail". *Id.* ¶ 74 & Exh. 16. Plaintiff's grievance was denied at the local level, including by the facility superintendent, and that unfavorable determination was upheld on appeal to the CORC. *Id.* ¶ 75 & Exh. 16.

## II. *PROCEDURAL HISTORY*

Plaintiff commenced this action on or about September 27, 2005.[FN4] Dkt. No. 2. Named as defendants in Snyder's complaint are DOCS Commissioner Glenn S. Goord; Richard Roy, the DOCS Inspector General; Assistant Deputy Inspector General Mark Miller; James Plescia, the Superintendent at Washington; and Corrections Officers Whittier and Funnye. *Id.* Plaintiff's complaint asserts a variety of claims growing out of the events at Washington and Groveland, alleging deprivation of his rights under the First, Fourth, Eighth and Fourteenth Amendments to the United States Constitution, as well as a host of pendent state statutory and common law claims.[FN5] As relief, plaintiff seeks both the entry of an injunction and awards of compensatory and punitive damages.

> [FN4.] This action was initially filed in the United States District Court for the Western District of New York, but was transferred here by order issued by District Judge David G. Larimer on September 29, 2005. *See* Dkt. No. 4.

> [FN5.] Plaintiff's complaint, which is comprised of seventy-two typewritten pages and several attached exhibits, is not lacking in detail. Despite its refreshing clarity, however, plaintiff's complaint is in many respects repetitive and fails to comply with the governing provisions of the Federal Rules of Civil Procedure which require, *inter alia,* that a pleading contain "a short and plain statement of the claim showing that the

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 957530 (N.D.N.Y.)
(Cite as: 2007 WL 957530 (N.D.N.Y.))

pleader is entitled to relief[.]" Fed.R.Civ.P. 8(a). This requirement is more than merely technical, and instead is designed to permit a responding party and the court to accurately gauge the allegations of a complaint and permit the issues in a case to be properly framed. *Conley v. Gibson,* 355 U.S. 41, 47, 78 S.Ct. 99, 103 (1957); *Phillips v. Girdich,* 408 F.3d 124, 127-29 (2d Cir.2005); *Salahuddin v. Cuomo,* 861 F.2d 40, 42 (2d Cir.1988); *In re Ferro Corp. ERISA Litig.,* 422 F.Supp.2d 850, 857 (N.D.Ohio 2006); *Rashidi v. Albright,* 818 F.Supp. 1354, 1355-56 (D.Nev.1993).

**\*5** In lieu of answering plaintiff's complaint, defendants instead have chosen to interpose a motion seeking the entry of summary judgment. Dkt. No. 20. In that motion, which was filed on March 9, 2006, defendants assert that plaintiff's harassment and excessive force claims are procedurally barred based upon his failure to file and pursue to completion an internal grievance regarding those matters before commencing suit. *Id.* Defendants also argue that defendants Goord, Ray, Plescia, and Miller were not personally involved in any of the violations asserted, and that all of the defendants lack personal involvement with regard to plaintiff's legal mail cause of action. *Id.* Plaintiff responded in opposition to defendants' motion on April 12, 2006, Dkt. No. 23, and defendants have since filed a reply in further support of their motion. Dkt. No. 23.

Defendants' motion, which is now ripe for a determination, has been referred to me for the issuance of a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c). *See also* Fed.R.Civ.P. 72(b).

III. *DISCUSSION*

A. *Consequences of Defendants' Failure to Answer or Move to Dismiss*

While plaintiff has not raised this issue, one could argue that by their failure either to answer or to interpose a motion cognizable under Rule 12(b) of the Federal Rules

of Civil Procedure within the allotted time, defendants are in default. Defendants' motion is brought under Rule 56 of the Federal Rules of Civil Procedure and does not, as an alternative, seek dismissal under Rule 12(b). While Rule 12(b) of the Federal Rules of Civil Procedure contains a specific provision in effect staying the requirement of answering a complaint during the pendency of a motion brought under its provision, Rule 56 does not contain a parallel provision.

Some courts confronted with this procedural setting have concluded that the interposition of a motion for summary judgment qualifies as otherwise defending against a complaint, and that as such no default is presented under the circumstances. *See, e.g., Rashidi,* 818 F.Supp. at 1355-56. Other courts, however, have noted that there is no automatic entitlement to a delay of the time to answer as a result of the filing of a summary judgment motion, the matter instead being addressed to the discretion of the court to extend that period, as authorized under Rule 6(b) of the Federal Rules of Civil Procedure.[FN6] *See, e.g., Poe v. Cristina Copper Mines, Inc.,* 15 F.R.D. 85, 87 (D.Del.1953).

> FN6. That rule provides, in relevant part, that
>
> [w]hen by these rules or by a notice given thereunder or by order of court an act is required or allowed to be done at or within a specified time, the court for cause shown may at any time in its discretion (1) with or without motion or notice order the period enlarged.
>
> Fed.R.Civ.P. 6(b).

Since this is not a situation where a motion to dismiss was initially filed but converted by the court to a summary judgment motion, a circumstance which would warrant a finding that the stay provisions of Rule 12 apply, *see Brooks v. Chappius,* No. 05-CV-6021, 2006 WL 559253, at *1 (W.D.N.Y. Mar. 1, 2006), defendants are technically in default. In light of the circumstances presented, however, I find that the defendants have demonstrated their intention to defend against plaintiff's claims and,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 957530 (N.D.N.Y.)
(Cite as: 2007 WL 957530 (N.D.N.Y.))

concluding that there is good cause for doing so, will order a stay of their time to answer plaintiff's complaint until ten days after a determination by the assigned district judge in connection with the pending motion. *See Rashidi, 818 F.Supp. at 1355-56.*

B. *Summary Judgment Standard*

**\*6** Summary judgment is governed by Rule 56 of the Federal Rules of Civil Procedure. Under that provision, summary judgment is warranted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits ... show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247, 106 S.Ct. 2505, 2509-10 (1986); Security Ins. Co. of Hartford v. Old Dominion Freight Line, Inc., 391 F.3d 77, 82-83 (2d Cir.2004).* A fact is "material", for purposes of this inquiry, if "it might affect the outcome of the suit under the governing law." *Anderson, 477 U.S. at 248, 106 S.Ct. at 2510;see also Jeffreys v. City of New York, 426 F.3d 549, 553 (2d Cir.2005)* (citing *Anderson).* A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson, 477 U.S. at 248, 106 S.Ct. at 2510.* Though *pro se* plaintiffs are entitled to special latitude when defending against summary judgment motions, they must establish more than merely "metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S.Ct. 1348, 1356 (1986); but see Vital v. Interfaith Med. Ctr., 168 F.3d 615, 620-21 (2d Cir.1999)* (noting obligation of court to consider whether *pro se* plaintiff understood nature of summary judgment process).

When summary judgment is sought, the moving party bears an initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue; the failure to meet this burden warrants denial of the motion. *Anderson, 477 U.S. at 250 n. 4, 106 S.Ct. at 2511 n. 4;Security Ins., 391 F.3d at 83.* In the event this initial burden is met, the opposing party must show, through affidavits or otherwise,

that there is a material issue of fact for trial. Fed.R.Civ.P. 56(e); *Celotex, 477 U.S. at 324, 106 S.Ct. at 2553;Anderson, 477 U.S. at 250, 106 S.Ct. at 2511.*

When deciding a summary judgment motion, a court must resolve any ambiguities, and draw all inferences from the facts, in a light most favorable to the nonmoving party. *Jeffreys, 426 F.3d at 553;Wright v. Coughlin, 132 F.3d 133, 137-38 (2d Cir.1998).* Summary judgment is inappropriate where "review of the record reveals sufficient evidence for a rational trier of fact to find in the [non-movant's] favor." *Treglia v. Town of Manlius, 313 F.3d 713, 719 (2d Cir.2002)* (citation omitted); *see also Anderson, 477 U.S. at 250, 106 S.Ct. at 2511* (summary judgment is appropriate only when "there can be but one reasonable conclusion as to the verdict.").

C. *Failure to Exhaust Administrative Remedies*

**\*7** In their motion defendants assert that plaintiff's harassment and assault claims growing out of events which occurred at Washington are procedurally barred, based upon his failure to file and pursue to completion a timely grievance relating to those claims. Plaintiff responds by asserting that his failure to file a grievance regarding the matter while at Washington was the product of his fear of retaliation, and further argues that the requirement of exhaustion should be excused based upon the fact that his claims were, in fact, investigated by the DOCS Inspector General.

The Prison Litigation Reform Act of 1996 ("PLRA"), Pub.L. No. 104-134, 110 Stat. 1321 (1996), altered the inmate litigation landscape considerably, imposing several restrictions on the ability of prisoners to maintain federal civil rights actions. One such restriction introduced by the PLRA requires that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). The Supreme Court has held that the "PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 957530 (N.D.N.Y.)
(Cite as: 2007 WL 957530 (N.D.N.Y.))

allege excessive force or some other wrong." *Porter v. Nussle,* 534 U.S. 516, 532, 122 S.Ct. 983, 992 (2002). The PLRA's exhaustion requirement thus applies to plaintiff's excessive force claims absent a finding of sufficient basis to find that plaintiff's failure to exhaust was justified or should be excused. *Ruggiero v. County of Orange,* 467 F.3d 170, 175 (2d Cir.2006).

New York prison inmates are subject to an Inmate Grievance Program established by the DOCS, and recognized as an "available" remedy for purposes of the PLRA. *See Mingues v. Nelson,* No. 96 CV 5396, 2004 WL 324898, at *4 (S.D.N.Y. Feb. 20, 2004) (citing *Mojias v. Johnson,* 351 F.3d 606 (2003) and *Snider v. Melindez,* 199 F.3d 108, 112-13 (2d Cir.1999)). The New York Inmate Grievance Program consists of a three-step review process. First, a written grievance is submitted to the Inmate Grievance Review Committee ("IGRC") within fourteen days of the incident.[FN7] 7 N.Y.C.R.R. § 701.7(a). The IGRC, which is comprised of inmates and facility employees, then issues a determination regarding the grievance. 7 N.Y.C.R.R. § 701.7(a). If an appeal is filed, the superintendent of the facility next reviews the IGRC's determination and issues a decision. *Id.* § 701.7(b). The third level of the process affords the inmate the right to appeal the superintendent's ruling to the Central Office Review Committee ("CORC"), which makes the final administrative decision. *Id.* § 701.7(c). Absent the finding of a basis to excuse non-compliance with this prescribed process, only upon exhaustion of these three levels of review may a prisoner seek relief pursuant to section 1983 in federal court. *Reyes v. Punzal,* 206 F.Supp.2d 431, 432 (W.D.N.Y.2002) (citing, *inter alia, Sulton v. Greiner,* No. 00 Civ. 0727, 2000 WL 1809284, at *3 (S.D.N.Y. Dec. 11, 2000)).

FN7. The Inmate Grievance Program supervisor may waive the timeliness of the grievance submission due to "mitigating circumstances." 7 N.Y.C.R.R. § 701.7(a)(1).

**\*8** The record before the court confirms Snyder's awareness of New York's IGP. Plaintiff in fact grieved the failure of prison officials at Groveland to treat his correspondence to the National Gay and Lesbian Task Force as legal mail and unsuccessfully pursued that

grievance through to a determination by the CORC. Accordingly-and defendants do not argue otherwise-plaintiff has fulfilled his obligation to exhaust administrative remedies with regard to his legal mail claim before commencing this action.

Distinctly different circumstances obtain with regard to plaintiff's claims of the use of excessive force and harassment by prison officials and fellow inmates. While plaintiff did file a grievance regarding those matters, the grievance was rejected as untimely, and that determination was neither appealed to the CORC, nor did plaintiff commence a second grievance challenging the untimeliness rejection, a course which was apparently available to him under the IGP.[FN8]

FN8. Although there is no need to address this argument since plaintiff failed to pursue the matter through to the CORC, had he done so with regard to the excessive force and harassment grievance filed at Groveland, he nonetheless would have failed to satisfy the PLRA's exhaustion requirement since, as the Supreme Court has now made clear, the filing and pursuit to completion of an untimely grievance does not satisfy the Act's exhaustion requirement. *Woodford v. Ngo,* --- U.S. ----, 126 S.Ct. 2378, 2382 (2006).

This is not to say that plaintiff cannot be said to have exhausted available administrative remedies. It should be noted that the three tiered IGP set forth in the controlling regulations does not describe the sole method for a New York State prison inmate to complain of prison conditions including, notably, the use of excessive force. *Heath v. Saddlemire,* No. 9:96-CV-1998, 2002 WL 31242204, at *4 (N.D.N.Y. Oct. 7, 2002). Indeed, the IGP regulations themselves provide that the three tiered mechanism " 'is intended to supplement, not replace, existing formal or informal channels of problem resolution.' " *Id.* (quoting 7 N.Y.C.R.R. § 701.1(a)). One of those alternative methods is a process for informal, expedited review of allegations of harassment by prison officials. 7 N.Y.C.R.R. § 701.11; *Perez,* 195 F.Supp.2d at 543. In this instance, an issue of fact exists surrounding whether plaintiff complied with section 701.11 by submitting a letter regarding

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 957530 (N.D.N.Y.)
(Cite as: 2007 WL 957530 (N.D.N.Y.))

Corrections Officer Whittier's actions to Lieutenant Greene. *See Perez*, 195 F.Supp.2d at 543.

Even assuming that plaintiff's efforts to address Corrections Officer Whittier's actions by writing to Lieutenant Green did not suffice to exhaust available remedies, the court must determine whether there is a basis to overlook this deficiency and permit the plaintiff to nonetheless proceed with his excessive force and harassment claims. The situations under which courts have excused an inmate's failure to comply with the IGP's three tier system generally one or more of the categories, including when 1) administrative remedies are not in fact available to the prisoner; 2) the defendants have either waived the defense or engaged in conduct which should estop them from raising it; and 3) other special circumstances, including a reasonable misunderstanding of the grievance procedure, which justify the inmate's failure to comply with the applicable administrative procedural requirements.[FN9]*Hemphill v. New York*, 380 F.3d 680, 686 (2d Cir.2004); *see also Ruggiero*, 467 F.3d at 175 (citing *Hemphill* ). If the court deems any of these three categories applicable, then plaintiff's claims may be considered exhausted and should not be dismissed.[FN10]*Hemphill*, 380 F.3d at 690-91.

> **FN9.** As this case aptly illustrates, many of the typical fact patterns presented in cases involving an inmate's failure to exhaust do not fit neatly into any single category, but instead may overlap into two, or potentially even all three, of the groupings identified in *Hemphill. See Giano v. Goord*, 380 F.3d 670, 677 n. 6. This fact may well account for a blurring of these categories in a large share of Second Circuit PLRA cases. *Id.*

> **FN10.** Relying upon case law which has since been supplanted in light of the Supreme Court's contrary decision in *Porter v. Nussle*, 534 U.S. 516, 122 S.Ct. 983 (2002), plaintiff argues that he was not required to exhaust administrative remedies in light of the nature of his claim. The case upon which Snyder principally relies, however, *Lawrence v. Goord*, 238 F.3d 182 (2d Cir.2001), has since been vacated, 535 U.S. 901, 122 S.Ct. 1200 (2002), and the Court has now

made it clear in *Porter* that PLRA's exhaustion requirement applies to "all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter*, 534 U.S. at 532, 122 S.Ct. at 992;*Ruggiero*, 380 F .3d at 173 (citing *Porter* ). The contention implicit in plaintiff's argument, to the effect that his reliance upon pre-*Porter* case law as a basis for not filing a formal grievance was appropriate, citing *Rodriguez v. Westchester County Jail Correctional Dept.*, 372 F.3d 485 (2d Cir.2004), is misplaced, since *Porter* was decided some three years prior to the events at issue.

*1. Availability Of Administrative Remedies*

**\*9** Under certain circumstances the behavior of prison officials may have the legal affect of rendering administrative remedies functionally unavailable. *Abney v. McGinnis*, 380 F.3d 663, 667 (2d Cir.2004). In such cases, the finding that the three tiered IGP was open to the plaintiff inmate does not necessary end the inquiry. *Hemphill*, 380 F.3d at 686-88. Like the plaintiff in *Hemphill*, Snyder argues that he was deterred from filing a grievance while at Washington in light of threats made against him, principally by Corrections Officer Whittier. As was also the situation in *Hemphill*, however, plaintiff did avail himself of other avenues of recourse including to write a letter of complaint to a corrections lieutenant, thereby potentially signaling that his claims of fearing retribution are less than genuine.

When, as in this case, an inmate asserts that his or her resort to the grievance process was deterred based upon conduct such as threats by prison officials, the question of whether a sufficient basis to negate a finding of "availability" has been established entails an objective inquiry, focusing upon whether " 'a similarly situated individual of ordinary firmness' [would] have deemed them available." *Id.* at 688 (citing *Davis v. Goord*, 320 F.3d 346, 353 (2d Cir.2003)). Plaintiff's complaint and papers in opposition to defendants' motion, in which he asserts that his fears of retribution were based in part upon defendant Whittier's reported efforts to have him harmed

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 957530 (N.D.N.Y.)
(Cite as: 2007 WL 957530 (N.D.N.Y.))

by other inmates following his transfer out of the dormitory to which he had been assigned, raises genuine issues of material fact in connection with the objective test to be applied under *Hemphill,* thus precluding the entry of summary judgment.

Urging the court to disregard the strictures associated with evaluation of a summary judgment motion and to proceed to assess plaintiff's credibility, in reliance upon the Second Circuit's decision in *Jeffreys v. City of New York,* 426 F.3d 549, 555 (2d Cir.2005) (characterizing plaintiff's version of the events as so wholly credible that no reasonable jury could believe it), defendants contend that plaintiff's claimed fear of retribution does not suffice under *Hemphill* to serve as a counterweight to the availability of the IGP in New York. I recommend that the court decline defendants' invitation to assure the role of factfinder, and instead find that plaintiff's assertion that he feared reprisal is sufficient to raise a genuine issue of material fact regarding whether administrative remedies were available to him.

### 2. *Waiver and Estoppel*

Since defendants have raised exhaustion of remedies, an affirmative defense, at the earliest available opportunity, they have not waived the defense. The circumstances now presented, however, do provide a basis upon which an estoppel could potentially be predicated.

Prison officials may be estopped from defending against an inmate civil rights action based upon the plaintiff's failure to exhaust available administrative remedies, including when "(1) an inmate was led to believe by prison officials that his alleged incident was not a 'grievance matter' and assured that his claims were otherwise investigated ... (2) an inmate makes a 'reasonable attempt' to exhaust his administrative remedies, especially where it is alleged that corrections officers failed to file the inmate's grievances or otherwise impeded or prevented his efforts, and (3) the state's time to respond to the grievance has expired." *Martinez v. Williams,* 349 F.Supp.2d 677, 683 (S.D.N.Y.2004) (citing and quoting, *inter alia, O'Connor v. Featherston,* No. 01 Civ. 3251, 2002 WL 818085, at *2-*3 (S.D.N.Y. Apr. 29, 2002)). Thus, for

example, a defendant who fails to forward an inmate's complaint to a grievance officer in a timely manner may be estopped from invoking the defense. *Hemphill,* 380 F.3d at 688-89. Similarly, an estoppel may be found where a defendant's use of force or threats inhibit an inmate's ability to utilize grievance procedures. *Ziemba v. Wezner,* 366 F.3d 161, 162-64 (2d Cir.2004).

**\*10** In this instance there is a potential basis for finding an estoppel. Plaintiff's complaints against Corrections Officer Whittier were the subject of an investigation by the DOCS Inspector General, a fact of which the plaintiff was keenly aware. Plaintiff's apparent belief that this investigation obviated the need for him to file a grievance regarding the issue was in all likelihood fortified when, in response to his grievance filed at Groveland, he was advised by the IGP Supervisor at that facility that if the matter had previously been brought "to some administration's attention [,] ... it is not necessary to have this matter readdressed." *See* Complaint (Dkt. No. 2) Exh. 12. This response may well have dissuaded the plaintiff from pursuing the matter further, including to press his otherwise untimely grievance to the CORC or to attempt to convince officials at Groveland that mitigating circumstances existed to accept his otherwise untimely grievance. *See* 7 N.Y.C.R.C. § 701.7(a)(1). Accordingly, in my view a reasonable factfinder could conclude that defendants should be estopped from asserting a defense based upon failure to exhaust. [FN11]

> FN11. It should be noted that fear of retribution can also provide a basis for finding that a defendant should be estopped from asserting failure to exhaust as a defense. *See Hemphill,* 380 F.3d at 688-89.

### 3. *Special Circumstances*

The third category of circumstances under which an inmate's failure to exhaust may be excused was addressed by the Second Circuit in *Giano v. Goord,* 380 F.3d 670 (2d Cir.2004). In *Giano,* the court rejected the concept of a categorical statement regarding the "special circumstances" exception, instead, determining that the court should "[look] at the circumstances which might

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 957530 (N.D.N.Y.)
(Cite as: 2007 WL 957530 (N.D.N.Y.))

understandably lead usually uncounselled prisoners to fail to grieve in the normally required way." 380 F.3d at 678.

Defendants claim that plaintiff has not shown special circumstances which might explain why his grievance was late. Plaintiff counters that he should be entitled to the benefit of this special circumstances exception for two reasons. First, Snyder again asserts that his failure to file a grievance was motivated out of fear of retribution, based upon his efforts to seek review of the matter by the Inspector General's office. Additionally, plaintiff notes that his complaint regarding Corrections Officer Whittier was the subject of at least one letter to prison officials, resulting in an investigation by the DOCS Inspector General. Such efforts can provide a basis for finding exhaustion notwithstanding the technical failure of a prisoner to avail himself or herself of the three tiered IGP set forth in the governing regulations. *See Heath, 2002 WL 31242204, at *4-*5;Perez,* 195 F.Supp.2d at 545-46; *see also Marvin v. Goord, 255 F.3d 40, 43 n. 3 (2d Cir.2001)* ("Resolution of the matter through informal channels satisfies the exhaustion requirement, as, under the administrative scheme applicable to New York prisoners, grieving through informal channels is an available remedy."). In order to avail himself of this exception, however, plaintiff must demonstrate that his informal complaints led to a favorable resolution in communication with his charges of misconduct. *Thomas v. Cassleberry, 315 F.Supp.2d 301, 304 (W.D.N.Y.2004)* (rejecting plaintiff's argument that defendants' motion for summary judgment for failure to exhaust should be denied because although plaintiff complained to the Inspector General's Office, there were no allegations that his complaints resulted in a favorable resolution); *Grey v. Sparhawk, No. 99 CIV. 9871, 2000 WL 815916, at *2 (S.D.N.Y. June 23, 2000)* (complaint filed directly with the Inspector General found insufficient to fulfill exhaustion requirement); *cf. Giano, 380 F.3d at 679* (finding that plaintiff's attempt to expose allegedly retaliatory behavior during a disciplinary hearing which centered upon the same retaliatory act which he complains provided a basis to find justification for plaintiff's failure to exhaust). While plaintiff is unable to make this claim, it is purely the product of the failure of prison officials to notify him of the results of the Inspector General's investigation despite his written requests for this information. I am therefore unable to state with certainty that plaintiff is not entitled to the benefit of the special

circumstances exception to the PLRA's exhaustion requirement.

**\*11** In sum, applying the tripartite test announced in the Second Circuit's August, 2004 collection of exhaustion cases and their progeny, I find genuine issues of fact including summary judgment on the issue of plaintiff's alleged failure to exhaust available administrative remedies, and therefore recommend denial of defendants' motion to dismiss on this procedural basis.

C. *Personal Involvement*

Turning to the merits of plaintiff's claims, defendants allege that Snyder's complaint discloses potential personal involvement in the events occurring at Washington on the part of only defendants Whittier and Funnye, and that none of them are implicated in the legal mail claims stemming from plaintiff's incarceration in Groveland. This, defendants argue, provides a basis for dismissal of certain of plaintiff's claims.

Personal involvement of a defendant in alleging a constitutional deprivation is a prerequisite to an award of damages against that person under section 1983 against that person. *Wright v. Smith, 21 F.3d 496, 501 (2d Cir.1994)* (citing *Moffitt v. Town of Brookfield, 950 F.2d 880, 885 (2d Cir.1991)* and *McKinnon v. Patterson, 568 F.2d 930, 934 (2d Cir.1977), cert. denied,434 U.S. 1087, 98 S.Ct. 1282 (1978)*). In order to prevail on a section 1983 cause of action against an individual, a plaintiff must show some tangible connection between the constitutional violation alleged and that particular defendant. *See Bass v. Jackson, 790 F.2d 260, 263 (2d Cir.1986).*

1. *Events at Washington*

The only defendants alleged by the plaintiff to have had direct involvement in or knowledge of the events at Washington are two corrections officers directly implicated, defendants Whittier and Funnye, as well as the Assistant Inspector General involved in the investigation of those matters, Mark Miller. Nothing in the record now

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 957530 (N.D.N.Y.)
(Cite as: 2007 WL 957530 (N.D.N.Y.))

before the court suggests any actual involvement of or awareness by DOCS Commissioner Goord, Inspector General Roy, or Washington Superintendent Plescia, in any of the relevant events. Instead, plaintiff's claims against those defendants appear to be based purely upon their supervisory positions and Snyder's contention that by virtue of their roles, they must have known about the incident, or the very least should be charged with constructive knowledge of the constitutional violations alleged. These allegations are insufficient to implicate those defendants in the matters involved; it is well established that a supervisor cannot be liable for damages under section 1983 solely by virtue of being a supervisor-there is no *respondeat superior* liability under section 1983. *Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003); *Wright,* 21 F.3d at 501.

It is true that a supervisory official can be found liable in a civil rights setting such as that now presented in one of several ways: 1) the supervisor may have directly participated in the challenged conduct; 2) the supervisor, after learning of the violation through a report or appeal, may have failed to remedy the wrong; 3) the supervisor may have created or allowed to continue a policy or custom under which unconstitutional practices occurred; 4) the supervisor may have been grossly negligent in managing the subordinates who caused the unlawful event; or 5) the supervisor may have failed to act on information indicating that unconstitutional acts were occurring. *Richardson,* 347 F.3d at 435;*Wright,* 21 F.3d at 501;*Williams v. Smith,* 781 F.2d 319, 323-24 (2d Cir.1986). The plaintiff, however, has failed to present any evidence which tends to establish a basis for finding liability on the part of defendants Goord, Roy, or Plescia under any of those theories. Accordingly, I recommend a finding that claims against them based upon lack of personal involvement.

**\*12** Plaintiff's claims against defendant Miller present a slightly different situation. Defendant Miller was charged with investigating the incident implicated in plaintiff's excessive force claims. At the time of the investigation, however, any harassment of him by Whittier had ended, and plaintiff had been transferred out of Washington. Plaintiff does not allege the existence of any lingering effects of the events at Washington, following his transfer out of that prison, which could have been prevented had

defendant Miller acted to end the constitutional violations involved. Plaintiff's only quarrel with defendant Miller appears to be his failure, and the failure of his office, to notify him of the status of the investigation conducted in response to his communications inquiring in that regard. This fact alone, however, provides no basis for a finding that defendant Miller was involved in the constitutional violations alleged. *Cf. Greenwaldt v. Coughlin,* No. 93 Civ. 6551, 1995 WL 232736, at \*4 (S.D.N.Y. Apr. 19, 1995) ("It is well-established that an allegation that an official ignored a prisoner's letter of protest and request for an investigation of allegations made therein is insufficient to hold that official liable for the alleged violations.") (citing *Garrido v. Coughlin,* 716 F.Supp. 98, 100 (S.D.N.Y.1989) (dismissing claim against superintendent of prison where only allegation was that he ignored inmate's request for an investigation)).

2. *Plaintiff's Legal Mail Claims*

Plaintiff's legal mail claims involve actions taken by prison officials at Groveland, including those working in the prison mail room. None of the individuals named in plaintiff's complaint, however, was employed at Groveland, and plaintiff has identified no basis to conclude that any of them, including particularly DOCS Commissioner Goord, had any awareness of or involvement in the decision to deny legal mail status to his communications to the National Gay and Lesbian Task Force or to open his returned mail sent to that agency. Plaintiff's legal mail claim is subject to dismissal for failure to name, as a defendant, anyone proven to have been personally involved in that deprivation. *Bass,* 790 F.2d at 263.

IV. *SUMMARY AND RECOMMENDATION*

While plaintiff failed to file a grievance, and thereby avail himself of the comprehensive inmate grievance program offered to him as a New York State prisoner, to address the harassment allegedly endured at Washington at the hands of defendant Whittier and fellow inmates, in light of the existence of genuine issues of material fact I am unable to state that no reasonable factfinder could discern a proper basis exists to excuse this failure and find that

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 957530 (N.D.N.Y.)
(Cite as: 2007 WL 957530 (N.D.N.Y.))

plaintiff should not be barred on this procedural basis from pursuing his claims surrounding the events at Washington. I therefore recommend that defendants' motion for summary judgment dismissing plaintiff's excessive force and harassment claim on this procedural ground be denied. I do find, however, that plaintiff has failed to demonstrate the personal involvement of any of the defendants in his legal mail claim, and of defendants Goord, Roy, Plescia and Miller in connection with the claims growing out of events occurring at Washington, and therefore recommend that defendants' motion for summary judgment dismissing all claims against those defendants be granted.

**\*13** Based on the foregoing, it is hereby

ORDERED that the time within which defendants must answer plaintiff's complaint in this matter is hereby stayed and extended until ten days following the issuance of a decision by Senior District Judge Thomas J. McAvoy deciding the present summary judgment motion, or such other time as Judge McAvoy shall direct; and it is further

RECOMMENDED that defendants' motion for summary judgment dismissing plaintiff's complaint (Dkt. No. 20) be GRANTED, in part, and that plaintiff's legal mail claim be DISMISSED in its entirety, and further that all remaining claims be DISMISSED as against defendants Goord, Roy, Plescia and Miller, but that it otherwise be DENIED, and that the matter proceed with regard to plaintiff's constitutional claims against defendants Whittier and Funnye based upon events occurring at the Washington Correctional Facility.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have ten days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(e), 72; Roldan v. Racette, 984 F.2d 85 (2d Cir.1993).

The clerk is directed to promptly forward copies of this order to the parties in accordance with this court's local rules.

N.D.N.Y.,2007.
Snyder v. Goord
Not Reported in F.Supp.2d, 2007 WL 957530 (N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

**C**  Only the Westlaw citation is currently available.

United States District Court, N.D. New York.
Lisa ELGAMIL, Plaintiff,
v.
SYRACUSE UNIVERSITY, Defendant.
**No. 99-CV-611 NPMGLS.**

Aug. 22, 2000.

Joch & Kirby, Ithaca, New York, for Plaintiff, Joseph Joch, of counsel.

Bond, Schoeneck & King, LLP, Syracuse, New York, for Defendant, John Gaal, Paul Limmiatis, of counsel.

MEMORANDUM-DECISION AND ORDER

MCCURN, Senior J.

INTRODUCTION

**\*1** Plaintiff brings suit against defendant Syracuse University ("University") pursuant to 20 U.S.C. § 1681*etseq.* ("Title IX") claiming hostile educational environment, and retaliation for complaints of same. Presently before the court is the University's motion for summary judgment. Plaintiff opposes the motion.

LOCAL RULES PRACTICE

The facts of this case, which the court recites below, are affected by plaintiff's failure to file a Statement of Material Facts which complies with the clear mandate of Local

Rule 7.1(a)(3) of the Northern District of New York. This Rule requires a motion for summary judgment to contain a Statement of Material Facts with specific citations to the record where those facts are established. A similar obligation is imposed upon the non-movant who

shall file a response to the [movant's] Statement of Material Facts. The non-movant's response shall mirror the movant's Statement of Material Facts by admitting and/or denying each of the movant's assertions in matching numbered paragraphs. Each denial shall set forth a specific citation to the record where the factual issue arises.... *Any facts set forth in the [movant's] Statement of material Facts shall be deemed admitted unless specifically controverted by the opposing party.*

L.R. 7.1(a)(3) (emphasis in original).

In moving for summary judgment, the University filed an eleven page, twenty-nine paragraph Statement of Material Facts, replete with citations to the record in every paragraph. Plaintiff, in opposition, filed a two page, nine paragraph statement appended to her memorandum of law which failed to admit or deny the specific assertions set forth by defendant, and which failed to contain a single citation to the record. Plaintiff has thus failed to comply with Rule 7.1(a)(3).

As recently noted in another decision, "[t]he Local Rules are not suggestions, but impose procedural requirements upon parties litigating in this District." *Osier v. Broome County,* 47 F.Supp.2d 311, 317 (N.D.N.Y.1999). As a consequence, courts in this district have not hesitated to enforce Rule 7.1(a)(3) and its predecessor, Rule 7.1(f)[FN1] by deeming the facts asserted in a movant's proper Statement of Material Facts as admitted, when, as here, the opposing party has failed to comply with the Rule. *See,e.g.,Phipps v. New York State Dep't of Labor,* 53 F.Supp.2d 551, 556-57 (N.D.N.Y.1999); *DeMar v. Car-Freshner Corp.,* 49 F.Supp.2d 84, 86 (N.D.N.Y.1999); *Osier,* 47 F. Supp .2d at 317;*Nicholson v. Doe,* 185 F.R.D. 134, 135 (N.D.N.Y.1999); *TSI Energy,*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

*Inc. v. Stewart and Stevenson Operations, Inc.,* 1998 WL 903629, at *1 n. 1 (N.D. N.Y.1998); *Costello v.. Norton,* 1998 WL 743710, at *1 n. 2 (N.D.N.Y.1998); *Squair v. O'Brien & Gere Engineers, Inc.,* 1998 WL 566773, at *1 n. 2 (N.D.N.Y.1998). As in the cases just cited, this court deems as admitted all of the facts asserted in defendant's Statement of Material Facts. The court next recites these undisputed facts.

FN1. Amended January 1, 1999.

BACKGROUND

*2 Plaintiff became a doctoral student in the University's Child and Family Studies ("CFS") department in the Spring of 1995. Successful completion of the doctoral program required a student to (1) complete 60 credit hours of course work; (2) pass written comprehensive examinations ("comp.exams") in the areas of research methods, child development, family theory and a specialty area; (3) after passing all four comp. exams, orally defend the written answers to those exams; (4) then select a dissertation topic and have the proposal for the topic approved; and (5) finally write and orally defend the dissertation. Plaintiff failed to progress beyond the first step.

Each student is assigned an advisor, though it is not uncommon for students to change advisors during the course of their studies, for a myriad of reasons. The advisor's role is to guide the student in regard to course selection and academic progress. A tenured member of the CFS department, Dr. Jaipaul Roopnarine, was assigned as plaintiff's advisor.

As a student's comp. exams near, he or she selects an examination committee, usually consisting of three faculty members, including the student's advisor. This committee writes the questions which comprise the student's comp. exams, and provides the student with guidance and assistance in preparing for the exams. Each member of the committee writes one exam; one member writes two. Two evaluators grade each exam; ordinarily the faculty member who wrote the question, and one other faculty member

selected by the coordinator of exams.

Roopnarine, in addition to his teaching and advising duties, was the coordinator of exams for the entire CFS department. In this capacity, he was generally responsible for selecting the evaluators who would grade each student's comp. exam, distributing the student's answer to the evaluators for grading, collecting the evaluations, and compiling the evaluation results.

The evaluators graded an exam in one of three ways: "pass," "marginal" or "fail." A student who received a pass from each of the two graders passed that exam. A student who received two fails from the graders failed the exam. A pass and a marginal grade allowed the student to pass. A marginal and a fail grade resulted in a failure. Two marginal evaluations may result in a committee having to decide whether the student would be given a passing grade. In cases where a student was given both a pass and a fail, a third evaluator served as the tie breaker.

These evaluators read and graded the exam questions independently of each other, and no indication of the student's identity was provided on the answer. [FN2] The coordinator, Roopnarine, had no discretion in compiling these grades-he simply applied the pass or fail formula described above in announcing whether a student passed or failed the comp. exams. Only after a student passed all four written exam questions would he or she be permitted to move to the oral defense of those answers.

FN2. Of course, as mentioned, because one of the evaluators may have written the question, and the question may have been specific to just that one student, one of the two or three evaluators may have known the student's identity regardless of the anonymity of the examination answer.

*3 Plaintiff completed her required course work and took the comp. exams in October of 1996. Plaintiff passed two of the exams, family theory and specialty, but failed two, child development and research methods. On each of the exams she failed, she had one marginal grade, and one failing grade. Roopnarine, as a member of her committee,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

authored and graded two of her exams. She passed one of them, specialty, and failed the other, research methods. Roopnarine, incidently, gave her a pass on specialty, and a marginal on research methods. Thus it was another professor who gave her a failing grade on research methods, resulting in her failure of the exam. As to the other failed exam, child development, it is undisputed that Roopnarine neither wrote the question, nor graded the answer.

Pursuant to the University's procedures, she retook the two exams she failed in January of 1997. Despite being given the same questions, she only passed one, child development. She again failed research methods by getting marginal and fail grades from her evaluators. This time, Roopnarine was not one of the evaluators for either of her exam questions.

After this second unsuccessful attempt at passing research methods, plaintiff complained to the chair of the CFS department, Dr. Norma Burgess. She did not think that she had been properly prepared for her exam, and complained that she could no longer work with Roopnarine because he yelled at her, was rude to her, and was otherwise not responsive or helpful. She wanted a new advisor. Plaintiff gave no indication, however, that she was being sexually harassed by Roopnarine.

Though plaintiff never offered any additional explanation for her demands of a new advisor, Burgess eventually agreed to change her advisor, due to plaintiff's insistence. In March of 1997, Burgess and Roopnarine spoke, and Roopnarine understood that he would no longer be advising plaintiff. After that time period, plaintiff and Roopnarine had no further contact. By June of that year, she had been assigned a new advisor, Dr. Mellisa Clawson.

Plaintiff then met with Clawson to prepare to take her research methods exam for the third time. Despite Clawson's repeated efforts to work with plaintiff, she sought only minimal assistance; this was disturbing to Clawson, given plaintiff's past failures of the research methods exam. Eventually, Clawson was assigned to write plaintiff's third research methods exam.

The first time plaintiff made any mention of sexual harassment was in August of 1997, soon before plaintiff made her third attempt at passing research methods. She complained to Susan Crockett, Dean of the University's College of Human Development, the parent organization of the CFS department. Even then, however, plaintiff merely repeated the claims that Roopnarine yelled at her, was rude to her, and was not responsive or helpful. By this time Roopnarine had no contact with plaintiff in any event. The purpose of plaintiff's complaint was to make sure that Roopnarine would not be involved in her upcoming examination as exam coordinator. Due to plaintiff's complaints, Roopnarine was removed from all involvement with plaintiff's third research methods examination. As chair of the department, Burgess took over the responsibility for serving as plaintiff's exam coordinator. Thus, Burgess, not Roopnarine, was responsible for receiving plaintiff's answer, selecting the evaluators, and compiling the grades of these evaluators; [FN3] as mentioned, Clawson, not Roopnarine, authored the exam question.

**FN3.** Plaintiff appears to allege in her deposition and memorandum of law that Roopnarine remained the exam coordinator for her third and final exam. *See* Pl.'s Dep. at 278; Pl.'s Mem. of Law at 9. The overwhelming and undisputed evidence in the record establishes that Roopnarine was not, in fact, the coordinator of this exam. Indeed, as discussed above, the University submitted a Statement of Material Facts which specifically asserted in paragraph 18 that Roopnarine was removed from all involvement in plaintiff's exam, including the role of exam coordinator. *See* Def.'s Statement of Material Facts at ¶ 18 (and citations to the record therein). Aside from the fact that this assertion is deemed admitted for plaintiff's failure to controvert it, plaintiff cannot maintain, without any evidence, that Roopnarine was indeed her exam coordinator. Without more than broad, conclusory allegations of same, no genuine issue of material fact exists on this question.

*4 Plaintiff took the third research methods examination

Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

in September of 1997. Clawson and another professor, Dr. Kawamoto, were her evaluators. Clawson gave her a failing grade; Kawamoto indicated that there were "some key areas of concern," but not enough for him to deny her passage. As a result of receiving one passing and one failing grade, plaintiff's research methods exam was submitted to a third evaluator to act as a tie breaker. Dr. Dean Busby, whose expertise was research, was chosen for this task. Busby gave plaintiff a failing grade, and began his written evaluation by stating that

[t]his is one of the most poorly organized and written exams I have ever read. I cannot in good conscience vote any other way than a fail. I tried to get it to a marginal but could not find even one section that I would pass.

Busby Aff. Ex. B.

The undisputed evidence shows that Clawson, Kawamoto and Busby each evaluated plaintiff's exam answer independently, without input from either Roopnarine or anyone else. Kawamoto and Busby did not know whose exam they were evaluating. [FN4] Importantly, it is also undisputed that none of the three evaluators knew of plaintiff's claims of sexual harassment.

   FN4. Clawson knew it was plaintiff's examination because she was plaintiff's advisor, and wrote the examination question.

After receiving the one passing and two failing evaluations, Burgess notified plaintiff in December of 1997 that she had, yet again, failed the research methods exam, and offered her two options. Although the University's policies permitted a student to only take a comp. exam three times (the original exam, plus two retakes), the CFS department would allow plaintiff to retake the exam for a fourth time, provided that she took a remedial research methods class to strengthen her abilities. Alternatively, Burgess indicated that the CFS department would be willing to recommend plaintiff for a master's degree based on her graduate work. Plaintiff rejected both offers.

The second time plaintiff used the term sexual harassment in connection with Roopnarine was six months after she was notified that she had failed for the third time, in May of 1998. Through an attorney, she filed a sexual harassment complaint against Roopnarine with the University. This written complaint repeated her allegations that Roopnarine had yelled at her, been rude to her, and otherwise had not been responsive to her needs. She also, for the first time, complained of two other acts:

1. that Roopnarine had talked to her about his sex life, including once telling her that women are attracted to him, and when he attends conferences, they want to have sex with him over lunch; and

2. that Roopnarine told her that he had a dream in which he, plaintiff and plaintiff's husband had all been present.

Prior to the commencement of this action, this was the only specific information regarding sexual harassment brought to the attention of University officials.

The University concluded that the alleged conduct, if true, was inappropriate and unprofessional, but it did not constitute sexual harassment. Plaintiff then brought this suit. In her complaint, she essentially alleges two things; first, that Roopnarine's conduct subjected her to a sexually hostile educational environment; and second, that as a result of complaining about Roopnarine's conduct, the University retaliated against her by preventing her from finishing her doctorate, mainly, by her failing her on the third research methods exam.

**\*5** The University now moves for summary judgment. Primarily, it argues that the alleged conduct, if true, was not sufficiently severe and pervasive to state a claim. Alternatively, it argues that it cannot be held liable for the conduct in any event, because it had no actual knowledge of plaintiff's alleged harassment, and was not deliberately indifferent to same. Finally, it argues that plaintiff is unable to establish a retaliation claim. These contentions are addressed below.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

## DISCUSSION

The principles that govern summary judgment are well established. Summary judgment is properly granted only when "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). When considering a motion for summary judgment, the court must draw all factual inferences and resolve all ambiguities in favor of the nonmoving party. See Torres v. Pisano, 116 F.3d 625, 630 (2d Cir.1997). As the Circuit has recently emphasized in the discrimination context, "summary judgment may not be granted simply because the court believes that the plaintiff will be unable to meet his or her burden of persuasion at trial." Danzer v. Norden Sys., Inc., 151 F.3d 50, 54 (2d Cir.1998). Rather, there must be either an absence of evidence that supports plaintiff's position, see Norton v. Sam's Club, 145 F.3d 114, 117-20 (2d Cir.), cert. denied, 525 U.S. 1001 (1998), "or the evidence must be so overwhelmingly tilted in one direction that any contrary finding would constitute clear error." Danzer, 151 F.3d at 54. Yet, as the Circuit has also admonished, "purely conclusory allegations of discrimination, absent any concrete particulars," are insufficient to defeat a motion for summary judgment. Meiri v. Dacon, 759 F.2d 989, 998 (2d Cir.1985). With these principles in mind, the court turns to defendant's motion.

*I. Hostile Environment*

Title IX provides, with certain exceptions not relevant here, that

[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance.

20 U.S.C. § 1681(a).

Recently, the Supreme Court reiterated that Title IX is enforceable through an implied private right of action, and that monetary damages are available in such an action.

See Gebser v. Lago Vista Indep. Sch. Dist., 524 U.S. 274, , 118 S.Ct. 1989, 1994 (1998) (citing Cannon v. University of Chicago, 441 U .S. 677 (1979) and Franklin v. Gwinnett County Pub. Sch., 503 U.S. 60 (1992)).

## A. Severe or Pervasive

Provided that a plaintiff student can meet the requirements to hold the school itself liable for the sexual harassment,[FN5] claims of hostile educational environment are generally examined using the case law developed for hostile work environment under Title VII. See Davis, 119 S.Ct. at 1675 (citing Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 67 (1986), a Title VII case). Accord Kracunas v. Iona College, 119 F.3d 80, 87 (2d Cir.1997); Murray v. New York Univ. College of Dentistry, 57 F.3d 243, 249 (2d Cir.1995), both abrogated on other grounds by Gebser, 118 S.Ct. at 1999.

> FN5. In Gebser, 118 S.Ct. at 1999, and Davis v. Monroe County Bd. of Educ., 526 U.S. 629, , 119 S.Ct. 1661, 1671 (1999), the Supreme Court explicitly departed from the *respondeat superior* principles which ordinarily govern Title VII actions for purposes of Title IX; in a Title IX case it is now clear that a school will not be liable for the conduct of its teachers unless it knew of the conduct and was deliberately indifferent to the discrimination. Defendant properly argues that even if plaintiff was subjected to a hostile environment, she cannot show the University's knowledge and deliberate indifference. This argument will be discussed below.

> It bears noting that courts examining sexual harassment claims sometimes decide first whether the alleged conduct rises to a level of actionable harassment, before deciding whether this harassment can be attributed to the defendant employer or school, as this court does here. See, e.g., Distasio v. Perkin Elmer Corp., 157 F.3d 55 (2d Cir.1998). Sometimes, however, courts first examine whether the defendant can be held liable for the conduct,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

and only then consider whether this conduct is actionable. *See,e.g.,Quinn v. Green Tree Credit Corp.,* 159 F.3d 759, 767 n. 8 (2d Cir.1998). As noted in *Quinn,* the Circuit has not instructed that the sequence occur in either particular order. *Seeid.*

**\*6** In *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21-22 (1993), the Supreme Court stated that in order to succeed, a hostile environment claim must allege conduct which is so "severe or pervasive" as to create an " 'objectively' hostile or abusive work environment," which the victim also "subjectively perceive[s] ... to be abusive." *Richardson v. New York State Dep't of Corr. Servs.,* 180 F.3d 426, 436 (alteration in original) (quoting *Harris,* 510 U.S. at 21-22). From this court's review of the record, there is no dispute that plaintiff viewed her environment to be hostile and abusive; hence, the question before the court is whether the environment was "objectively" hostile. *Seeid.* Plaintiff's allegations must be evaluated to determine whether a reasonable person who is the target of discrimination would find the educational environment "so severe, pervasive, and objectively offensive, and that so undermines and detracts from the victim['s] educational experience, that [this person is] effectively denied equal access to an institution's resources and opportunities." *Davis,* 119 S.Ct. at 1675.

Conduct that is "merely offensive" but "not severe or pervasive enough to create an objectively hostile or abusive work environment-an environment that a reasonable person would find hostile or abusive" is beyond the purview of the law. *Harris,* 510 U.S. at 21. Thus, it is now clear that neither "the sporadic use of abusive language, gender-related jokes, and occasional testing," nor "intersexual flirtation," accompanied by conduct "merely tinged with offensive connotations" will create an actionable environment. *Faragher v. City of Boca Raton,* 524 U.S. 775, 787 (1998). Moreover, a plaintiff alleging sexual harassment must show the hostility was based on membership in a protected class. *SeeOncale v. Sundowner Offshore Servs., Inc.,* 523 U.S. 75, 77 (1998). Thus, to succeed on a claim of sexual harassment, a plaintiff "must always prove that the conduct at issue was not merely tinged with offensive sexual connotations, but actually constituted discrimina[tion] ... because of ... sex." *Id.* at 81 (alteration

and ellipses in original).

The Supreme Court has established a non-exclusive list of factors relevant to determining whether a given workplace is permeated with discrimination so severe or pervasive as to support a Title VII claim. *SeeHarris,* 510 U.S. at 23. These include the frequency of the discriminatory conduct, its severity, whether the conduct was physically threatening or humiliating, whether the conduct unreasonably interfered with plaintiff's work, and what psychological harm, if any, resulted from the conduct. *Seeid.;Richardson,* 180 F.3d at 437.

Although conduct can meet this standard by being either "frequent" or "severe," *Osier,* 47 F.Supp.2d at 323, "isolated remarks or occasional episodes of harassment will not merit relief [ ]; in order to be actionable, the incidents of harassment must occur in concert or with a regularity that can reasonably be termed pervasive." ' *Quinn,* 159 F.3d at 767 (quoting *Tomka v. Seiler Corp.,* 66 F.3d 1295, 1305 n. 5 (2d Cir.1995)). Single or episodic events will only meet the standard if they are sufficiently threatening or repulsive, such as a sexual assault, in that these extreme single incidents "may alter the plaintiff's conditions of employment without repetition." *Id.AccordKotcher v. Rosa and Sullivan Appliance Ctr., Inc.,* 957 F.2d 59, 62 (2d Cir.1992) ("[t]he incidents must be repeated and continuous; isolated acts or occasional episodes will not merit relief.").

**\*7** The University quite properly argues that the conduct plaintiff alleges is not severe and pervasive. As discussed above, she claims that she was subjected to behavior by Roopnarine that consisted primarily of his yelling at her, being rude to her, and not responding to her requests as she felt he should. This behavior is insufficient to state a hostile environment claim, despite the fact that it may have been unpleasant. *See,e.g.,Gutierrez v. Henoch,* 998 F.Supp. 329, 335 (S.D.N.Y.1998) (disputes relating to job-related disagreements or personality conflicts, without more, do not create sexual harassment liability); *Christoforou v. Ryder Truck Rental, Inc.,* 668 F.Supp. 294, 303 (S.D.N.Y.1987) ("there is a crucial difference between personality conflict ... which is unpleasant but legal ... [and sexual harassment] ... which is despicable and illegal."). Moreover, the court notes that plaintiff has

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

failed to show that this alleged behavior towards her was sexually related-an especially important failing considering plaintiff's own testimony that Roopnarine treated some males in much of the same manner. *See,e.g.,* Pl.'s Dep. at 298 ("He said that Dr. Roopnarine screamed at him in a meeting"). As conduct that is "equally harsh" to both sexes does not create a hostile environment, *Brennan v. Metropolitan Opera Ass'n, Inc.,* 192 F.3d 310, 318 (2d Cir.1999), this conduct, while demeaning and inappropriate, is not sufficiently gender-based to support liability. *See Osier,* 47 F.Supp.2d at 324.

The more detailed allegations brought forth for the first time in May of 1998 are equally unavailing. These allegations are merely of two specific, isolated comments. As described above, Roopnarine told plaintiff of his sexual interaction(s) with other women, and made a single, non-sexual comment about a dream in which plaintiff, plaintiff's husband, and Roopnarine were all present. Accepting as true these allegations, the court concludes that plaintiff has not come forward with evidence sufficient to support a finding that she was subject to abuse of sufficient severity or pervasiveness that she was "effectively denied equal access to an institution's resources and opportunities." *Davis,* 119 S.Ct. at 1675.

*Quinn,* a recent Second Circuit hostile work environment case, illustrates the court's conclusion well. There, plaintiff complained of conduct directed towards her including sexual touching and comments. She was told by her supervisor that she had been voted the "sleekest ass" in the office and the supervisor deliberately touched her breasts with some papers he was holding. 159 F.3d at 768. In the Circuit's view, these acts were neither severe nor pervasive enough to state a claim for hostile environment. *See id.* In the case at bar, plaintiff's allegations are no more severe than the conduct alleged in *Quinn,* nor, for that matter, did they occur more often. Thus, without more, plaintiff's claims fail as well.

**8** Yet, plaintiff is unable to specify any other acts which might constitute sexual harassment. When pressed to do so, plaintiff maintained only that she "knew" what Roopnarine wanted "every time [she] spoke to him" and that she could not "explain it other than that's the feeling [she] had." Pl.'s Dep. at 283-85, 287, 292. As defendant

properly points out, these very types of suspicions and allegations of repeated, but unarticulated conduct have been shown to be insufficient to defeat summary judgment. *See Meiri,* 759 F.2d at 998 (plaintiff's allegations that employer " 'conspired to get of [her];' that he 'misconceived [her] work habits because of his subjective prejudice against [her] Jewishness;' and that she 'heard disparaging remarks about Jews, but, of course, don't ask me to pinpoint people, times or places.... It's all around us," ' are conclusory and insufficient to satisfy the demands of Rule 56) (alterations and ellipses in original); *Dayes v. Pace Univ.,* 2000 WL 307382, at *5 (S.D.N.Y.2000) (plaintiff's attempts to create an appearance of pervasiveness by asserting "[t]he conduct to which I was subjected ... occurred regularly and over many months," without more "is conclusory, and is not otherwise supported in the record [and] therefore afforded no weight"); *Quiros v. Ciba-Geigy Corp.,* 7 F.Supp.2d 380, 385 (S.D.N.Y.1998) (plaintiff's allegations of hostile work environment without more than conclusory statements of alleged discrimination insufficient to defeat summary judgment); *Eng v. Beth Israel Med. Ctr.,* 1995 U.S. Dist. Lexis 11155, at *6 n. 1 (S.D.N.Y.1995) (plaintiff's "gut feeling" that he was victim of discrimination was no more than conclusory, and unable to defeat summary judgment). As plaintiff comes forward with no proper showing of either severe or pervasive conduct, her hostile environment claim necessarily fails.

B. Actual Knowledge / Deliberate Indifference

Even if plaintiff's allegations were sufficiently severe or pervasive, her hostile environment claim would still fail. As previously discussed, *seesupra* note 5, the Supreme Court recently departed from the framework used to hold defendants liable for actionable conduct under Title VII. *See Davis,* 119 S.Ct. at 1671; *Gebser,* 118 S.Ct. at 1999. Pursuant to these new decisions, it is now clear that in order to hold an educational institution liable for a hostile educational environment under Title IX, it must be shown that "an official who at minimum has authority to address the alleged discrimination and to institute corrective measures on the [plaintiff's] behalf *has actual knowledge of [the] discrimination* [.]" *Gebser,* 118 S.Ct. at 1999 (emphasis supplied). What's more, the bar is even higher: after learning of the harassment, in order for the school to be liable, its response must then "amount to deliberate

Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

indifference to discrimination[,]" or, "in other words, [ ] *an official decision by the [school] not to remedy the violation."Id.* (Emphasis supplied). *Accord Davis,* 119 S.Ct. at 1671 ("we concluded that the [school] could be liable for damages only where the [school] itself intentionally acted in clear violation of Title IX by remaining deliberately indifferent to acts of teacher-student harassment of which it had actual knowledge."). This requires plaintiff to show that the school's "own deliberate indifference effectively 'cause[d]' the discrimination." *Id.* (alteration in original) (quoting *Gebser,* 118 S.Ct. at 1999). The circuits that have taken the question up have interpreted this to mean that there must be evidence that actionable harassment continued to occur *after* the appropriate school official gained actual knowledge of the harassment. *See Reese v. Jefferson Sch. Dist.,* 208 F.3d 736, 740 (9th Cir.2000); *Soper v. Hoben,* 195 F.3d 845, 855 (6th Cir.1999); *Murreel v. School Dist. No. 1, Denver Colo.,* 186 F.3d 1238, 1246 (10th Cir.1999); *Wills v. Brown Univ.,* 184 F.3d 20, 26-27 (1st Cir.1999). There is no serious contention that plaintiff can satisfy this requirement.

**\*9** By the time plaintiff complained to Dean Crockett of sexual harassment in August of 1997, it is uncontested that her alleged harasser had no contact with her. Nor, for that matter, did he ultimately have any involvement in the third retake of her exam. She had a new advisor, exam committee and exam coordinator. Quite simply, by that point, Roopnarine had no involvement with her educational experience at all.[FN6] This undisputed fact is fatal to plaintiff's claim. As discussed above, the Supreme Court now requires some harm to have befallen plaintiff *after* the school learned of the harassment. As there have been no credible allegations of subsequent harassment, no liability can be attributed to the University.[FN7] *See Reese,* 208 F.3d at 740 ("There is no evidence that any harassment occurred after the school district learned of the plaintiffs' allegations. Thus, under *Davis,* the school district cannot be deemed to have 'subjected' the plaintiffs to the harassment.").

FN6. Of course, plaintiff contends that the University had notice of the harassment prior to this time, through her complaints to Burgess that she no longer could work with Roopnarine, because he yelled at her, was rude to her, and

refused to assist her with various requests. But it is undisputed that she never mentioned sexual harassment, and provided no details that might suggest sexual harassment. Indeed, as pointed out by defendant, plaintiff *herself* admits that she did not consider the conduct sexual harassment until another person later told her that it might be, in June of 1997. *See* Pl.'s Dep. at 258-59, 340. As a result, plaintiff can not seriously contend that the University was on notice of the alleged harassment before August of 1997.

FN7. As mentioned previously, *see supra* note 3, plaintiff maintains without any evidentiary support that Roopnarine played a role in her third exam. This allegation is purely conclusory, especially in light of the record evidence the University puts forward which demonstrates that he was not, in fact, involved in the examination.

As plaintiff's allegations of harassment are not severe or pervasive enough to state a claim, and in any event, this conduct can not be attributed to the University, her hostile environment claim is dismissed.

*II. Retaliation*

Plaintiff's retaliation claim must be dismissed as well. She cannot establish an actionable retaliation claim because there is no evidence that she was given failing grades due to complaints about Roopnarine. *See Murray,* 57 F.3d at 251 (retaliation claim requires evidence of causation between the adverse action, and plaintiff's complaints of discrimination). The retaliation claim appears to be based exclusively on plaintiff's speculative and conclusory allegation that Roopnarine was involved in or influenced the grading of her third research methods exam.[FN8] In any event, the adverse action which plaintiff claims to be retaliation must be limited to her failing grade on the third research methods exam, since plaintiff made no complaints of sexual harassment until August of 1997, long after plaintiff failed her second examination. *See Murray,* 57 F.3d at 251 (retaliation claim requires proof that defendant had knowledge of plaintiff's protected activity at the time of the adverse reaction); *Weaver v.*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

*Ohio State Univ.*, 71 F.Supp.2d 789, 793-94 (S.D.Ohio) ("[c]omplaints concerning unfair treatment in general which do not specifically address discrimination are insufficient to constitute protected activity"), *aff'd,* 194 F.3d 1315 (6th Cir.1999).

> FN8. As properly noted by defendant, *see* Def. Mem. of Law at 28 n. 14, plaintiff's complaint alleges that a number of individuals retaliated against her, but in her deposition she essentially conceded that she has no basis for making a claim against anyone other than Roopnarine and those who graded her third exam. *See* Pl.'s Dep. at 347-53.

The undisputed evidence establishes that Roopnarine had no role in the selection of who would grade plaintiff's exam. Nor, for that matter, did he grade the exam; this was done by three other professors. Each of these professors has averred that they graded the exam without any input or influence from Roopnarine. More importantly, it is undisputed that none of the three had any knowledge that a sexual harassment complaint had been asserted by plaintiff against Roopnarine, not surprising since two of the three did not even know whose exam they were grading. Plaintiff's inability to show that her failure was causally related in any way to her complaint of harassment is fatal to her retaliation claim.[FN9]

> FN9. Plaintiff's claim also fails to the extent that the school's refusal to let her take the research methods exam for a fourth time was the retaliatory act she relies upon. It is undisputed that the University's policies for CFS department students only allow a comp. exam to be given three times. *See* Gaal Aff. Ex. 53. Plaintiff cannot claim that the University's refusal to depart from its own policies was retaliation without some concrete showing that its refusal to do so was out of the ordinary, i.e., that it had allowed other students to take the exam a fourth time without a remedial course, when these other students had not engaged in some protected activity. *See* *Murray,* 57 F.3d at 251 (there is "no allegation either that NYU selectively enforced its academic standards, or that the decision in

[plaintiff's] case was inconsistent with these standards.").

CONCLUSION

*10 For the aforementioned reasons, Syracuse University's motion for summary judgment is GRANTED; plaintiff's claims of hostile environment and retaliation are DISMISSED.

IT IS SO ORDERED.

N.D.N.Y.,2000.
Elgamil v. Syracuse University
Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

C   Only the Westlaw citation is currently available.

United States District Court,
E.D. New York.
Wayne HARGROVE, Plaintiff,
v.
Sheriff Edward RILEY; Nassau County Correctional
Facility, et al; Nassau County University Medical Staff
and Nassau County Correctional Facility, Defendants.
**Civil Action No. CV-04-4587 (DGT).**

Jan. 31, 2007.

Wayne Hargrove, Ossining, NY, pro se.

Alexander V. Sansone, Troy & Troy, Lake Ronkonkoma, NY, Joseph Carney, Mineola, NY, for Defendants.

*MEMORANDUM AND ORDER*

TRAGER, J.

**\*1** Inmate Wayne Hargrove ("Hargrove" or "plaintiff") brings this *pro se* action pursuant to 42 U.S.C. § 1983 against the Nassau County Sheriff, Nassau County Correctional Facility ("NCCF") and NCCF's medical staff, (collectively, "defendants"), seeking damages for injuries allegedly caused by defendants while he was incarcerated at NCCF. Defendants now move for summary judgment pursuant to Fed.R.Civ.P. 56 arguing, *inter alia,* that Hargrove's claims should be dismissed because he failed to exhaust administrative remedies, as required by the Prison Litigation Reform Act of 1995 ("PLRA"), 42 U.S.C. § 1997e. For the following reasons, defendants' motions for summary judgment are granted.

**Background**

On August 27, 2004,[FN1] Hargrove filed a complaint, alleging that defendants violated his civil rights when they forcibly administered purified protein derivative skin tests ("PPD test") to test for latent tuberculosis ("TB") in April 2002, 2003 and 2004 while he was incarcerated at NCCF. Complaint, Ex. C; Aff. in Opp. at 1-4, Ex. A. Hargrove named Nassau County Sheriff Edward Reilly ("Reilly"), NCCF and Nassau County University Medical Staff [FN2] as defendants.[FN3] On November 22, 2004, after discovery, County Defendants and NHCC Defendants filed separate motions for summary judgment pursuant to Fed.R.Civ.P. 56. Both defendants properly filed a Local Rule 56.1 Statement and served Hargrove a Notice to *Pro Se* Litigant Opposing Motion for Summary Judgment, pursuant to Local Civil Rule 56.2.

FN1. Hargrove signed the complaint August 27, 2004. The *pro se* clerk's office received and filed the complaint on September 20, 2004. Under the prison mail-box rule, a *pro se* prisoner's complaint is deemed filed when it is delivered to prison authorities. *See, e.g., Walker v. Jastremski, 430 F.3d 560, 562 (2d Cir.2005)*(deeming *pro* se prisoner's § 1983 action filed on date complaint was handed to prison officials). There is no evidence in the record as to when Hargrove handed the complaint to prison officials. However, it is clear the operative date is between August 27, 2004 and September 20, 2004. As discussed, *infra,* both of these dates occur before Hargrove properly exhausted the administrative remedies available to him at NCCF.

FN2. The Nassau County University Medical Staff are employed by the Nassau Health Care Corporation ("NHCC"). Pursuant to the Correctional Center Health Services Agreement between the County of Nassau and NHCC, dated September 24, 1999, NHCC provides medical services for inmates at NCCF. County Defs.'s

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

Not. of Motion, Decl., at 1.

FN3. Reilly and NCCF are represented separately from NHCC. Accordingly, when a distinction is necessary, Reilly and NCCF will be referred to as "County Defendants" and Nassau County University Medical Staff and NHCC will be referred to as "NHCC Defendants."

**(1)**

**Tuberculosis Testing at NCCF**

Upon entering NCCF, new prisoners must first go through medical intake. Aff. of Kim Edwards, ("Edwards Aff.") ¶ 3. This standard process usually takes seventy-two hours. Edwards Aff. ¶ 4. During medical intake, NCCF tests inmates for TB. Aff. of Getachew Feleke ("Feleke Aff.") ¶ 3. NCCF generally uses a PPD test to detect latent TB. Feleke Aff. ¶ 3. However, if an inmate has previously tested positive for TB, it is NCCF's policy to test for TB using an x-ray instead.FN4 Feleke Aff. ¶ 3. As part of its Infectious Disease Program, NCCF re-tests inmates for TB each year, beginning after they have been housed in that facility for one year. Edwards Aff. ¶ 5.

FN4. According to WebMD, "[a] tuberculin skin test should not be done for people who have a(1) Known TB infection [or a] (2) Positive tuberculin skin test in the past. A second test may cause a more severe reaction to the TB antigens." Jan Nissl, RN, BS, *Tuberculin Skin Tests,* W E B M D , h t t p : / / www.webmd.com/hw/lab_tests/hw203560.asp (last visited Jan. 31, 2007).

**(2)**

**Hargrove's Tuberculosis Testing at NCCF**

On March 15, 2002, Hargrove was incarcerated at NCCF.

NHCC Defs.' 56.1 Statement ¶ 1. Before entering the general population, Hargrove was processed through medical intake. NHCC Defs.' 56.1 Statement ¶ 2. The NCCF Medical Intake Chart for Hargrove, dated March 15, 2002 ("3/15/02 Chart"), shows that Hargrove informed medical staff that he had previously been exposed to tuberculosis. NHCC Defs.' Notice of Mot., Ex. C, at 1; NHCC Defs.' 56.1 Statement ¶ 2. The 3/15/02 Chart also shows that Hargrove reported testing positive to a prior PPD test and that he had been treated for TB in 2000. NHCC Defs.' Notice of Mot., Ex. C, at 1. Hargrove alleges that he was exposed to and treated for TB in 1997. Hargrove's Aff. in Opp. to Mot. for Summary Judgment, ("Aff. in Opp."), Ex. A at 1-2. Defendants contend that Hargrove was given an x-ray during the medical intake process because of his reported positive PPD test, and that the x-ray was negative, showing no active TB infection. NHCC Defs.' 56.1 Statement ¶ 2; Edwards Aff. ¶ 3. Without specifying a date, Hargrove generally states that his "request to be x-rayed was denied." Aff. in Opp. at 3.

**\*2** Pursuant to NCCF's Infectious Disease Program, after being incarcerated in NCCF for a year, Hargrove was scheduled to be re-tested for TB. Edwards Aff. ¶ 5; NHCC Defs.' 56.1 Statement ¶ 4. On May 24, 2003, Hargrove was given a PPD skin test. Edwards Aff. ¶ 5; NHCC Defs.' 56.1 Statement ¶ 4. This test was negative. Edwards Aff. ¶ 5; NHCC Defs.' 56.1 Statement ¶ 4. According to Hargrove, he requested an x-ray instead of a PPD test because of his previous exposure to TB, but was forced to submit to the PPD test. He also alleges that defendants threatened to put him in "keep lock" or "lock up" unless he submitted to the PPD test.FN5 Complaint, Ex. C; Aff. in Opp. at 1-4, Ex. A.

FN5. Hargrove has made contradictory statements about being placed in "keep lock" or "lock up". It is unclear whether he is alleging that defendants threatened to place him in "lock up" unless he submitted to the PPD test or whether he was actually placed in "lock up" until such time that he agreed to submit to the PPD tests. For example, in his complaint, Hargrove states that when he "refused to submit to another [PPD] test, the Correctional Authorities were brought in and placed [him] in lock up." Complaint ¶ 4. In a hearing before Magistrate Judge Bloom on

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

January 31, 2005, Hargrove stated that he took the PPD tests because he was told that he would be placed in "lock up" until he submitted to the test. Hr'g Tr. 6:1-18; 9:5-10:10. In Exhibit B to his complaint, Hargrove alleges both that he was given an unwarranted TB shot and that when he refused the same shot he was placed in "keep lock." Complaint, Ex. B. There is no evidence in the record that Hargrove was ever segregated from the general population while housed at NCCF, outside of the seventy-two hour initial medical intake period. Aff. of Sgt. Neumann ("Neumann Aff.") at 1-2 (referring to prison records showing Hargrove's holding locations which demonstrate that he was never placed in "lock up"); NCCF 56.1 Statement ¶ E. Whether or not Hargrove was actually placed in "lock up" is not a material fact for purposes of this motion; as explained in detail, *infra,* Hargrove's failure to exhaust administrative remedies under the PLRA precludes a consideration of the merits of his Section 1983 claim.

The following year, in June of 2004, Hargrove was scheduled to be retested. Edwards Aff. ¶ 6; NHCC Defs.' 56.1 Statement ¶ 5. Because of the contradiction between the negative May 2003 PPD test and his reported positive history, NCCF contacted the Infectious Disease Department of the Nassau County Medical Center. Edwards Aff. ¶ 6. It was suggested that Hargrove be given a two-step PPD test, administered fifteen days apart. Feleke Aff. ¶ 4; Edwards Aff. ¶ 6. Hargrove was given these two PPD skin tests in June 2004. Edwards Aff. ¶ 6; NHCC Defs.' 56.1 Statement ¶ 5. Again, Hargrove alleges that these tests were administered against his will and under threat of being placed in quarantine. Complaint, Exs. A, B; Aff. in Opp., Ex. A.

On December 3, 2004, Hargrove was seen by a physician's assistant. NHCC Defs.' 56.1 Statement ¶ 6. During this meeting, Hargrove complained of a dry cough and that the site on his forearm where the June 2004 PPD tests had been administered was red and swollen. NHCC Defs.' 56.1 Statement ¶ 6; 11/28/04 Sick Call Request.

Hargrove's December 18, 2004 chart notes a positive PPD

test and an order was placed in the chart that Hargrove not be submitted for future PPD tests. Edwards Aff. ¶ 7; NHCC Defs.' 56.1 Statement ¶ 8. *See also* 11/19/2004 Grievance.

Hargrove alleges that the following physical ailments were caused by the PPD tests: chronic coughing, high blood pressure, chronic back pain, lung infection, dizzy spells, blurred vision and a permanent scar on both his forearms. Complaint, Ex. C; Aff. in Opp. at 3-4.

(3)

**NCCF's Inmate Grievance Procedure**

NCCF has had an inmate grievance program ("IGP") in place since 2001. Aff. of Kenneth Williams, ("Williams Aff."), at 2. NCCF's IGP is carried out in conformance with the New York State Commission of Corrections Minimum Standards and Regulations for Management of County Jails and Penitentiaries ("Minimum Standards"). *Id.*

The IGP is designed to resolve complaints and grievances that an inmate may have regarding the inmate's care and treatment while incarcerated at NCCF. Williams Aff. at 2. Upon entering NCCF, all inmates receive a copy of the NCCF inmate handbook, which outlines the IGP. *Id.*

**\*3** The record does not include an actual copy of NCCF's IGP, but the NCCF's IGP is detailed in the affidavit of NCCF Investigator Kenneth Williams. FN6 The IGP encourages inmates to resolve their grievances informally with the staff member assigned to the inmate housing unit first. *Id.* If an acceptable resolution cannot be reached, inmates must then proceed through the formal three-step process set out in the IGP. *Id.* at 3.

FN6. Hargrove does dispute any statements made by Investigator Williams regarding the inmate grievance procedure, time limits or its availability to him. Furthermore, Hargrove does

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

not dispute that he received a handbook outlining the IGP.

The first step requires an inmate to submit his grievance form [FN7] to the Inmate Grievance Unit by placing it in a locked box located in each housing area, "within five days of the date of the act or occurrence giving rise to the grievance." [FN8] *Id.* at 2-3. NCCF indexes all grievance forms filed by inmates in a log book and in a computer system. *Id.* at 1, 3. Once a grievance form is received by the Inmate Grievance Unit, the grievance is investigated and the inmate will receive a written determination of the outcome from the Inmate Grievance Coordinator in Section II of the grievance form. [FN9] *Id.* at 3. The inmate is then given a choice to accept or appeal the decision by checking the desired selection and signing his name in Section III of the grievance form. *See, e.g.,* 11/19/2004 Grievance form. If the inmate is not satisfied with the decision of the Inmate Grievance Coordinator, the inmate may appeal the determination to the Chief Administrative Officer. Williams Aff. at 3. Finally, if the inmate is not satisfied with the Chief Administrative Officer's determination, the inmate may appeal to the New York State Commission of Correction Citizen's Policy and Complaint Review Council ("Council"). *Id.* at 3. The Council will then render a final determination. *Id.* at 3.

> FN7. The grievance forms contain four sections to be utilized throughout all three steps of the IGP. Section I provides space for the inmate to explain his complaint and the actions he requests as relief. Section II is for the decision of the Inmate Grievance Coordinator. Section III is titled "Acceptance/Appeal of Grievance Coordinator's decision" and contains two mutually exclusive options in which the inmate must choose one or the other: "I have read and accept the Grievance Coordinator's decision," or "I have read and appeal the Grievance Coordinator's decision." Section IV provides space for the decision of the Chief Administrative Officer.

> FN8. Hargrove has not argued that he was unaware of this five-day deadline.

> FN9. There is no evidence in the record specifying the how long an inmate has to appeal inaction by the Inmate Grievance Unit.

### (4)

### Authenticity of the Grievance Forms and Other Documents Submitted by Hargrove

In support of his allegations that he continuously informed defendants that he had been exposed to TB and, therefore, should not have been given PPD tests, Hargrove submitted three letters with his complaint, two of which were addressed to the Inmate Grievance Committee and one of which was addressed to "To whom it may concern." Complaint, Exs. A-C. He also submitted five complaint letters written to Sheriff Reilly, seventeen sick call requests and nine grievance forms during discovery and with his Affidavit in Opposition to Defendants' Motion for Summary Judgment, explaining that some of the medical records and notarized letters were "missing." Aff. in Opp, Ex. A at 2. Defendants call the authenticity of most of these documents into question, contending that Hargrove never submitted any grievance form or complaint letter before he filed his complaint. County Defs.' Mem. of Law at 16-21; County Defs.' 56.1 Statement at ¶¶ B2, C3, D3.

Kenneth Williams, an investigator at NCCF in the Inmate Grievance Unit, testified that he reviewed all of the grievance forms, complaint letters and sick call requests annexed to Hargrove's Complaint and to Hargrove's Affidavit in Opposition to Defendants' Motion for Summary Judgment. Williams Aff. at 2. Williams testified that he examined the grievance records at NCCF and searched "for any grievances by plaintiff/inmate Hargrove" and found "only two." [FN10] Williams Aff. at 1. The first grievance, dated November 19, 2004, complained that the medical staff continued "forcing [Hargrove] to take a T.B. shot while [he] keep[s] telling them that [he] has been exposed to T.B." 11/19/2004 Grievance; Williams Aff. at 1. In response to this grievance, Hargrove's "positive" TB status was noted in his medical records and an order was placed in Hargrove's medical chart, stating that Hargrove not be subjected to future PPD tests. 11/19/2004 Grievance, Section II;

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

Williams Aff. at 1; NHCC Defs.' 56.1 Statement ¶ 8; Edwards Aff. ¶ 7. In Section III of the 11/19/2004 Grievance, Hargrove acknowledged that he had read the Grievance Coordinator's decision, and that he chose to accept the decision instead of appealing it. 11/19/2004 Grievance. The other grievance received by the Grievance Unit, dated May 11, 2005, complained of an unrelated matter. 5/11/2005 Grievance (complaining of back problems and requesting the return of his medical shoes); Williams Aff. at 1. Thus, Williams concluded that, beside the 11/19/2004 and 5/11/2005 Grievance Forms, none of the other documents were "received by the grievance unit, and, given the locked box system, the grievance-forms were never submitted by plaintiff/inmate." Williams Aff. at 2.

> FN10. It is NCCF's procedure to forward to the attention of the Grievance Unit all official grievance forms and complaint letters-even ones not specifically addressed to the Grievance Unit. Williams Aff. at 3.

**\*4** A visual examination of the grievance forms Hargrove submitted in support of his claims suggests forgery. Five of the nine grievance forms were requests to stop PPD testing. *See* April 19, 2002 grievance; April 28, 2002 grievance; April 20, 2003 grievance; April 28, 2003 grievance; November 19, 2004 grievance. The remaining grievance forms concerned Hargrove's requests for medical shoes. *See* March 18, 2002 grievance; July 6, 2002 grievance; February 20, 2003 grievance; May 11, 2005 grievance. Of the grievance forms complaining of unwanted PPD tests, the April 28, 2002 grievance form is a patent photocopy of the April 19, 2002 grievance form, and the April 28, 2003 grievance form is a patent photocopy of the April 20, 2003 grievance form, with only the handwritten dates changed. The only potentially authentic grievance forms relating to Hargrove's complaint about the PPD testing are dated April 19, 2002, April 20, 2003, and November 19, 2004. Of these grievance forms, only the November 19, 2004 has been authenticated by NCCF personnel. *See generally* Williams Aff. at 1-4.

Turning to the complaint letters addressed to Reilly, many contain notary stamps cut from the bottom of unrelated

documents and photocopied onto the bottom of the complaint letters. *See* County Defs.' Mem. of Law at 18-21. C.O. Thomas McDevitt and C.O. Paul Klein, both of whom perform notary services for prisoners at NCCF, have submitted sworn affidavits, stating that they kept individual Notary Log Books covering all dates relevant to this litigation. Aff. of C.O. Klein, ("Klein Aff."), at 1; Aff. of C.O. McDevitt, ("McDevitt Aff."), at 1. McDevitt's Notary Log Book shows that he notarized only one document for Hargrove. This document, dated May 13, 2002, was a motion related to Hargrove's criminal trial. McDevitt Aff. at 1-2. Hargrove signed the Notary Log Book acknowledging receipt of that notarized motion. McDevitt Aff. at 2. McDevitt states that he never notarized any other documents for Hargrove. McDevitt Aff. at 2. However, McDevitt's stamp and signature dated May 13, 2002 (the date of the legitimate notarization) appear on Hargrove's letter to Sheriff Reilly dated May 10, 2002. County Defs.' Not. of Motion, Ex. A.

These facts repeat themselves in regard to the documents bearing the notary stamp and signature of Klein. Klein had performed several legitimate notarizations for Hargrove in connection to Hargrove's criminal trial. Klein Aff. at 1-2. Hargrove signed Klein's Notary Log Book acknowledging receipt of those notarized documents. Klein Aff. at 2. However, Klein states that he never notarized any of Hargrove's letters addressed to Sheriff Reilly that bear Klein's stamp and signature. Klein Aff. at 2. On all of the documents that Hargrove submitted bearing Klein's stamp and signature, the dates and signatures of Klein match identically to the dates on which he had performed legitimate notarizations for Hargrove in connection with his criminal trial. Defendants argue it is clear that the documents bearing the stamps and signatures of McDevitt and Klein were not actually notarized by these notaries. County Defs.' Mem. of Law at 17-22.

**\*5** Hargrove does not deny these allegations. Instead, he resubmits the documents that McDevitt and Klein testify they did not notarize with his Affidavit in Opposition and insists that the documents "refute[ ] the assertions put forth by the defendants." Aff. in Opp. at 2.

**Discussion**

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

**(1)**

**Summary Judgment Standard**

A motion for summary judgment is granted when "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). A court ruling on a summary judgment motion must construe the facts in the light most favorable to the non-moving party and draw all reasonable inferences in his favor. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986); *Williams v. Metropolitan Detention Center,* 418 F.Supp.2d 96, 100 (E.D.N.Y.2005). Defendants, the moving party in this action, bear the burden of demonstrating the absence of a genuine issue of material fact. *Baisch v. Gallina,* 346 F.3d 366, 371 (2d Cir.2003).

As Hargrove is proceeding *pro se,* his complaint must be reviewed carefully and liberally, and be interpreted to "raise the strongest argument it suggests," *Green v. United States,* 260 F.3d 78, 83 (2d Cir.2001), particularly when civil rights violations are alleged, *see, e.g., McEachin v. McGuinnis,* 357 F.3d 197, 200 (2d Cir.2004). Plaintiff's complaint does not specify the legal theories upon which it relies, but, in construing his complaint to raise its strongest arguments, it will be interpreted to raise claims under 42 U.S.C. § 1983. *See, e.g., Dufort v. Burgos,* No. 04-CV-4940, 2005 WL 2660384, at *2 (E.D.N.Y. Oct. 18, 2005) (liberally construing plaintiff's complaint, which failed to specify the legal theory or theories upon which it rested, as, *inter alia,* a claim under 42 U.S.C. § 1983); *Williams,* 418 F.Supp.2d at 100 (same).

**(2)**

**Prison Litigation Reform Act**

**a. Purpose of the Prison Litigation Reform Act**

The PLRA was intended to "reduce the quantity and improve the quality of prisoner suits." *Woodford v. Ngo,*

--- U.S. ----, 126 S.Ct. 2378, 2387 (2006) (quoting *Porter v. Nussle,* 534 U.S. 516, 524 (2002)). It seeks to eliminate unwarranted interference with the administration of prisons by federal courts, and thus " 'affor[d] corrections officials time and opportunity to address complaints internally before allowing the initiation of a federal case.' " *Woodford,* 126 S.Ct. at 2387 (quoting *Porter,* 534 U.S. at 525).See also *Booth v. Churner,* 532 U.S. 731, 739 (2001). Formal grievance procedures allow prison officials to reconsider their policies, implement the necessary corrections and discipline prison officials who fail to follow existing policy. *See Ruggiero v. County of Orange,* 467 F.3d 170, 177-78 (2d Cir.2006).

**b. The Exhaustion Requirement**

The PLRA's "invigorated" exhaustion provision, 42 U.S.C. § 1997e(a), provides the mechanism to reduce the quantity and improve the quality of prisoners' suits by requiring that prison officials have the opportunity to address prisoner complaints through internal processes before allowing a case to proceed in federal court. *Woodford,* 126 S.Ct. at 2382 (citing *Porter,* 534 U.S. at 524).Section 1997e(a) provides that:

**\*6** [n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other federal law, by a prisoner confined in any jail, or other correctional facility until such administrative remedies as are available are exhausted.

42 U.S.C. § 1997e(a).

The exhaustion requirement is a mandatory condition precedent to any suit challenging prison conditions, including suits brought under Section 1983. *Woodford,* 126 S.Ct. at 2383;*Ruggiero,* 467 F.3d at 174;*Williams,* 418 F.Supp.2d at 100-01. The exhaustion provision is applicable to suits seeking relief, such as money damages, that may not be available in prison administrative proceedings, as long as other forms of relief are obtainable through administrative channels. *Giano v. Goord,* 380 F.3d 670, 675 (2d Cir.2004); *see also Woodford,* 126 S.Ct. at 2382-83 ("[A] prisoner must now exhaust

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

administrative remedies even where the relief sought-monetary damages-cannot be granted by the administrative process.") (citing *Booth,* 532 U.S. at 734).

In June 2006, the Supreme Court held that the PLRA requires "proper exhaustion" before a case may proceed in federal court. *Woodford,* 126 S.Ct. at 2387. "Proper exhaustion" requires a prisoner to use " 'all steps that the agency holds out, and doing so *properly* (so that the agency addresses the issues on the merits).' " *Ruggiero,* 467 F.3d at 176 (citing *Woodford,* 126 S.Ct. at 2385 (emphasis in original). Although the level of detail necessary to properly exhaust a prison's grievance process will vary from system to system, *Jones v. Bock,* 127 S.Ct. 910, 2007 WL 135890, at *12 (Jan. 22, 2007), "proper exhaustion" under the PLRA " 'demands compliance with [that] agency's deadlines and other critical procedural rules.' " *Ruggiero,* 467 F.3d at 176 (quoting *Woodford,* 126 S.Ct. at 2386). Thus, the PLRA's exhaustion requirement is not satisfied by "untimely or otherwise procedurally defective attempts to secure administrative remedies." *Ruggiero,* 467 F.3d at 176 (citing *Woodford,* 126 S.Ct. at 2382).

**(3)**

**Exhaustion Analysis: Hargrove did not Exhaust the Administrative Remedies Made Available by NCCF prior to Bringing Suit**

Section 1997e(a) of the PLRA applies to Hargrove's complaint; Hargrove was and continues to be confined in a correctional facility, *see Berry v. Kerik,* 366 F.3d 85, 87 (2d Cir.2004), and Hargrove's claim is about a "prison condition" within the meaning of the PLRA, *see Williams,* 418 F.Supp.2d at 101. *See also Sloane v. W. Mazzuca,* No. 04-CV-8266, 2006 WL 3096031, at *4 (S.D.N.Y. Oct. 31, 2006) (recognizing PLRA's application to complaint alleging retaliation by prison officials for plaintiff's refusal to consent to a PPD test). Accordingly, the merits of Hargrove's Section 1983 claims can only be addressed if it is first determined that Hargrove properly exhausted each claim under Section 1997e(a) of the PLRA before filing his complaint in federal court.

**\*7** Hargrove has submitted both forged [FN11] and authentic grievance forms in opposing defendants' motions for summary judgment. Excluding, for the moment, the forged documents, NCCF's records reflect that Hargrove did not submit his first grievance until after he filed the instant complaint. Williams Aff. at 1. Hargrove's first grievance complaining of unwanted PPD testing is dated November 19, 2004, Williams Aff. at 1, two to three months after Hargrove filed his complaint. Additionally, this first grievance, dated November 19, 2004, was submitted five months after the last PPD test was administered to him in June 2004. NHCC Defs.' 56.1 Statement ¶¶ 5,6. This five-month period far exceeds the five-day window provided by NCCF's IGP. Since Hargrove failed to comply with the IGP's deadlines, he did not properly exhaust the available administrative remedies. *Ruggiero,* 467 F.3d at 176 (" 'untimely or otherwise procedurally defective attempts to secure administrative remedies do not satisfy the PLRA's exhaustion requirement.' ") (quoting *Woodford,* 126 S.Ct. at 2382).

> FN11. Based on an examination of the documents themselves, as well as the uncontradicted testimony of the notaries performing services for prisoners at NCCF, *see generally* Klein Aff.; McDevitt Aff., and of the investigator in the Inmate Grievance Unit, *see generally* Williams Aff., it appears that many of the documents submitted by Hargrove are forgeries. However, in order to view the facts in the light most favorable to Hargrove, and so as to avoid making findings of fact in a summary judgment motion, for the purposes of the exhaustion analysis, all of the documents will be considered to be authentic. However, for purposes of the sanctions analysis, the documents will be explored and the consequences of Hargrove's misrepresentations will be addressed.

Furthermore, even if the falsified grievance forms Hargrove submitted in support of his claim are considered authentic, they are still untimely. The diagnostic TB tests (whether x-ray or PPD tests) were given to Hargrove on March 15, 2002, May 24, 2003 and in June of 2004, but the grievance forms Hargrove submitted complaining of unwanted PPD tests are dated April 19, 2002, April 28, 2002, April 20, 2003, April 28, 2003 and November 19,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

2004. None of these grievances were filed "within five days of the of the date of the act or occurrence giving rise to the grievance." Williams Aff. at 3. There is no evidence in the record suggesting that NCCF's IGP allows for a tolling of the five-day time limit in which to file a grievance.[FN12]

FN12. Even if the submitted grievances had been filed within the proscribed time period, they only show that Hargrove's grievances reached an Inmate Grievance Coordinator, the first formal step of NCCF's three-step administrative grievance process; Hargrove never appealed to the Chief Administrative Officer. By failing to take the next available step in NCCF's IGP, Hargrove failed to satisfy the mandatory exhaustion requirement. *See, e.g., Williams, 418 F.Supp.2d at 101, 102* (dismissing *pro se* complaint where plaintiff could only show he exhausted two of the four-step process mandated by prison's administrative process).

While the letters to Reilly and sick call requests show that Hargrove attempted to bring his complaints about the PPD testing to the attention of the prison staff, *see, e.g.,* Aff. in Opp., Exs. A-D, NCCF's IGP requires use of formal grievance forms. Thus, writing complaint letters and submitting sick call requests did not properly exhaust NCCF's available administrative remedies. *See, e .g., Hernandez v. Coffey,* No. 99-CV-11615, 2006 WL 2109465, at *4 (S.D.N.Y. July 26, 2006) (holding letters did not satisfy plaintiff's exhaustion obligation); *Williams, 418 F.Supp.2d at 101* (holding that because plaintiff's efforts to convey his medical condition through letters and conversations with the warden and medical staff did "not include the required steps of the PLRA's administrative remedy process," plaintiff failed to exhaust); *Mills v. Garvin,* No. 99-CV-6032, 2001 U.S. Dist. LEXIS 3333, at *8 (S.D.N.Y. Mar. 2, 2001) ("letter writing is not the equivalent of an exhaustion of administrative remedies under the PLRA").

As Hargrove failed to properly exhaust his administrative remedies, this action is precluded by 42 U.S.C. § 1997e(a) unless Hargrove can establish excuse for his failure to exhaust.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

**(4)**

**No Grounds to Excuse Plaintiff's Failure to Exhaust**

*8 Exhaustion is an affirmative defense that defendants have the duty to raise. *Jones,* 2007 WL 135890, at * 8-11;*Sloane,* 2006 WL 3096031, at *4;*Williams, 418 F.Supp.2d at 101.* Once argued by the defendants, a plaintiff has an opportunity to show why the exhaustion requirement should be excused or why his failure to exhaust is justified. *See Ruggiero,* 467 F.3d at 175;*Collins v. Goord,* 438 F.Supp.2d 399, 411 (S.D.N.Y.2006) ("[T]he Second Circuit has cautioned that 'while the PLRA's exhaustion requirement is 'mandatory,' certain caveats apply.' ")(internal citations omitted). Thus, before concluding that a prisoner failed to exhaust available administrative remedies as required by Section 1997e(a) of the PLRA, the following three factors must be considered: (1) whether administrative remedies were actually available to the prisoner; (2) whether defendants have either waived the defense of failure to exhaust or acted in such a way as to estop them from raising the defense; and (3) whether special circumstances, such as a reasonable misunderstanding of the grievance procedures, exist justifying the prisoner's failure to comply with the exhaustion requirement. *Ruggiero,* 467 F.3d at 175 (citing *Hemphill v. New York,* 380 F.3d 680, 686 (2d Cir.2004)).[FN13]

FN13. Courts in the Second Circuit have questioned what effect, if any, the Supreme Court's recent decision in *Woodford* requiring "proper exhaustion" may have on the three-step *Hemphill* inquiry. The Second Circuit has yet to address this issue. *See Ruggiero,* 467 F.3d at 175-76 (declining to "determine what effect *Woodford* has on our case law in this area ... because [plaintiff] could not have prevailed even under our pre-*Woodford* case law). To date, district courts have acknowledged the tension, but resolved to apply *Hemphill* to exhaustion claims until instructed otherwise by the Second Circuit. *See, e.g., Larkins v. Selsky,* 04-CV-5900, 2006 WL 3548959, at *9, n. 4 (S.D.N.Y. Dec. 6,

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

2006) (applying the current law of the Second Circuit to exhaustion claims); *Sloane,* 2006 WL 3096031, at *5 ("Until such time as the Court of Appeals considers the impact of *Woodford,* if any, on its prior rulings, this Court must follow the law of the Second Circuit. The Court will therefore apply the current law of this circuit to the exhaustion claims."); *Collins v. Goord,* 438 F.Supp.2d at 411 n. 13 (acknowledging that *Woodford* and *Hemphill* may be in tension, but deciding exhaustion claims under *Hemphill* inquiry); *Hernandez v. Coffey,* No.99-CV11615, 2006 WL 2109465, at *3 (S.D.N.Y. July 26, 2006) (same). Here, Hargrove does not prevail under *Hemphill;* therefore, there is no occasion to address the potential effect *Woodford* may have had in his case.

**a. Whether administrative remedies were "available" to Hargrove**

The first step in the *Hemphill* inquiry requires a court to determine whether administrative remedies were available to the prisoner. *Hemphill,* 380 F.3d at 686. The test for assessing availability is an "objective one: that is, would a similarly situated individual of ordinary firmness have deemed them available." *Id.* at 688 (internal quotation marks omitted). In making this determination, "courts should be careful to look at the applicable set of grievance procedures." *Abney v. McGinnis,* 380 F.3d 663, 668 (2d Cir.2004). Exhaustion may be considered unavailable in situations where plaintiff is unaware of the grievance procedures or did not understand it, *Ruggiero,* 467 F.3d at 179, or where defendants' behavior prevents plaintiff from seeking administrative remedies, [FN14] *Hemphill v. State of New York,* 380 F.3d 680, 686 (2d Cir.2004).

FN14. Case law does not clearly distinguish between situations in which defendants' behavior renders administrative remedies "unavailable" to the plaintiff and cases in which defendants are estopped from asserting non-exhaustion as an affirmative defense because of their behavior. As such, there will be some overlap in the analyses.

Here, Hargrove has not claimed that NCCF's administrative grievance procedure was unavailable to him. In fact, Hargrove demonstrated his access to and knowledge of NCCF's IGP by filing proper grievances on November 19, 2004 and on May 10, 2005. Hargrove did not dispute any part of Investigator Williams's affidavit detailing the IGP and its availability to inmates since 2001. Specifically, Hargrove did not dispute, upon entering the facility, that he received a copy of the inmate handbook outlining the IGP. He has not claimed that he is unfamiliar with or unaware of NCCF's IGP. Hargrove has not alleged that prison officials failed to advance his grievances [FN15] or that they threatened him or took any other action which effectively rendered the administrative process unavailable.

FN15. Although not specifically alleged, interpreting the evidence to "raise the strongest argument," Hargrove may be arguing that NCCF's IGP was not available to him because the Grievance Coordinator failed to respond to his grievances. In the single grievance regarding PPD tests that defendants concede is authentic, Hargrove writes, "[n]ow for the third time your office refused to answer my grievances so please look into this matter because the T.B. shot is [sic] effecting my health." 11/19/04 Grievance. This language implies that Hargrove filed grievances in the past and received no response from the Inmate Grievance Coordinator. Furthermore, Hargrove wrote on one of the submitted copies of the November 19, 2004 grievance that "[t]his is the only accepte[sic] that Plaintiff got back from all grievances and letters that the Plaintiff sent to Sheriff Riley and his medical staffs about his staff making [sic] take T.B. test for 3 year[s]." County Defs'. Not. of Motion, Ex. A, 11/19/2004 grievance.

First, it must be reiterated that filing of the initial grievances was untimely. However, even assuming *arguendo* that the original grievances had been timely filed, district courts in the Second Circuit have held that the "lack of a response from the [Inmate Grievance Review Committee] does not excuse an inmate's obligation to exhaust his

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

remedies through available appeals." *Hernandez v. Coffey,* 2006 WL 2109465, at *3-5. *See also Hemphill,* 380 F.3d at 686 ("Threats or other intimidation by prison officials may well deter a prisoner of 'ordinary firmness' from filing an internal grievance, but not from appealing directly to individuals in positions of greater authority within the prison system"); *Acosta v. Corr. Officer Dawkins,* No. 04-CV-6678, 2005 WL 1668627, at *3 (S.D.N.Y. July 14, 2005) (inmate required to appeal lack of response to exhaust administrative remedies); *Mendoza v. Goord,* No. 00-CV-0146, 2002 U.S. Dist. LEXIS 22573, at *6 (S.D.N.Y. Nov. 21, 2002) ("If, as a result of a negligent error by prison officials-or even their deliberate attempt to sabotage a prisoner's grievance-the prisoner [does not receive a response] on his complaint, he is not thereby forestalled from appealing"). Hargrove did not assert or offer evidence suggesting that he appealed the unresponsiveness or that those appeals were not advanced.

**\*9** Additionally, Hargrove's transfer from NCCF to Sing Sing Correctional Facility ("Sing Sing") in July 2005 did not excuse his previous failure to properly exhaust. *See, e.g., Sims v. Blot,* No. 00-CV-2524, 2003 WL 21738766, at *4 (S.D.N.Y. July 25, 2003) (determining that failure to exhaust administrative remedies is not excused by transfer to another facility); *Santiago v. Meinsen,* 89 F.Supp.2d 435, 440-41 (S.D.N.Y.2000) (determining that plaintiff should not be "rewarded" for failing to participate in grievance procedure before being transferred). Hargrove had ample opportunity to properly file his grievances and to appeal their results as required by NCCF's procedures while he was imprisoned at NCCF. The last PPD test Hargrove complains of was given in 2004; therefore, Hargrove had until June or July of 2004 to timely file his grievance in accordance with NCCF's IGP. Hargrove was not transferred to Sing Sing until July 2005. County Defs.' Mem. of Law at 2. Thus, Hargrove's transfer cannot excuse his previous failure to properly exhaust.

**b. Estoppel**

The second step of the inquiry asks whether defendants are estopped from raising exhaustion as a defense. Specifically, "whether the defendants may have forfeited the affirmative defense of non-exhaustion by failing to raise or preserve it, or whether the defendants' own actions inhibiting the inmate's exhaustion of remedies may estop one or more of the defendants from raising the plaintiff's failure to exhaust as a defense." *Hemphill,* 380 F.3d at 686 (internal citations omitted).

Here, Hargrove has not made any statements that would permit a finding that defendants should be estopped from raising the affirmative defense of exhaustion or that defendants waived the right to raise the defense. Defendants first raised the PLRA's exhaustion requirement as an affirmative defense in their respective answers. *See* County Defs.' Am. Answer at 3; NHCC Defs.' Answer at 1. County Defendants raised it again in their motion for summary judgment. *See* County Defs.' Mem of Law at 15-23. Thus, defendants are not estopped from raising the affirmative defense now. *See, e.g., Sloane,* 2006 WL 3096031, at *8 (exhaustion defense not waived where defendants first raised it in their motion to dismiss).

Additionally, defendants have not threatened Hargrove or engaged in other conduct preventing him from exhausting the available administrative remedies. *Cf. Ziemba v. Wezner,* 366 F.3d 161, 162 (2d Cir.2004) (holding defendants were estopped from asserting non-exhaustion because of prison officials' beatings, threats and other conduct inhibiting the inmate from filing proper grievances); *Feliciano v. Goord,* No. 97-CV-263, 1998 WL 436358, at *2 (S.D.N.Y. July 27, 1998) (holding defendants were estopped from asserting non-exhaustion where prison officials refused to provide inmate with grievance forms, assured him that the incidents would be investigated by staff as a prerequisite to filing a grievance, and provided prisoner with no information about results of investigation). Hargrove has not argued otherwise. *See Ruggiero,* 467 F.3d at 178 (holding defendants were not estopped from asserting a failure to exhaust defense where plaintiff pointed to no affirmative act by prison officials that would have prevented him from pursing administrative remedies); *Sloane,* 2006 WL 3096031, at *8 (finding no estoppel where plaintiff did not argue that defendants prevented him from pursuing the available administrative remedies); *Hernandez,* 2006 WL 2109465,

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

at *4 (finding no estoppel where plaintiff did not argue that any threats or intimidation prevented him from pursuing his appeals). Thus, for the same reasons that administrative remedies were not deemed unavailable to Hargrove, defendants are not estopped from raising a failure to exhaust defense.

**c. Special circumstances**

**\*10** Even where administrative remedies are available and the defendants are not estopped from arguing exhaustion, the court must "consider whether 'special circumstances' have been plausibly alleged that justify 'the prisoner's failure to comply with administrative procedural requirements.' " *Hemphill,* 380 F.3d at 688 (quoting *Giano,* 380 F.3d at 676). For example, plaintiff's reasonable interpretation of regulations differing from prison official's interpretation has been held to constitute a "special circumstance." *Giano,* 380 F.3d at 676-77. No special circumstances have been alleged that would excuse Hargrove from availing himself of administrative remedies. *See Sloane,* 2006 WL 3096031, at *8; *Freeman v. Goord,* No. 02-CV-9033, 2004 U .S. Dist. LEXIS 23873, at * 9-10 (S.D.N.Y.2004) (granting motion to dismiss where "there is no evidence in the record ••• of any 'special circumstances' in this action.")

**(5)**

**Hargrove's Failure to Exhaust, in Addition to his Fraud on the Court, Warrants Dismissal with Prejudice**

Hargrove has not sufficiently rebutted the defendants' assertion of failure to exhaust, and a liberal reading of his submissions does not reveal any grounds to excuse that failure.

Because Hargrove filed a complaint in federal court before filing a grievance, permitting his unexhausted and unexcused claim to proceed would undercut one of the goals of the exhaustion doctrine by allowing NCCF to be haled into federal court without the "opportunity to correct

its own mistakes with respect to the programs it administers." *Woodford,* 126 S.Ct. at 2385. *See also Ruggiero,* 467 F.3d at 178 (citing *Porter,* 534 U.S. at 525). Thus, his complaint must be dismissed.

In general, dismissal without prejudice is appropriate where plaintiff has failed to exhaust but the time permitted for pursuing administrative remedies has not expired. *Berry v. Kerik,* 366 F.3d 85, 87 (2d Cir.2004). Dismissal with prejudice is appropriate where "administrative remedies have become unavailable after the prisoner had ample opportunity to use them and no special circumstances justified failure to exhaust." *Berry,* 366 F.3d at 88. Here, Hargrove's administrative remedies were available to him during his entire period of confinement at NCCF. He remained incarcerated in NCCF throughout the time period in which he alleges the PPD tests are given. He could have exhausted remedies for his grievances at any time. Therefore, Hargrove had ample opportunity to seek administrative remedies but failed to do so. Because there is no evidence in the record that administrative remedies are still available to Hargrove, as the five-day time period had run, and because Hargrove has alleged no special circumstances justifying his failure to exhaust, his complaint is accordingly dismissed with prejudice. *Berry,* 366 F.3d at 88 (upholding dismissal with prejudice where plaintiff had no justification for his failure to pursue administrative remedies while they were available.)

**\*11** Additionally, defendants' have moved for sanctions based on Hargrove's alleged submission of falsified evidence. If a party commits a fraud on the court, the court has the inherent power to do whatever is reasonably necessary to deter abuse of the judicial process. *Shangold v. The Walt Disney Co.,* No. 03-CV-9522, 2006 WL 71672, at *4 (S.D.N.Y. January 12, 2006) (citing *Chambers v. NASCO, Inc.,* 501 U.S. 32, 44 (1991)). Fraud upon the court has been defined as "fraud which seriously affects the integrity of the normal process of adjudication." *Gleason v. Jandrucko,* 860 F.2d 556, 559 (2d Cir.1988); *McMunn v. Mem'l Sloan-Kettering Cancer Center,* 191 F.Supp.2d 440, 445 (S.D.N.Y.2002). In order for a court to grant sanctions based upon fraud, it must be established by clear and convincing evidence that a party has "sentiently set in motion some unconscionable scheme calculated to interfere with the judicial system's ability impartially to adjudicate a matter by ... unfairly hampering

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

the presentation of the opposing party's claim or defense." *McMunn,* 191 F.Supp.2d at 455 (quoting *Aoude v. Mobil Oil Corp.,* 892 F.2d 1115, 1119 (1st Cir.1989).

After carefully reviewing the allegedly fraudulent documents, it must be concluded that Hargrove consciously falsified these documents. *See, e.g., Shangold,* 2006 WL 71672, at *1, *3 (finding clear and convincing evidence of fraud where plaintiffs fabricated a timeline and plot outlines to advance their claims); *McMunn,* 191 F.Supp.2d at 446 (finding clear and convincing evidence of fraud where plaintiff edited audio tapes and represented that they were unedited during discovery). The notaries performing services for prisoners at NCCF testify that they never notarized many of the documents supplied by Hargrove. *See* Klein Aff.; McDevitt Aff. Furthermore, a visual examination of the documents themselves makes it clear that many of the documents submitted by Hargrove are forgeries.

In considering what sanction to impose, courts consider the following five factors: (i) whether the misconduct was the product of intentional bad faith; (ii) whether and to what extent the misconduct prejudiced the plaintiffs; (iii) whether there was a pattern of misbehavior rather than an isolated instance; (iv) whether and when the misconduct was corrected; and (v) whether further misconduct is likely to occur in the future. *Scholastic, Inc. v. Stouffer,* 221 F.Supp.2d 425, 444 (S.D.N.Y.2002) (citing *McMunn,* 191 F.Supp.2d at 461).

Here, Hargrove's deception was not an isolated instance; he fabricated the dates on many grievance forms, in addition to improperly duplicating notary stamps on complaint letters to make them look authentic. Klein Aff. at 2; McDevitt Aff. at 2; County Defs.' 56.1 Statement ¶¶ C3, D3. He submitted these forgeries to defendants during discovery and again as exhibits to his Affidavit in Opposition to Defendant's Motion for Summary Judgment. A severe sanction is warranted as Hargrove's forgeries were intentional, he never corrected them once their authenticity was challenged and he continues to insist on their veracity. Aff. in Opp. at 1-4. Given that there is clear and convincing evidence that Hargrove has continuously and consciously perpetrated a fraud on the court through his submission of fraudulent documents and sworn

affirmations of those documents' authenticity, dismissal with prejudice is especially appropriate. *See, e.g., Shangold,* 2006 WL 71672, at *5 (dismissing with prejudice where plaintiffs fabricated evidence to advance their claims); *Scholastic,* 221 F.Supp.2d at 439-444 (dismissing with prejudice where plaintiff produced seven pieces of falsified evidence); *McMunn,* 191 F.Supp.2d at 445 (dismissing with prejudice where plaintiff "lie[d] to the court and his adversary intentionally, repeatedly, and about issues that are central to the truth-finding process").

**Conclusion**

**\*12** Because Hargrove did not satisfy the exhaustion requirement under the PLRA, defendants' motions for summary judgment are granted. Further, considering the fraud Hargrove perpetrated on the court, the claims are dismissed against all defendants with prejudice. The Clerk of the Court is directed to close the case.

SO ORDERED:

E.D.N.Y.,2007.
Hargrove v. Riley
Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2006 WL 2639369 (N.D.N.Y.)
(Cite as: 2006 WL 2639369 (N.D.N.Y.))

C  Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
James PETTUS, Plaintiff,
v.
Jospeh McCOY, Superintendent, Deputy Ryan,
Defendants.
**No. 9:04-CV-0471.**

Sept. 13, 2006.

James Pettus, Comstock, NY, pro se.

Charles J. Quackenbush, New York State Attorney
General, The Capitol Albany, NY, for Defendants.

### DECISION and ORDER

THOMAS J. McAVOY, Senior District Judge.

**\*1** Plaintiff commenced the instant action asserting
various violations of his constitutional rights arising out of
his placement at the Southport Correctional Facility. In his
Complaint, Plaintiff alleges that he was improperly sent to
the Special Housing Unit ("SHU") at a maximum security
facility and that being in SHU has put his life in jeopardy.
Currently before the Court is Defendants' motion for
summary judgment pursuant to Fed.R.Civ.P. 56 seeking
dismissal of the Complaint in its entirety for failure to
exhaust administrative remedies.

**I. FACTS**[FN1]

> FN1. The following facts are taken from

Defendants' statement of material facts submitted
pursuant to N.D.N.Y.L.R. 7.1(a)(3). These facts
are deemed admitted because they are supported
by the record evidence and Plaintiff failed to
submit an opposing statement of material facts as
required by Rule 7.1(a)(3). Plaintiff was
specifically advised by Defendants of his
obligation to file an opposing statement of
material facts and to otherwise properly respond
to the motion for summary judgment.

Plaintiff is an inmate in the custody of the New York State
Department of Correctional Services. Plaintiff signed the
instant Complaint on April 7, 2004. On his Complaint
form, Plaintiff indicated that there is a grievance
procedure available to him and that he availed himself of
the grievance procedure by filing a complaint with the
IGRC [FN2], followed by an appeal to the superintendent of
the facility, and then to the Central Office Review
Committee in Albany. The Complaint indicates that
Plaintiff is "waiting for response from Albany." The
Complaint was filed on April 27, 2004.

> FN2. Inmate Grievance Review Committee.

On April 12, 2004, prior to the filing of the instant
Complaint, Plaintiff filed a grievance relating to the issues
presented in this case. On April 19, 2004, the IGRC
recommended that Plaintiff's grievance be denied. Plaintiff
then appealed that decision to the facility Superintendent.
In the meantime, on April 27, Plaintiff commenced the
instant litigation. On May 3, 2004, after Plaintiff filed the
Complaint in this case, the Superintendent denied
Plaintiff's grievance. On May 5, 2004, Plaintiff appealed
the decision to the Central Office Review Committee in
Albany. On June 23, 2004, the Central Office Review
Committee denied Plaintiff's appeal. Plaintiff did not file
any other grievances in connection with the matters raised
in this lawsuit.

Defendants now move to dismiss on the ground that
Plaintiff commenced the instant action before fully

© 2010 Thomson Reuters. No Claim to Orig. US Gov.
Works.

Not Reported in F.Supp.2d, 2006 WL 2639369 (N.D.N.Y.)
(Cite as: 2006 WL 2639369 (N.D.N.Y.))

exhausting his available administrative remedies.

## II. DISCUSSION

The sole issue presented is whether Plaintiff was required to complete the administrative process before commencing this litigation. This issue has already been addressed by the Second Circuit in *Neal v. Goord,* 267 F.3d 116 (2d Cir.2001). The issue in that case was "whether plaintiff's complaint should have been dismissed despite his having exhausted at least some claims during the pendency of his lawsuit." *Id.* at 121. The Second Circuit held that "exhausting administrative remedies after a complaint is filed will not save a case from dismissal." *Id.*

In this case, Defendants have established from a legally sufficient source that an administrative remedy is available and applicable. *Mojias v. Johnson,* 351 F.3d 606, 610 (2d Cir.2003); *see also* 7. N.Y.C.R.R. § 701.1, *et seq.* Plaintiff's Complaint concerns his placement in SHU at a maximum security facility. These are matters that fall within the grievance procedure available to NYSDOCS inmates and are required to be exhausted under the Prison Litigation Reform Act, 42 U.S.C. § 1997e. Plaintiff has failed to demonstrate any applicable exception to the exhaustion requirement. Because Plaintiff commenced the instant litigation prior to fully completing the administrative review process, the instant Complaint must be dismissed without prejudice. *Neal,* 267 F.3d 116.

## III. CONCLUSION

**\*2** For the foregoing reasons, Defendants' motion for summary judgment is GRANTED and the Complaint is DISMISSED WITHOUT PREJUDICE. The Clerk of the Court shall close the file in this matter.

IT IS SO ORDERED.

N.D.N.Y.,2006.
Pettus v. McCoy
Not Reported in F.Supp.2d, 2006 WL 2639369

(N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Page 1

Not Reported in F.Supp.2d, 2007 WL 2847304 (N.D.N.Y.)
(Cite as: 2007 WL 2847304 (N.D.N.Y.))

C  Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
LaCream NEWMAN, Plaintiff,
v.
George B. DUNCAN, Superintendent of Great Meadow
Correctional Facility; David Carpenter, Deputy
Superintendent; Patrick Vanguilder, Deputy
Superintendent of Security; William Mazzuca,
Superintendent of Fishkill Correctional Facility; R.
Ercole, Deputy Superintendent of Security; J. Conklin,
Corrections Sergeant; and John Doe, Corrections
Officer, Defendants.
**No. 04-CV-395 (TJM/DRH).**

Sept. 26, 2007.

LaCream Newman, Auburn, NY, pro se.

Hon. Andrew M. Cuomo, Attorney General for the State
of New York, Charles J. Quackenbush, Esq., Assistant
Attorney General, of Counsel, Albany, NY, for
Defendants.

**DECISION & ORDER**

THOMAS J. McAVOY, Senior United States District
Judge.

**I. INTRODUCTION**

**\*1** This *pro se* action brought pursuant to 42 U.S.C. §
1983 was referred to the Hon. David R. Homer, United
States Magistrate Judge, for a Report and
Recommendation pursuant to 28 U.S.C. § 636(b) and

Local Rule 72.3(c). No objections to the
Report-Recommendation and Order dated September 6,
2007 have been filed. Furthermore, after examining the
record, this Court has determined that the
Report-Recommendation and Order is not subject to attack
for plain error or manifest injustice. Accordingly, the
Court adopts the Report-Recommendation and Order for
the reasons stated therein.

It is therefore,

**ORDERED** that

(1) Defendants' motion for summary judgment (Docket
No. 36) is **GRANTED** as to defendants Duncan,
Carpenter, VanGuilder, Mazzuca, Ercole, and Conklin and
as to all of Newman's causes of action;

(2) The complaint is **DISMISSED** without prejudice as to
defendant John Doe; and

(3) This action is **TERMINATED** in its entirety as to all
defendants and all claims.

**IT IS SO ORDERED**

**REPORT-RECOMMENDATION AND ORDER** [FN1]

> [FN1.] This matter was referred to the undersigned
> for report and recommendation pursuant to 28
> U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).

DAVID R. HOMER, U.S. Magistrate Judge.

Plaintiff pro se LaCream Newman ("Newman"), an inmate
in the custody of the New York State Department of
Correctional Services ("DOCS"), brings this action
pursuant to 42 U.S.C. § 1983 alleging that defendants,

© 2010 Thomson Reuters. No Claim to Orig. US Gov.
Works.

Not Reported in F.Supp.2d, 2007 WL 2847304 (N.D.N.Y.)
(Cite as: 2007 WL 2847304 (N.D.N.Y.))

seven DOCS employees, violated his constitutional rights under the Eighth and Fourteenth Amendments. [FN2] *See* Compl. (Docket No. 1). Presently pending is defendants' motion for summary judgment pursuant to Fed.R.Civ.P. 56. Docket No. 36. Newman opposes the motion. Docket No. 41. For the following reasons, it is recommended that defendants' motion be granted.

> FN2. Newman's Fourteenth Amendment claims were previously dismissed. *See* Docket No. 28.

### I. Background

The facts are presented in the light most favorable to Newman as the non-moving party. *See Ertman v. United States,* 165 F.3d 204, 206 (2d Cir.1999).

On October 23, 2002, Newman was being transferred from Great Meadow Correctional Facility ("Great Meadow") to Fishkill Correctional Facility's ("Fishkill") Special Housing Unit ("SHU"). [FN3] *See* Pelc. Aff. (Docket No. 36), Ex. B. Before arriving at Fishkill, Newman was temporarily housed at Downstate Correctional Facility ("Downstate"). *Id.* While being housed at Downstate, an inmate attempted to sexually assault Newman. *See* Compl. at ¶ 7. On October 24, 2002, Newman was transferred from Downstate to Fishkill. *See* Pelc. Aff., Ex. B. Upon arrival at Fishkill, Newman was assigned to a double occupancy cell. *See* Compl. at ¶ 10. On October 29, 2002, an inmate again attempted to sexually assault Newman. *See* Compl. at ¶ 12; *see also* Harris Aff. (Docket No. 36) at Ex. A. On November 15, 2002, Newman was transferred to Clinton Correctional Facility ("Clinton"). *See* Pelc. Aff., Ex. B. This action followed.

> FN3. SHUs exist in all maximum and certain medium security facilities. The units "consist of single-or double-occupancy cells grouped so as to provide separation from the general population ...." N.Y. Comp.Codes R. & Regs. tit. 7, § 300.2(b) (2004). Inmates are confined in a SHU as discipline, pending resolution of misconduct charges, for administrative or security reasons, or in other circumstances as

required. *Id.* at pt. 301.

### II. Discussion

Newman asserts six causes of action, each alleging that defendants' failure to house Newman in a single occupancy cell constituted cruel and unusual punishment under the Eighth Amendment. Defendants seek judgment on all claims.

### A. Standard

**\*2** A motion for summary judgment may be granted if there is no genuine issue as to any material fact if supported by affidavits or other suitable evidence and the moving party is entitled to judgment as a matter of law. The moving party has the burden to show the absence of disputed material facts by informing the court of portions of pleadings, depositions, and affidavits which support the motion. Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). Facts are material if they may affect the outcome of the case as determined by substantive law. *Anderson v. Liberty Lobby,* 477 U.S. 242, 248 (1986). All ambiguities are resolved and all reasonable inferences are drawn in favor of the non-moving party. *Skubel v. Fuoroli,* 113 F.3d 330, 334 (2d Cir.1997).

The party opposing the motion must set forth facts showing that there is a genuine issue for trial. The non-moving party must do more than merely show that there is some doubt or speculation as to the true nature of the facts. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986). It must be apparent that no rational finder of fact could find in favor of the non-moving party for a court to grant a motion for summary judgment. *Gallo v. Prudential Residential Servs.* 22 F.3d 1219, 1223-24 (2d Cir.1994); *Graham v. Lewinski,* 848 F.2d 342, 344 (2d Cir.1988). When, as here, a party seeks summary judgment against a pro se litigant, a court must afford the non-movant special solicitude. *Id.; see also Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 477 (2d Cir.2006). However, the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 2847304 (N.D.N.Y.)
(Cite as: 2007 WL 2847304 (N.D.N.Y.))

motion for summary judgment; the requirement is that there be no genuine issue of material fact. *Anderson*, 477 U.S. at 247-48.

**B. Exhaustion**

Defendants contend that Newman has failed to demonstrate any reasonable excuse for failing to exhaust his administrative remedies as to his Eighth Amendment claim. *See* Defs. Mem. of Law (Docket No. 36) at 6-11. Newman contends that he failed to exhaust his administrative remedies after the attempted sexual assaults because (1) he was threatened by John Doe; (2) he was in transit between DOCS facilities; and (3) he was dealing with the mental and emotional effects of the attempted assaults. *See* Pl. Reply Mem. of Law (Docket No. 41) at 1-3.

The Prison Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e(a), subjects suits concerning prison conditions brought under federal law to certain prerequisites. Specifically, the PLRA dictates that a prisoner confined to any jail, prison, or correctional facility must exhaust all available administrative remedies prior to bringing any suit concerning prison life, " '*whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong.*' " *Ziemba v. Wezner*, 366 F.3d 161, 163 (2d Cir.2004) (quoting *Porter v. Nussle*, 534 U.S. 516, 532 (2002)); *see also Jones v. Bock*, 127 S.Ct. 910, 918-19 (2007) ( "There is no question that exhaustion is mandatory under the PLRA and that unexhausted claims cannot be brought in court.") (citation omitted); *Woodford v. Ngo*, 126 S.Ct. 2378, 2382-83 (2006). Administrative remedies include all appellate remedies provided within the system, not just those that meet federal standards. *Woodford*, 126 S.Ct. at 2382-83. However, the Second Circuit has recognized three exceptions to the PLRA's exhaustion requirement:[FN4]

> **FN4.** It is unclear whether *Woodford* has overruled the Second Circuit's exceptions to the exhaustion requirement. *See Miller v. Covey*, No. Civ. 05-649 (LEK/GJD), 2007 WL 952054, at *3-4 (N.D.N.Y. Mar. 29, 2007). However, it is

not necessary to determine what effect *Woodford* has on the Second Circuit's exceptions to the exhaustion requirement because Newman's contentions cannot prevail even under pre-*Woodford* case law. *See Ruggiero v. County of Orange*, 467 F.3d 170, 176 (2d Cir.2006)

**\*3** when (1) administrative remedies are not available to the prisoner; (2) defendants have either waived the defense of failure to exhaust or acted in such a way as to estop them from raising the defense; or (3) special circumstances, such as a reasonable misunderstanding of the grievance procedures, justify the prisoner's failure to comply with the exhaustion requirement.

*Ruggiero*, 467 F.3d at 175 (citing *Hemphill v. New York*, 380 F.3d 680, 686 (2d Cir.2004)

"The PLRA's exhaustion requirement is designed to 'afford [ ] corrections officials time and opportunity to address complaints internally before allowing the initiation of a federal case.' " *Johnson v. Testman*, 380 F.3d 691, 697 (2d Cir.2004) (quoting *Porter*, 534 U.S. at 524-25)). " '[A] grievance suffices if it alerts the prison to the nature of the wrong for which redress is sought.' " *Id.* (quoting *Strong v. David*, 297 F.3d 646, 650 (7th Cir.2002)). Inmates must provide sufficient information to "allow prison officials to take appropriate responsive measures." *Id.*

DOCS has established a grievance procedure which includes a three-stage review and appeal process. *See* N.Y. Correct. Law § 139 (McKinney 2003); N.Y. Comp.Codes R. & Regs. tit. 7, § 701.1-.16 (2003);[FN5] *Hemphill*, 380 F.3d at 682-83. When an inmate files a grievance, it is investigated and reviewed by an Inmate Grievance Resolution Committee ("IGRC"). If the grievance cannot be resolved informally, a hearing is held. The IGRC decision may be appealed to the Superintendent of the facility. Finally, an inmate may appeal the Superintendent's decision to the Central Office Review Committee ("CORC"). N.Y. Comp.Codes R. & Regs. tit.7, § 701.7(c).

> **FN5.** The Court is aware that the sections governing the Inmate Grievance Program

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 2847304 (N.D.N.Y.)
(Cite as: 2007 WL 2847304 (N.D.N.Y.))

procedures in the Official Compilation of Codes, Rules & Regulations of the State of New York were re-numbered in June 2006. *See Bell v. Beebe,* No. Civ. 06-544 (NAM/GLD), 2007 WL 1879767, at *3 n. 4 (N.D.N.Y. June 29, 2007). However, in the interests of clarity, the Court will cite the section numbers of the provisions that were in effect at the time Newman filed his complaint.

Here, it is undisputed that Newman's first attempt to file a grievance regarding the alleged sexual assaults did not occur until September 21, 2003, nearly one year after the alleged assaults. *See* Pl. Reply Statement of Material Facts (Docket No. 41) at Ex. 2; *see also* Newman Dep. (Ullman Decl. at Ex. 1, Docket No. 36) at 85-87. In his complaint, Newman contends that he failed to file a timely complaint due to "fear." *See* Pl. Reply Statement of Material Facts at Ex. 2. However, the Inmate Grievance Program ("IGP") supervisor at Clinton rejected Newman's attempt to file his complaint as a grievance because Newman failed to "expand on what/who caused the 'fear.' " *Id.* The IGP supervisor also noted that Newman had been housed at Clinton for the previous nine months and, thus, had "ample opportunity to file [his] complaint before [September 2003]." *Id.* Newman attempted to file an appeal of the IGP supervisor's decision to the Superintendent, but the supervisor advised Newman "[t]here is no provision to appeal the IGP Supervisors decision (to not accept a grievance) to the Superintendent. You may file a separate grievance on the determination by submitting it to the IGRC office." *Id.*

**\*4** On or about October 15, 2003, Newman filed a grievance requesting that the October 10, 2003 decision of the IGP supervisor be reversed. *See* Ullman Decl. (Docket No. 36) at Exs. 5 & 6. Newman alleged that the following "mitigating circumstances" prevented him from filing a timely grievance regarding the October 2002 sexual assaults: "1. I was in transit within the 14 days of the incident; to a number of correctional facilities; in addition to MHU within NYS DOCS; 2. I was confronted with fear (threats); which was made by CO's at Fishkill SHU 200 which I wasn't to make mention of the situation and that he could cause me to be placed in the same situation again and no on[e] would help me." *Id.* The IGRC denied Newman's grievance, finding that "[Newman] has been in

[Clinton] since Dec. 2002 which gave him adequate time to file complaint which would have been accepted if filed then. Grievant did not provide mitigating circumstances to warrant the acceptance of complaint." Ullman Decl., Ex. 5 at 4. The Superintendent and CORC both denied Newman's appeals, finding that Newman had failed to present mitigating circumstances to excuse his delay in submitting the complaint. *See* Ullman Decl, Exs. 7 & 8.

In claiming that his non-exhaustion should be excused, Newman makes three arguments. First, he contends that a corrections officer at Fishkill (John Doe) threatened him, warning that if Newman reported the October 29, 2002 sexual assault then he would be placed back in the "same predicament" he was in before. *See* Newman Dep. at 83. However, Newman was transferred to Clinton in November 2002 and, thus, could have immediately filed a grievance now that he was separated from the officer who threatened him. *See* Pelc Decl. (Docket No. 36) at Ex. B. Further, Newman testified that he felt "safe" while at Clinton, demonstrating that any fear he may have had surrounding the filing of a grievance was left behind at Fishkill. *See* Newman Dep. at 66. Moreover, Newman ultimately did file a grievance while at Clinton. *See* Ullman Decl., Exs. 5 & 6. Thus, Newman's first argument for failure to properly exhaust is not persuasive.

Second, Newman contends that his frequent transfers between DOCS facilities within fourteen days of the sexual assaults prevented him from timely filing a grievance. However, this argument is not persuasive because DOCS regulations state that "[e]ach correctional facility housing a reception/classification/transit inmate population shall insure all inmates access to the IGP." N.Y. Comp.Codes R. & Regs. tit.7, § 701.14. Further, Newman arrived at Clinton on November 15, 2003 and was not moved to another DOCS facility until November 19, 2003, thus affording him nearly a year where he was not "in transit." *See* Pelc. Decl. at Ex. B.

Third, Newman contends that this Court should apply the "special circumstances" exception under *Hemphill* because he was dealing with the mental and emotional effects of the sexual assaults, thus preventing his filing of a grievance. *See* Newman Dep. at 83-84; Pl. Reply Mem. of Law at 2-3; *see also Hemphill,* 380 F.3d at 686.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 2847304 (N.D.N.Y.)
(Cite as: 2007 WL 2847304 (N.D.N.Y.))

However, the special circumstances exception under *Hemphill* concerned an inmate's justifiable confusion regarding the proper DOCS procedure for filing an expedited grievance, not an inmate's mental or emotional condition. *See Hemphill,* 380 F.3d at 689-91. Thus, absent any documented mental illness that prevented Newman from filing a grievance, his third argument excusing his failure to timely exhaust his administrative remedies is not persuasive.[FN6]

> FN6. Moreover, shortly after the second assault, Newman wrote a letter to his counselor requesting that he be able to correspond with another inmate. *See* Newman Dep. at 42-43. Thus, in light of his ability to correspond with his counselor shortly after the incident, Newman's contention that he was too emotionally distraught to file a grievance is without merit.

*5 Therefore, it is recommended that defendants' motion on this ground be granted.

### C. Eighth Amendment[FN7]

> FN7. In his complaint, Newman contends that defendants' conduct constituted cruel and unusual punishment in violation of the Eighth Amendment because their failure to comply with DOCS regulations "facilitated ... the cause for the incident of attempted rape/physical assault that occurred to plaintiff therein at Fishkill SHU 200, on or about 10/29/02." Compl. at ¶¶ 15, 17, 19, 21, 23. Therefore, Newman's cause of action is best addressed under the Eighth Amendment's failure to protect standard.

Newman contends that defendants knew or should have know that he was a homosexual and that his placement in a double occupancy cell "facilitated ... the cause for the incident of attempted rape/physical assault that occurred to plaintiff therein at Fishkill SHU 200, on or about 10/29/02." Compl. at ¶¶ 15, 17, 19, 21, 23.

Prison officials have a duty to protect inmates from violence by other inmates. *See Farmer v. Brennan,* 511 U.S. 825, 833 (1994). When asserting a failure to protect claim, an inmate must establish that he was "incarcerated under conditions posing a substantial risk of serious harm" and that the defendants acted with deliberate indifference to the inmate's safety. *Id.* at 834. Deliberate indifference is established when the official knew of and disregarded an excessive risk to inmate health or safety. *Id.* at 837. However, "the issue is not whether [a plaintiff] identified his enemies by name to prison officials, but whether they were aware of a substantial risk of harm to [him]." *Hayes v. New York City Dep't of Corr.,* 84 F.3d 614, 621 (2d Cir.1991).

Here, Newman contends that on two separate occasions, fellow inmates "attempted to rape/physical[ly] assault" him. *See* Compl. at ¶¶ 7, 11, 15, 17, 19, 21, 23. However, it is undisputed that Newman did not suffer any actual injury[FN8] from these attempted assaults. *See* Defs. Statement of Material Facts (Docket No. 36) at ¶¶ 71-76; Pl. Reply Statement of Facts at ¶¶ 71-76; *see also* Newman Dep. at 31-32, 35-37, 41-42, 68-74, 95-96; Harris Aff. at Ex. A. The law is clear that an inmate must demonstrate an "actual injury" when alleging a constitutional violation. *See Brown v. Saj,* No. Civ. 06-6272(DGL), 2007 WL 1063011, at *2 (W.D.N.Y. Apr. 5, 2007) (citing *Lewis v. Casey,* 518 U.S. 343, 349 (1996)). These two isolated incidents, coupled with Newman's failure to allege any injury resulting from the attempted sexual assaults, fail to demonstrate a constitutional violation under the Eighth Amendment. *See Boddie v. Schnieder,* 105 F.3d 857, 861-62 (2d Cir.1997) (holding that isolated incidents of sexual assault, without any injury, fail to state an Eighth Amendment claim); *see also Brown,* 2007 WL 1063011, at *2 (dismissing inmate's failure to protect claim for failure to demonstrate an actual injury).

> FN8. To the extent that Newman contends that the attempted assaults caused him any mental or emotional injury, this claim must fail because "[n]o Federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury." 42 U.S.C. §

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 2847304 (N.D.N.Y.)
(Cite as: 2007 WL 2847304 (N.D.N.Y.))

1997e(e) (2003); *see also Thompson v. Carter,* 284 F.3d 411, 417 (2d Cir.2002) (holding that § 1997e(e) "applies to claims in which a plaintiff alleges constitutional violations so that the plaintiff cannot recover damages for mental or emotional injury for a constitutional violation in the absence of a showing of actual physical injury").

Therefore, in the alternative, it is recommended that defendants' motion on this ground be granted.

### D. Qualified Immunity

Defendants also contend that they are entitled to qualified immunity. Qualified immunity generally protects governmental officials from civil liability insofar as their conduct does not violate clearly established constitutional law of which a reasonable person would have known. *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982); *Aiken v. Nixon,* 236 F.Supp.2d 211, 229 (N.D.N.Y.2002), *aff'd,* 80 Fed.Appx. 146 (2d Cir. Nov. 10, 2003). A court must first determine that if plaintiff's allegations are accepted as true, there would be a constitutional violation. Only if there is a constitutional violation does a court proceed to determine whether the constitutional rights were clearly established at the time of the alleged violation. *Aiken,* 236 F.Supp.2d at 230. Here, as discussed *supra,* accepting all of Newman's allegations as true, he has not shown that defendants violated his constitutional rights.

**\*6** Therefore, in the alternative, defendants' motion for summary judgment on this ground should be granted.

### E. Failure to Serve Defendant John Doe

Newman's complaint asserts a claim against John Doe, a defendant who has neither been identified nor served with the complaint. Rule 4(m) of the Federal Rules of Civil Procedure requires that service of process be effectuated within 120 days of the date of the filing of the complaint. *See also* N.D.N.Y.L.R. 4.1(b). Because defendant John Doe has not been identified by Newman or timely served

with process, it is recommended that the complaint be dismissed without prejudice against this defendant.

### III. Conclusion[FN9]

FN9. Defendants also contend that Newman failed to demonstrate that they were personally involved in the alleged constitutional violations. *See* Defs. Mem. of Law at 11-14. However, it is recommended herein that defendants' motion should be granted as to all of Newman's claims on other grounds. Thus, this argument need not be addressed.

For the reasons stated above, it is hereby

**RECOMMENDED** that:

1. Defendants' motion for summary judgment (Docket No. 36) be **GRANTED** as to defendants Duncan, Carpenter, VanGuilder, Mazzuca, Ercole, and Conklin and as to all of Newman's causes of action;

2. The complaint be **DISMISSED** without prejudice as to defendant John Doe; and

3. This action therefore be **TERMINATED** in its entirety as to all defendants and all claims.

Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993); *Small v. Sec'y of HHS,* 892 F.2d 15 (2d Cir.1989); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

N.D.N.Y.,2007.
Newman v. Duncan

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 2847304 (N.D.N.Y.)
(Cite as: 2007 WL 2847304 (N.D.N.Y.))

Not Reported in F.Supp.2d, 2007 WL 2847304
(N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov.
Works.



Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

**C** Only the Westlaw citation is currently available.

United States District Court,
E.D. New York.
Wayne HARGROVE, Plaintiff,
v.
Sheriff Edward RILEY; Nassau County Correctional
Facility, et al; Nassau County University Medical Staff
and Nassau County Correctional Facility, Defendants.
**Civil Action No. CV-04-4587 (DGT).**

Jan. 31, 2007.

Wayne Hargrove, Ossining, NY, pro se.

Alexander V. Sansone, Troy & Troy, Lake Ronkonkoma,
NY, Joseph Carney, Mineola, NY, for Defendants.

*MEMORANDUM AND ORDER*

TRAGER, J.

**\*1** Inmate Wayne Hargrove ("Hargrove" or "plaintiff")
brings this *pro se* action pursuant to 42 U.S.C. § 1983
against the Nassau County Sheriff, Nassau County
Correctional Facility ("NCCF") and NCCF's medical staff,
(collectively, "defendants"), seeking damages for injuries
allegedly caused by defendants while he was incarcerated
at NCCF. Defendants now move for summary judgment
pursuant to Fed.R.Civ.P. 56 arguing, *inter alia,* that
Hargrove's claims should be dismissed because he failed
to exhaust administrative remedies, as required by the
Prison Litigation Reform Act of 1995 ("PLRA"), 42
U.S.C. § 1997e. For the following reasons, defendants'
motions for summary judgment are granted.

**Background**

On August 27, 2004,[FN1] Hargrove filed a complaint,
alleging that defendants violated his civil rights when they
forcibly administered purified protein derivative skin tests
("PPD test") to test for latent tuberculosis ("TB") in April
2002, 2003 and 2004 while he was incarcerated at NCCF.
Complaint, Ex. C; Aff. in Opp. at 1-4, Ex. A. Hargrove
named Nassau County Sheriff Edward Reilly ("Reilly"),
NCCF and Nassau County University Medical Staff [FN2] as
defendants.[FN3] On November 22, 2004, after discovery,
County Defendants and NHCC Defendants made separate
motions for summary judgment pursuant to Fed.R.Civ.P.
56. Both defendants properly filed a Local Rule 56.1
Statement and served Hargrove a Notice to *Pro Se* Litigant
Opposing Motion for Summary Judgment, pursuant to
Local Civil Rule 56.2.

FN1. Hargrove signed the complaint August 27,
2004. The *pro se* clerk's office received and
filed the complaint on September 20, 2004. Under the
prison mail-box rule, a *pro se* prisoner's
complaint is deemed filed when it is delivered to
prison authorities. *See, e.g., Walker v.
Jastremski, 430 F.3d 560, 562 (2d
Cir.2005)*(deeming *pro* se prisoner's
§ 1983
action filed on date complaint was handed to
prison officials). There is no evidence in the
record as to when Hargrove handed the
complaint to prison officials. However, it is clear
the operative date is between August 27, 2004
and September 20, 2004. As discussed, *infra,*
both of these dates occur before Hargrove
properly exhausted the administrative remedies
available to him at NCCF.

FN2. The Nassau County University Medical
Staff are employed by the Nassau Health Care
Corporation ("NHCC"). Pursuant to the
Correctional Center Health Services Agreement
between the County of Nassau and NHCC, dated
September 24, 1999, NHCC provides medical
services for inmates at NCCF. County Defs.'s

© 2010 Thomson Reuters. No Claim to Orig. US Gov.
Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

Not. of Motion, Decl., at 1.

FN3. Reilly and NCCF are represented separately from NHCC. Accordingly, when a distinction is necessary, Reilly and NCCF will be referred to as "County Defendants" and Nassau County University Medical Staff and NHCC will be referred to as "NHCC Defendants."

**(1)**

**Tuberculosis Testing at NCCF**

Upon entering NCCF, new prisoners must first go through medical intake. Aff. of Kim Edwards, ("Edwards Aff.") ¶ 3. This standard process usually takes seventy-two hours. Edwards Aff. ¶ 4. During medical intake, NCCF tests inmates for TB. Aff. of Getachew Feleke ("Feleke Aff.") ¶ 3. NCCF generally uses a PPD test to detect latent TB. Feleke Aff. ¶ 3. However, if an inmate has previously tested positive for TB, it is NCCF's policy to test for TB using an x-ray instead.[FN4] Feleke Aff. ¶ 3. As part of its Infectious Disease Program, NCCF re-tests inmates for TB each year, beginning after they have been housed in that facility for one year. Edwards Aff. ¶ 5.

FN4. According to WebMD, "[a] tuberculin skin test should not be done for people who have a (1) Known TB infection [or a] (2) Positive tuberculin skin test in the past. A second test may cause a more severe reaction to the TB antigens." Jan Nissl, RN, BS, *Tuberculin Skin Tests,* W E B M D , h t t p : / / www.webmd.com/hw/lab_tests/hw203560.asp (last visited Jan. 31, 2007).

**(2)**

**Hargrove's Tuberculosis Testing at NCCF**

On March 15, 2002, Hargrove was incarcerated at NCCF.

NHCC Defs.' 56.1 Statement ¶ 1. Before entering the general population, Hargrove was processed through medical intake. NHCC Defs.' 56.1 Statement ¶ 2. The NCCF Medical Intake Chart for Hargrove, dated March 15, 2002 ("3/15/02 Chart"), shows that Hargrove informed medical staff that he had previously been exposed to tuberculosis. NHCC Defs.' Notice of Mot., Ex. C, at 1; NHCC Defs.' 56.1 Statement ¶ 2. The 3/15/02 Chart also shows that Hargrove reported testing positive to a prior PPD test and that he had been treated for TB in 2000. NHCC Defs.' Notice of Mot., Ex. C, at 1. Hargrove alleges that he was exposed to and treated for TB in 1997. Hargrove's Aff. in Opp. to Mot. for Summary Judgment, ("Aff. in Opp."), Ex. A at 1-2. Defendants contend that Hargrove was given an x-ray during the medical intake process because of his reported positive PPD test, and that the x-ray was negative, showing no active TB infection. NHCC Defs.' 56.1 Statement ¶ 2; Edwards Aff. ¶ 3. Without specifying a date, Hargrove generally states that his "request to be x-rayed was denied." Aff. in Opp. at 3.

**\*2** Pursuant to NCCF's Infectious Disease Program, after being incarcerated in NCCF for a year, Hargrove was scheduled to be re-tested for TB. Edwards Aff. ¶ 5; NHCC Defs.' 56.1 Statement ¶ 4. On May 24, 2003, Hargrove was given a PPD skin test. Edwards Aff. ¶ 5; NHCC Defs.' 56.1 Statement ¶ 4. This test was negative. Edwards Aff. ¶ 5; NHCC Defs.' 56.1 Statement ¶ 4. According to Hargrove, he requested an x-ray instead of a PPD test because of his previous exposure to TB, but was forced to submit to the PPD test. He also alleges that defendants threatened to put him in "keep lock" or "lock up" unless he submitted to the PPD test.[FN5] Complaint, Ex. C; Aff. in Opp. at 1-4, Ex. A.

FN5. Hargrove has made contradictory statements about being placed in "keep lock" or "lock up". It is unclear whether he is alleging that defendants threatened to place him in "lock up" unless he submitted to the PPD test or whether he was actually placed in "lock up" until such time that he agreed to submit to the PPD tests. For example, in his complaint, Hargrove states that when he "refused to submit to another [PPD] test, the Correctional Authorities were brought in and placed [him] in lock up." Complaint ¶ 4. In a hearing before Magistrate Judge Bloom on

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

January 31, 2005, Hargrove stated that he took the PPD tests because he was told that he would be placed in "lock up" until he submitted to the test. Hr'g Tr. 6:1-18; 9:5-10:10. In Exhibit B to his complaint, Hargrove alleges both that he was given an unwarranted TB shot and that when he refused the same shot he was placed in "keep lock." Complaint, Ex. B. There is no evidence in the record that Hargrove was ever segregated from the general population while housed at NCCF, outside of the seventy-two hour initial medical intake period. Aff. of Sgt. Neumann ("Neumann Aff.") at 1-2 (referring to prison records showing Hargrove's holding locations which demonstrate that he was never placed in "lock up"); NCCF 56.1 Statement ¶ E. Whether or not Hargrove was actually placed in "lock up" is not a material fact for purposes of this motion; as explained in detail, *infra,* Hargrove's failure to exhaust administrative remedies under the PLRA precludes a consideration of the merits of his Section 1983 claim.

The following year, in June of 2004, Hargrove was scheduled to be retested. Edwards Aff. ¶ 6; NHCC Defs.' 56.1 Statement ¶ 5. Because of the contradiction between the negative May 2003 PPD test and his reported positive history, NCCF contacted the Infectious Disease Department of the Nassau County Medical Center. Edwards Aff. ¶ 6. It was suggested that Hargrove be given a two-step PPD test, administered fifteen days apart. Feleke Aff. ¶ 4; Edwards Aff. ¶ 6. Hargrove was given these two PPD skin tests in June 2004. Edwards Aff. ¶ 6; NHCC Defs.' 56.1 Statement ¶ 5. Again, Hargrove alleges that these tests were administered against his will and under threat of being placed in quarantine. Complaint, Exs. A, B; Aff. in Opp., Ex. A.

On December 3, 2004, Hargrove was seen by a physician's assistant. NHCC Defs.' 56.1 Statement ¶ 6. During this meeting, Hargrove complained of a dry cough and that the site on his forearm where the June 2004 PPD tests had been administered was red and swollen. NHCC Defs.' 56.1 Statement ¶ 6; 11/28/04 Sick Call Request.

Hargrove's December 18, 2004 chart notes a positive PPD

test and an order was placed in the chart that Hargrove not be submitted for future PPD tests. Edwards Aff. ¶ 7; NHCC Defs.' 56.1 Statement ¶ 8. *See also* 11/19/2004 Grievance.

Hargrove alleges that the following physical ailments were caused by the PPD tests: chronic coughing, high blood pressure, chronic back pain, lung infection, dizzy spells, blurred vision and a permanent scar on both his forearms. Complaint, Ex. C; Aff. in Opp. at 3-4.

(3)

**NCCF's Inmate Grievance Procedure**

NCCF has had an inmate grievance program ("IGP") in place since 2001. Aff. of Kenneth Williams, ("Williams Aff."), at 2. NCCF's IGP is carried out in conformance with the New York State Commission of Corrections Minimum Standards and Regulations for Management of County Jails and Penitentiaries ("Minimum Standards"). *Id.*

The IGP is designed to resolve complaints and grievances that an inmate may have regarding the inmate's care and treatment while incarcerated at NCCF. Williams Aff. at 2. Upon entering NCCF, all inmates receive a copy of the NCCF inmate handbook, which outlines the IGP. *Id.*

**\*3** The record does not include an actual copy of NCCF's IGP, but the NCCF's IGP is detailed in the affidavit of NCCF Investigator Kenneth Williams. FN6 The IGP encourages inmates to resolve their grievances informally with the staff member assigned to the inmate housing unit first. *Id.* If an acceptable resolution cannot be reached, inmates must then proceed through the formal three-step process set out in the IGP. *Id.* at 3.

FN6. Hargrove does dispute any statements made by Investigator Williams regarding the inmate grievance procedure, time limits or its availability to him. Furthermore, Hargrove does

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

not dispute that he received a handbook outlining the IGP.

The first step requires an inmate to submit his grievance form [FN7] to the Inmate Grievance Unit by placing it in a locked box located in each housing area, "within five days of the date of the act or occurrence giving rise to the grievance." [FN8] *Id.* at 2-3. NCCF indexes all grievance forms filed by inmates in a log book and in a computer system. *Id.* at 1, 3. Once a grievance form is received by the Inmate Grievance Unit, the grievance is investigated and the inmate will receive a written determination of the outcome from the Inmate Grievance Coordinator in Section II of the grievance form. [FN9] *Id.* at 3. The inmate is then given a choice to accept or appeal the decision by checking the desired selection and signing his name in Section III of the grievance form. *See, e.g.,* 11/19/2004 Grievance form. If the inmate is not satisfied with the decision of the Inmate Grievance Coordinator, the inmate may appeal the determination to the Chief Administrative Officer. Williams Aff. at 3. Finally, if the inmate is not satisfied with the Chief Administrative Officer's determination, the inmate may appeal to the New York State Commission of Correction Citizen's Policy and Complaint Review Council ("Council"). *Id.* at 3. The Council will then render a final determination. *Id.* at 3.

FN7. The grievance forms contain four sections to be utilized throughout all three steps of the IGP. Section I provides space for the inmate to explain his complaint and the actions he requests as relief. Section II is for the decision of the Inmate Grievance Coordinator. Section III is titled "Acceptance/Appeal of Grievance Coordinator's decision" and contains two mutually exclusive options in which the inmate must choose one or the other: "I have read and accept the Grievance Coordinator's decision," or "I have read and appeal the Grievance Coordinator's decision." Section IV provides space for the decision of the Chief Administrative Officer.

FN8. Hargrove has not argued that he was unaware of this five-day deadline.

FN9. There is no evidence in the record specifying the how long an inmate has to appeal inaction by the Inmate Grievance Unit.

(4)

**Authenticity of the Grievance Forms and Other Documents Submitted by Hargrove**

In support of his allegations that he continuously informed defendants that he had been exposed to TB and, therefore, should not have been given PPD tests, Hargrove submitted three letters with his complaint, two of which were addressed to the Inmate Grievance Committee and one of which was addressed to "To whom this may concern." Complaint, Exs. A-C. He also submitted five complaint letters written to Sheriff Reilly, seventeen sick call requests and nine grievance forms during discovery and with his Affidavit in Opposition to Defendants' Motion for Summary Judgment, explaining that some of the medical records and notarized letters were "missing." Aff. in Opp, Ex. A at 2. Defendants call the authenticity of most of these documents into question, contending that Hargrove never submitted any grievance form or complaint letter before he filed his complaint. County Defs.' Mem. of Law at 16-21; County Defs.' 56.1 Statement at ¶¶ B2, C3, D3.

Kenneth Williams, an investigator at NCCF in the Inmate Grievance Unit, testified that he reviewed all of the grievance forms, complaint letters and sick call requests annexed to Hargrove's Complaint and to Hargrove's Affidavit in Opposition to Defendants' Motion for Summary Judgment. Williams Aff. at 2. Williams testified that he examined the grievance records at NCCF and searched "for any grievances by plaintiff/inmate Hargrove" and found "only two." [FN10] Williams Aff. at 1. The first grievance, dated November 19, 2004, complained that the medical staff continued "forcing [Hargrove] to take a T.B. shot while [he] keep[s] telling them that [he] has been exposed to T.B." 11/19/2004 Grievance; Williams Aff. at 1. In response to this grievance, Hargrove's "positive" TB status was noted in his medical records and an order was placed in Hargrove's medical chart, stating that Hargrove not be subjected to future PPD tests. 11/19/2004 Grievance, Section II;

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

Williams Aff. at 1; NHCC Defs.' 56.1 Statement ¶ 8; Edwards Aff. ¶ 7. In Section III of the 11/19/2004 Grievance, Hargrove acknowledged that he had read the Grievance Coordinator's decision, and that he chose to accept the decision instead of appealing it. 11/19/2004 Grievance. The other grievance received by the Grievance Unit, dated May 11, 2005, complained of an unrelated matter. 5/11/2005 Grievance (complaining of back problems and requesting the return of his medical shoes); Williams Aff. at 1. Thus, Williams concluded that, beside the 11/19/2004 and 5/11/2005 Grievance Forms, none of the other documents were "received by the grievance unit, and, given the locked box system, the grievance-forms were never submitted by plaintiff/inmate." Williams Aff. at 2.

> FN10. It is NCCF's procedure to forward to the attention of the Grievance Unit all official grievance forms and complaint letters-even ones not specifically addressed to the Grievance Unit. Williams Aff. at 3.

**\*4** A visual examination of the grievance forms Hargrove submitted in support of his claims suggests forgery. Five of the nine grievance forms were requests to stop PPD testing. *See* April 19, 2002 grievance; April 28, 2002 grievance; April 20, 2003 grievance; April 28, 2003 grievance; November 19, 2004 grievance. The remaining grievance forms concerned Hargrove's requests for medical shoes. *See* March 18, 2002 grievance; July 6, 2002 grievance; February 20, 2003 grievance; May 11, 2005 grievance. Of the grievance forms complaining of unwanted PPD tests, the April 28, 2002 grievance form is a patent photocopy of the April 19, 2002 grievance form, and the April 28, 2003 grievance form is a patent photocopy of the April 20, 2003 grievance form, with only the handwritten dates changed. The only potentially authentic grievance forms relating to Hargrove's complaint about the PPD testing are dated April 19, 2002, April 20, 2003, and November 19, 2004. Of these grievance forms, only the November 19, 2004 has been authenticated by NCCF personnel. *See generally* Williams Aff. at 1-4.

Turning to the complaint letters addressed to Reilly, many contain notary stamps cut from the bottom of unrelated

documents and photocopied onto the bottom of the complaint letters. *See* County Defs.' Mem. of Law at 18-21. C.O. Thomas McDevitt and C.O. Paul Klein, both of whom perform notary services for prisoners at NCCF, have submitted sworn affidavits, stating that they kept individual Notary Log Books covering all dates relevant to this litigation. Aff. of C.O. Klein, ("Klein Aff."), at 1; Aff. of C.O. McDevitt, ("McDevitt Aff."), at 1. McDevitt's Notary Log Book shows that he notarized only one document for Hargrove. This document, dated May 13, 2002, was a motion related to Hargrove's criminal trial. McDevitt Aff. at 1-2. Hargrove signed the Notary Log Book acknowledging receipt of that notarized motion. McDevitt Aff. at 2. McDevitt states that he never notarized any other documents for Hargrove. McDevitt Aff. at 2. However, McDevitt's stamp and signature dated May 13, 2002 (the date of the legitimate notarization) appear on Hargrove's letter to Sheriff Reilly dated May 10, 2002. County Defs.' Not. of Motion, Ex. A.

These facts repeat themselves in regard to the documents bearing the notary stamp and signature of Klein. Klein had performed several legitimate notarizations for Hargrove in connection to Hargrove's criminal trial. Klein Aff. at 1-2. Hargrove signed Klein's Notary Log Book acknowledging receipt of those notarized documents. Klein Aff. at 2. However, Klein states that he never notarized any of Hargrove's letters addressed to Sheriff Reilly that bear Klein's stamp and signature. Klein Aff. at 2. On all of the documents that Hargrove submitted bearing Klein's stamp and signature, the dates and signatures of Klein match identically to the dates on which he had performed legitimate notarizations for Hargrove in connection with his criminal trial. Defendants argue it is clear that the documents bearing the stamps and signatures of McDevitt and Klein were not actually notarized by these notaries. County Defs.' Mem. of Law at 17-22.

**\*5** Hargrove does not deny these allegations. Instead, he resubmits the documents that McDevitt and Klein testify they did not notarize with his Affidavit in Opposition and insists that the documents "refute[ ] the assertions put forth by the defendants." Aff. in Opp. at 2.

**Discussion**

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

**(1)**

**Summary Judgment Standard**

A motion for summary judgment is granted when "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). A court ruling on a summary judgment motion must construe the facts in the light most favorable to the non-moving party and draw all reasonable inferences in his favor. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986); *Williams v. Metropolitan Detention Center,* 418 F.Supp.2d 96, 100 (E.D.N.Y.2005). Defendants, the moving party in this action, bear the burden of demonstrating the absence of a genuine issue of material fact. *Baisch v. Gallina,* 346 F.3d 366, 371 (2d Cir.2003).

As Hargrove is proceeding *pro se,* his complaint must be reviewed carefully and liberally, and be interpreted to "raise the strongest argument it suggests," *Green v. United States,* 260 F.3d 78, 83 (2d Cir.2001), particularly when civil rights violations are alleged, *see, e.g., McEachin v. McGuinnis,* 357 F.3d 197, 200 (2d Cir.2004). Plaintiff's complaint does not specify the legal theories upon which it relies, but, in construing his complaint to raise its strongest arguments, it will be interpreted to raise claims under 42 U.S.C. § 1983. *See, e.g., Dufort v. Burgos,* No. 04-CV-4940, 2005 WL 2660384, at *2 (E.D.N.Y. Oct. 18, 2005) (liberally construing plaintiff's complaint, which failed to specify the legal theory or theories upon which it rested, as, *inter alia,* a claim under 42 U.S.C. § 1983); *Williams,* 418 F.Supp.2d at 100 (same).

**(2)**

**Prison Litigation Reform Act**

**a. Purpose of the Prison Litigation Reform Act**

The PLRA was intended to "reduce the quantity and improve the quality of prisoner suits." *Woodford v. Ngo,*

--- U.S. ----, 126 S.Ct. 2378, 2387 (2006) (quoting *Porter v. Nussle,* 534 U.S. 516, 524 (2002)). It seeks to eliminate unwarranted interference with the administration of prisons by federal courts, and thus " 'affor[d] corrections officials time and opportunity to address complaints internally before allowing the initiation of a federal case.' " *Woodford,* 126 S.Ct. at 2387 (quoting *Porter,* 534 U.S. at 525).*See also Booth v. Churner,* 532 U.S. 731, 739 (2001). Formal grievance procedures allow prison officials to reconsider their policies, implement the necessary corrections and discipline prison officials who fail to follow existing policy. *See Ruggiero v. County of Orange,* 467 F.3d 170, 177-78 (2d Cir.2006).

**b. The Exhaustion Requirement**

The PLRA's "invigorated" exhaustion provision, 42 U.S.C. § 1997e(a), provides the mechanism to reduce the quantity and improve the quality of prisoners' suits by requiring that prison officials have the opportunity to address prisoner complaints through internal processes before allowing a case to proceed in federal court. *Woodford,* 126 S.Ct. at 2382 (citing *Porter,* 534 U.S. at 524).Section 1997e(a) provides that:

**\*6** [n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other federal law, by a prisoner confined in any jail, or other correctional facility until such administrative remedies as are available are exhausted.

42 U.S.C. § 1997e(a).

The exhaustion requirement is a mandatory condition precedent to any suit challenging prison conditions, including suits brought under Section 1983. *Woodford,* 126 S.Ct. at 2383;*Ruggiero,* 467 F.3d at 174;*Williams,* 418 F.Supp.2d at 100-01. The exhaustion provision is applicable to suits seeking relief, such as money damages, that may not be available in prison administrative proceedings, as long as other forms of relief are obtainable through administrative channels. *Giano v. Goord,* 380 F.3d 670, 675 (2d Cir.2004); *see also Woodford,* 126 S.Ct. at 2382-83 ("[A] prisoner must now exhaust

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

administrative remedies even where the relief sought-monetary damages-cannot be granted by the administrative process.") (citing *Booth*, 532 U.S. at 734).

In June 2006, the Supreme Court held that the PLRA requires "proper exhaustion" before a case may proceed in federal court. *Woodford*, 126 S.Ct. at 2387. "Proper exhaustion" requires a prisoner to use " 'all steps that the agency holds out, and doing so *properly* (so that the agency addresses the issues on the merits).' " *Ruggiero*, 467 F.3d at 176 (citing *Woodford*, 126 S.Ct. at 2385 (emphasis in original)). Although the level of detail necessary to properly exhaust a prison's grievance process will vary from system to system, *Jones v. Bock*, 127 S.Ct. 910, 2007 WL 135890, at *12 (Jan. 22, 2007), "proper exhaustion" under the PLRA " 'demands compliance with [that] agency's deadlines and other critical procedural rules.' " *Ruggiero*, 467 F.3d at 176 (quoting *Woodford*, 126 S.Ct. at 2386). Thus, the PLRA's exhaustion requirement is not satisfied by "untimely or otherwise procedurally defective attempts to secure administrative remedies." *Ruggiero*, 467 F.3d at 176 (citing *Woodford*, 126 S.Ct. at 2382).

**(3)**

**Exhaustion Analysis: Hargrove did not Exhaust the Administrative Remedies Made Available by NCCF prior to Bringing Suit**

Section 1997e(a) of the PLRA applies to Hargrove's complaint; Hargrove was and continues to be confined in a correctional facility, *see Berry v. Kerik*, 366 F.3d 85, 87 (2d Cir.2004), and Hargrove's claim is about a "prison condition" within the meaning of the PLRA, *see Williams*, 418 F.Supp.2d at 101. *See also Sloane v. W. Mazzuca*, No. 04-CV-8266, 2006 WL 3096031, at *4 (S.D.N.Y. Oct. 31, 2006) (recognizing PLRA's application to complaint alleging retaliation by prison officials for plaintiff's refusal to consent to a PPD test). Accordingly, the merits of Hargrove's Section 1983 claims can only be addressed if it is first determined that Hargrove properly exhausted each claim under Section 1997e(a) of the PLRA before filing his complaint in federal court.

*7 Hargrove has submitted both forged [FN11] and authentic grievance forms in opposing defendants' motions for summary judgment. Excluding, for the moment, the forged documents, NCCF's records reflect that Hargrove did not submit his first grievance until after he filed the instant complaint. Williams Aff. at 1. Hargrove's first grievance complaining of unwanted PPD testing is dated November 19, 2004, Williams Aff. at 1, two to three months after Hargrove filed his complaint. Additionally, this first grievance, dated November 19, 2004, was submitted five months after the last PPD test was administered to him in June 2004. NHCC Defs.' 56.1 Statement ¶¶ 5,6. This five-month period far exceeds the five-day window provided by NCCF's IGP. Since Hargrove failed to comply with the IGP's deadlines, he did not properly exhaust the available administrative remedies. *Ruggiero*, 467 F.3d at 176 (" 'untimely or otherwise procedurally defective attempts to secure administrative remedies do not satisfy the PLRA's exhaustion requirement.' ") (quoting *Woodford*, 126 S.Ct. at 2382).

> FN11. Based on an examination of the documents themselves, as well as the uncontradicted testimony of the notaries performing services for prisoners at NCCF, *see generally* Klein Aff.; McDevitt Aff., and of the investigator in the Inmate Grievance Unit, *see generally* Williams Aff., it appears that many of the documents submitted by Hargrove are forgeries. However, in order to view the facts in the light most favorable to Hargrove, and so as to avoid making findings of fact in a summary judgment motion, for the purposes of the exhaustion analysis, all of the documents will be considered to be authentic. However, for purposes of the sanctions analysis, the documents will be explored and the consequences of Hargrove's misrepresentations will be addressed.

Furthermore, even if the falsified grievance forms Hargrove submitted in support of his claim are considered authentic, they are still untimely. The diagnostic TB tests (whether x-ray or PPD tests) were given to Hargrove on March 15, 2002, May 24, 2003 and in June of 2004, but the grievance forms Hargrove submitted complaining of unwanted PPD tests are dated April 19, 2002, April 28, 2002, April 20, 2003, April 28, 2003 and November 19,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

2004. None of these grievances were filed "within five days of the of the date of the act or occurrence giving rise to the grievance." Williams Aff. at 3. There is no evidence in the record suggesting that NCCF's IGP allows for a tolling of the five-day time limit in which to file a grievance.[FN12]

> FN12. Even if the submitted grievances had been filed within the proscribed time period, they only show that Hargrove's grievances reached an Inmate Grievance Coordinator, the first formal step of NCCF's three-step administrative grievance process; Hargrove never appealed to the Chief Administrative Officer. By failing to take the next available step in NCCF's IGP, Hargrove failed to satisfy the mandatory exhaustion requirement. *See, e.g., Williams, 418 F.Supp.2d at 101, 102* (dismissing *pro se* complaint where plaintiff could only show he exhausted two of the four-step process mandated by prison's administrative process).

While the letters to Reilly and sick call requests show that Hargrove attempted to bring his complaints about the PPD testing to the attention of the prison staff, *see, e.g.,* Aff. in Opp., Exs. A-D, NCCF's IGP requires use of formal grievance forms. Thus, writing complaint letters and submitting sick call requests did not properly exhaust NCCF's available administrative remedies. *See, e .g., Hernandez v. Coffey,* No. 99-CV-11615, 2006 WL 2109465, at *4 (S.D.N.Y. July 26, 2006) (holding letters did not satisfy plaintiff's exhaustion obligation); *Williams, 418 F.Supp.2d at 101* (holding that because plaintiff's efforts to convey his medical condition through letters and conversations with the warden and medical staff did "not include the required steps of the PLRA's administrative remedy process," plaintiff failed to exhaust); *Mills v. Garvin,* No. 99-CV-6032, 2001 U.S. Dist. LEXIS 3333, at *8 (S.D.N.Y. Mar. 2, 2001) ("letter writing is not the equivalent of an exhaustion of administrative remedies under the PLRA").

As Hargrove failed to properly exhaust his administrative remedies, this action is precluded by *42 U.S.C. § 1997e(a)* unless Hargrove can establish excuse for his failure to exhaust.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

**(4)**

**No Grounds to Excuse Plaintiff's Failure to Exhaust**

**\*8** Exhaustion is an affirmative defense that defendants have the duty to raise. *Jones,* 2007 WL 135890, at * 8-11;*Sloane,* 2006 WL 3096031, at *4;*Williams, 418 F.Supp.2d at 101.* Once argued by the defendants, a plaintiff has an opportunity to show why the exhaustion requirement should be excused or why his failure to exhaust is justified. *See Ruggiero,* 467 F.3d at 175;*Collins v. Goord, 438 F.Supp.2d 399, 411 (S.D.N.Y.2006)* ("[T]he Second Circuit has cautioned that 'while the PLRA's exhaustion requirement is 'mandatory,' certain caveats apply.' ")(internal citations omitted). Thus, before concluding that a prisoner failed to exhaust available administrative remedies as required by *Section 1997e(a)* of the PLRA, the following three factors must be considered: (1) whether administrative remedies were actually available to the prisoner; (2) whether defendants have either waived the defense of failure to exhaust or acted in such a way as to estop them from raising the defense; and (3) whether special circumstances, such as a reasonable misunderstanding of the grievance procedures, exist justifying the prisoner's failure to comply with the exhaustion requirement. *Ruggiero,* 467 F.3d at 175 (citing *Hemphill v. New York, 380 F.3d 680, 686 (2d Cir.2004)).*[FN13]

> FN13. Courts in the Second Circuit have questioned what effect, if any, the Supreme Court's recent decision in *Woodford* requiring "proper exhaustion" may have on the three-step *Hemphill* inquiry. The Second Circuit has yet to address this issue. *See Ruggiero, 467 F.3d at 175-76* (declining to "determine what effect *Woodford* has on our case law in this area ... because [plaintiff] could not have prevailed even under our pre-*Woodford* case law). To date, district courts have acknowledged the tension, but resolved to apply *Hemphill* to exhaustion claims until instructed otherwise by the Second Circuit. *See, e.g., Larkins v. Selsky,* 04-CV-5900, 2006 WL 3548959, at *9, n. 4 (S.D.N.Y. Dec. 6,

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

2006) (applying the current law of the Second Circuit to exhaustion claims); *Sloane,* 2006 WL 3096031, at *5 ("Until such time as the Court of Appeals considers the impact of *Woodford,* if any, on its prior rulings, this Court must follow the law of the Second Circuit. The Court will therefore apply the current law of this circuit to the exhaustion claims."); *Collins v. Goord,* 438 F.Supp.2d at 411 n. 13 (acknowledging that *Woodford* and *Hemphill* may be in tension, but deciding exhaustion claims under *Hemphill* inquiry); *Hernandez v. Coffey,* No. 99-CV11615, 2006 WL 2109465, at *3 (S.D.N.Y. July 26, 2006) (same). Here, Hargrove does not prevail under *Hemphill;* therefore, there is no occasion to address the potential effect *Woodford* may have had in his case.

**a. Whether administrative remedies were "available" to Hargrove**

The first step in the *Hemphill* inquiry requires a court to determine whether administrative remedies were available to the prisoner. *Hemphill,* 380 F.3d at 686. The test for assessing availability is an "objective one: that is, would a similarly situated individual of ordinary firmness have deemed them available." *Id.* at 688 (internal quotation marks omitted). In making this determination, "courts should be careful to look at the applicable set of grievance procedures." *Abney v. McGinnis,* 380 F.3d 663, 668 (2d Cir.2004). Exhaustion may be considered unavailable in situations where plaintiff is unaware of the grievance procedures or did not understand it, *Ruggiero,* 467 F.3d at 179, or where defendants' behavior prevents plaintiff from seeking administrative remedies,[FN14]*Hemphill v. State of New York,* 380 F.3d 680, 686 (2d Cir.2004).

FN14. Case law does not clearly distinguish between situations in which defendants' behavior renders administrative remedies "unavailable" to the plaintiff and cases in which defendants are estopped from asserting non-exhaustion as an affirmative defense because of their behavior. As such, there will be some overlap in the analyses.

Here, Hargrove has not claimed that NCCF's administrative grievance procedure was unavailable to him. In fact, Hargrove demonstrated his access to and knowledge of NCCF's IGP by filing proper grievances on November 19, 2004 and on May 10, 2005. Hargrove did not dispute any part of Investigator Williams's affidavit detailing the IGP and its availability to inmates since 2001. Specifically, Hargrove did not dispute, upon entering the facility, that he received a copy of the inmate handbook outlining the IGP. He has not claimed that he is unfamiliar with or unaware of NCCF's IGP. Hargrove has not alleged that prison officials failed to advance his grievances [FN15] or that they threatened him or took any other action which effectively rendered the administrative process unavailable.

FN15. Although not specifically alleged, interpreting the evidence to "raise the strongest argument," Hargrove may be arguing that NCCF's IGP was not available to him because the Grievance Coordinator failed to respond to his grievances. In the single grievance regarding PPD tests that defendants concede is authentic, Hargrove writes, "[n]ow for the third time your office refused to answer my grievances so please look into this matter because the T.B. shot is [sic] effecting my health." 11/19/04 Grievance. This language implies that Hargrove filed grievances in the past and received no response from the Inmate Grievance Coordinator. Furthermore, Hargrove wrote on one of the submitted copies of the November 19, 2004 grievance that "[t]his is the only accepte[sic] that Plaintiff got back from all grievances and letters that the Plaintiff sent to Sheriff Riley and his medical staffs about his staff making [sic] take T.B. test for 3 year[s]." County Defs'. Not. of Motion, Ex. A, 11/19/2004 grievance.

First, it must be reiterated that filing of the initial grievances was untimely. However, even assuming *arguendo* that the original grievances had been timely filed, district courts in the Second Circuit have held that the "lack of a response from the [Inmate Grievance Review Committee] does not excuse an inmate's obligation to exhaust his

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

remedies through available appeals." *Hernandez v. Coffey,* 2006 WL 2109465, at *3-5. *See also Hemphill,* 380 F.3d at 686 ("Threats or other intimidation by prison officials may well deter a prisoner of 'ordinary firmness' from filing an internal grievance, but not from appealing directly to individuals in positions of greater authority within the prison system"); *Acosta v. Corr. Officer Dawkins,* No. 04-CV-6678, 2005 WL 1668627, at *3 (S.D.N.Y. July 14, 2005) (inmate required to appeal lack of response to exhaust administrative remedies); *Mendoza v. Goord,* No. 00-CV-0146, 2002 U.S. Dist. LEXIS 22573, at *6 (S.D.N.Y. Nov. 21, 2002) ("If, as a result of a negligent error by prison officials-or even their deliberate attempt to sabotage a prisoner's grievance-the prisoner [does not receive a response] on his complaint, he is not thereby forestalled from appealing"). Hargrove did not assert or offer evidence suggesting that he appealed the unresponsiveness or that those appeals were not advanced.

**\*9** Additionally, Hargrove's transfer from NCCF to Sing Sing Correctional Facility ("Sing Sing") in July 2005 did not excuse his previous failure to properly exhaust. *See, e.g., Sims v. Blot,* No. 00-CV-2524, 2003 WL 21738766, at *4 (S.D.N.Y. July 25, 2003) (determining that failure to exhaust administrative remedies is not excused by transfer to another facility); *Santiago v. Meinsen,* 89 F.Supp.2d 435, 440-41 (S.D.N.Y.2000) (determining that plaintiff should not be "rewarded" for failing to participate in grievance procedure before being transferred). Hargrove had ample opportunity to properly file his grievances and to appeal their results as required by NCCF's procedures while he was imprisoned at NCCF. The last PPD test Hargrove complains of was given in 2004; therefore, Hargrove had until June or July of 2004 to timely file his grievance in accordance with NCCF's IGP. Hargrove was not transferred to Sing Sing until July 2005. County Defs.' Mem. of Law at 2. Thus, Hargrove's transfer cannot excuse his previous failure to properly exhaust.

**b. Estoppel**

The second step of the inquiry asks whether defendants are estopped from raising exhaustion as a defense. Specifically, "whether the defendants may have forfeited the affirmative defense of non-exhaustion by failing to raise or preserve it, or whether the defendants' own actions inhibiting the inmate's exhaustion of remedies may estop one or more of the defendants from raising the plaintiff's failure to exhaust as a defense." *Hemphill,* 380 F.3d at 686 (internal citations omitted).

Here, Hargrove has not made any statements that would permit a finding that defendants should be estopped from raising the affirmative defense of exhaustion or that defendants waived the right to raise the defense. Defendants first raised the PLRA's exhaustion requirement as an affirmative defense in their respective answers. *See* County Defs.' Am. Answer at 3; NHCC Defs.' Answer at 1. County Defendants raised it again in their motion for summary judgment. *See* County Defs.' Mem of Law at 15-23. Thus, defendants are not estopped from raising the affirmative defense now. *See, e.g., Sloane,* 2006 WL 3096031, at *8 (exhaustion defense not waived where defendants first raised it in their motion to dismiss).

Additionally, defendants have not threatened Hargrove or engaged in other conduct preventing him from exhausting the available administrative remedies. *Cf. Ziemba v. Wezner,* 366 F.3d 161, 162 (2d Cir.2004) (holding defendants were estopped from asserting non-exhaustion because of prison officials' beatings, threats and other conduct inhibiting the inmate from filing proper grievances); *Feliciano v. Goord,* No. 97-CV-263, 1998 WL 436358, at *2 (S.D.N.Y. July 27, 1998) (holding defendants were estopped from asserting non-exhaustion where prison officials refused to provide inmate with grievance forms, assured him that the incidents would be investigated by staff as a prerequisite to filing a grievance, and provided prisoner with no information about results of investigation). Hargrove has not argued otherwise. *See Ruggiero,* 467 F.3d at 178 (holding defendants were not estopped from asserting a failure to exhaust defense where plaintiff pointed to no affirmative act by prison officials that would have prevented him from pursing administrative remedies); *Sloane,* 2006 WL 3096031, at *8 (finding no estoppel where plaintiff did not argue that defendants prevented him from pursuing the available administrative remedies); *Hernandez,* 2006 WL 2109465,

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

at *4 (finding no estoppel where plaintiff did not argue that any threats or intimidation prevented him from pursuing his appeals). Thus, for the same reasons that administrative remedies were not deemed unavailable to Hargrove, defendants are not estopped from raising a failure to exhaust defense.

**c. Special circumstances**

*10 Even where administrative remedies are available and the defendants are not estopped from arguing exhaustion, the court must "consider whether 'special circumstances' have been plausibly alleged that justify 'the prisoner's failure to comply with administrative procedural requirements.' " Hemphill, 380 F.3d at 688 (quoting Giano, 380 F.3d at 676). For example, plaintiff's reasonable interpretation of regulations differing from prison official's interpretation has been held to constitute a "special circumstance." Giano, 380 F.3d at 676-77. No special circumstances have been alleged that would excuse Hargrove from availing himself of administrative remedies. See Sloane, 2006 WL 3096031, at *8; Freeman v. Goord, No. 02-CV-9033, 2004 U .S. Dist. LEXIS 23873, at * 9-10 (S.D.N.Y.2004) (granting motion to dismiss where "there is no evidence in the record ••• of any 'special circumstances' in this action.")

**(5)**

**Hargrove's Failure to Exhaust, in Addition to his Fraud on the Court, Warrants Dismissal with Prejudice**

Hargrove has not sufficiently rebutted the defendants' assertion of failure to exhaust, and a liberal reading of his submissions does not reveal any grounds to excuse that failure.

Because Hargrove filed a complaint in federal court before filing a grievance, permitting his unexhausted and unexcused claim to proceed would undercut one of the goals of the exhaustion doctrine by allowing NCCF to be haled into federal court without the "opportunity to correct

its own mistakes with respect to the programs it administers." Woodford, 126 S.Ct. at 2385. See also Ruggiero, 467 F.3d at 178 (citing Porter, 534 U.S. at 525). Thus, his complaint must be dismissed.

In general, dismissal without prejudice is appropriate where plaintiff has failed to exhaust but the time permitted for pursuing administrative remedies has not expired. Berry v. Kerik, 366 F.3d 85, 87 (2d Cir.2004). Dismissal with prejudice is appropriate where "administrative remedies have become unavailable after the prisoner had ample opportunity to use them and no special circumstances justified failure to exhaust." Berry, 366 F.3d at 88. Here, Hargrove's administrative remedies were available to him during his entire period of confinement at NCCF. He remained incarcerated in NCCF throughout the time period in which he alleges the PPD tests are given. He could have exhausted remedies for his grievances at any time. Therefore, Hargrove had ample opportunity to seek administrative remedies but failed to do so. Because there is no evidence in the record that administrative remedies are still available to Hargrove, as the five-day time period had run, and because Hargrove has alleged no special circumstances justifying his failure to exhaust, his complaint is accordingly dismissed with prejudice. Berry, 366 F.3d at 88 (upholding dismissal with prejudice where plaintiff had no justification for his failure to pursue administrative remedies while they were available.)

*11 Additionally, defendants' have moved for sanctions based on Hargrove's alleged submission of falsified evidence. If a party commits a fraud on the court, the court has the inherent power to do whatever is reasonably necessary to deter abuse of the judicial process. Shangold v. The Walt Disney Co., No. 03-CV-9522, 2006 WL 71672, at *4 (S.D.N.Y. January 12, 2006) (citing Chambers v. NASCO, Inc., 501 U.S. 32, 44 (1991)). Fraud upon the court has been defined as "fraud which seriously affects the integrity of the normal process of adjudication." Gleason v. Jandrucko, 860 F.2d 556, 559 (2d Cir.1988); McMunn v. Mem'l Sloan-Kettering Cancer Center, 191 F.Supp.2d 440, 445 (S.D.N.Y.2002). In order for a court to grant sanctions based upon fraud, it must be established by clear and convincing evidence that a party has "sentiently set in motion some unconscionable scheme calculated to interfere with the judicial system's ability impartially to adjudicate a matter by ... unfairly hampering

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

the presentation of the opposing party's claim or defense." *McMunn,* 191 F.Supp.2d at 455 (quoting *Aoude v. Mobil Oil Corp.,* 892 F.2d 1115, 1119 (1st Cir.1989).

After carefully reviewing the allegedly fraudulent documents, it must be concluded that Hargrove consciously falsified these documents. *See, e.g., Shangold,* 2006 WL 71672, at *1, *3 (finding clear and convincing evidence of fraud where plaintiffs fabricated a timeline and plot outlines to advance their claims); *McMunn,* 191 F.Supp.2d at 446 (finding clear and convincing evidence of fraud where plaintiff edited audio tapes and represented that they were unedited during discovery). The notaries performing services for prisoners at NCCF testify that they never notarized many of the documents supplied by Hargrove. *See* Klein Aff.; McDevitt Aff. Furthermore, a visual examination of the documents themselves makes it clear that many of the documents submitted by Hargrove are forgeries.

In considering what sanction to impose, courts consider the following five factors: (i) whether the misconduct was the product of intentional bad faith; (ii) whether and to what extent the misconduct prejudiced the plaintiffs; (iii) whether there was a pattern of misbehavior rather than an isolated instance; (iv) whether and when the misconduct was corrected; and (v) whether further misconduct is likely to occur in the future. *Scholastic, Inc. v. Stouffer,* 221 F.Supp.2d 425, 444 (S.D.N.Y.2002) (citing *McMunn,* 191 F.Supp.2d at 461).

Here, Hargrove's deception was not an isolated instance; he fabricated the dates on many grievance forms, in addition to improperly duplicating notary stamps on complaint letters to make them look authentic. Klein Aff. at 2; McDevitt Aff. at 2; County Defs.' 56.1 Statement ¶¶ C3, D3. He submitted these forgeries to defendants during discovery and again as exhibits to his Affidavit in Opposition to Defendant's Motion for Summary Judgment. A severe sanction is warranted as Hargrove's forgeries were intentional, he never corrected them once their authenticity was challenged and he continues to insist on their veracity. Aff. in Opp. at 1-4. Given that there is clear and convincing evidence that Hargrove has continuously and consciously perpetrated a fraud on the court through his submission of fraudulent documents and sworn

affirmations of those documents' authenticity, dismissal with prejudice is especially appropriate. *See, e.g., Shangold,* 2006 WL 71672, at *5 (dismissing with prejudice where plaintiffs fabricated evidence to advance their claims); *Scholastic,* 221 F.Supp.2d at 439-444 (dismissing with prejudice where plaintiff produced seven pieces of falsified evidence); *McMunn,* 191 F.Supp.2d at 445 (dismissing with prejudice where plaintiff "lie[d] to the court and his adversary intentionally, repeatedly, and about issues that are central to the truth-finding process").

**Conclusion**

**\*12** Because Hargrove did not satisfy the exhaustion requirement under the PLRA, defendants' motions for summary judgment are granted. Further, considering the fraud Hargrove perpetrated on the court, the claims are dismissed against all defendants with prejudice. The Clerk of the Court is directed to close the case.

SO ORDERED:

E.D.N.Y.,2007.
Hargrove v. Riley
Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 276206 (E.D.N.Y.)
(Cite as: 2010 WL 276206 (E.D.N.Y.))

Only the Westlaw citation is currently available.

United States District Court,
E.D. New York.
Douglas STRONG, Petitioner,
v.
Harry LAPIN, Director of the Federal **Bureau** of
**Prisons**, Cameron Lindsay, Warden of MDC Brooklyn,
Respondents.
**No. 09-CV-3522 (ARR).**

Jan. 15, 2010.

JUDGMENT

**\*1** An Opinion and Order of Honorable Allyne R. Ross, United States District Judge, having been been filed on January 15, 2010, adopting the Report and Recommendation of Magistrate Judge Cheryl L. Pollak, dated November 9, 2009, after a *de novo* review of the record; and denying the petition for a writ of mandamus; it is

Douglas Strong, Fairton, NJ, pro se.

Seth D. Eichenholtz, United States Attorney's Office, Brooklyn, NY, for Defendants.

ORDERED and ADJUDGED that petitioner take nothing of the respondents; that the Report and Recommendation of Magistrate Judge Cheryl L. Pollak is adopted; and that the petition for a writ of mandamus is denied.

ROBERT C. HEINEMANN

Clerk of Court

*REPORT AND RECOMMENDATION*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

CHERYL L. POLLAK, United States Magistrate Judge.

Petitioner Douglas A. Strong, proceeding *pro se,* brings this petition, seeking a writ of mandamus to vacate certain sanctions, specifically, the loss of good conduct time and his return to a secure facility, which were imposed by respondents after petitioner failed to comply with the terms of his work release program. Petitioner alleges that in imposing these sanctions, defendants violated his rights to due process by failing to give petitioner notice of the charges that were pending against him, by failing to provide him with a copy of the report that formed the basis for the charges, and by depriving petitioner of the right to attend the disciplinary hearing that resulted in the imposition of sanctions.

By Order dated October 20, 2009, the petition for mandamus was referred to the undersigned to issue a Report and Recommendation. For the reasons set forth below, it is respectfully recommended that petitioner Strong's petition for a writ of mandamus be denied.

*FACTUAL BACKGROUND*

On November 9, 2007, petitioner was sentenced to a term of 33 months imprisonment and 2 years of supervised release after his conviction for bringing illegal aliens into the country in violation of 8 U.S.C. § 1324(a)(2)(B). (Gvt. Mem.[FN1] at 2). On April 14, 2009, he was transferred to a work release program at a Community Corrections Center ("CCC") in Brooklyn to serve out the remainder of his sentence. (*Id.;* Pet'n [FN2] at 1). Petitioner alleges that he paid his subsistence fees and remained drug and alcohol free while in the program. (Pet'n at 1). The rules of the CCC (the "Rules") and the Community Based Program Agreement (the "Agreement"), which petitioner was required to sign, provide that: "[a]ny unauthorized absence from the facility will be considered an as escape." (Eichenholtz Dec.,[FN3] Ex. A). The Agreement clearly provides that if an inmate fails to call the facility to report that he will be returning late from a pass, that would be considered an escape and a disciplinary report would be generated. (*Id.*)

Slip Copy, 2010 WL 276206 (E.D.N.Y.)
(Cite as: 2010 WL 276206 (E.D.N.Y.))

FN1. Citations to "Gvt Mem." refer to Government's Memorandum of Law in Opposition to Petition Seeking a Writ of Mandamus, dated October 15, 2009.

FN2. Citations to "Pet'n" refer to the Petition for a Writ of Mandamus pursuant to 28 U.S.C. § 1361, filed on July 22, 2009.

FN3. Citations to "Eicenholtz Dec." refer to the Ddclaration of Seth D. Eichenholtz, Assistant United States Attorney, dated October 14, 2009.

According to petitioner, on June 20, 2009, he went to work and was granted a weekend pass to visit his sister on Long Island. (Pet'n at 2). He claims that on June 21, 2009, he made a call to the half way house and was told that he was considered an escapee. (*Id.*) Petitioner told the staff that he had a weekend pass, but they indicated that because it was the weekend, they were unable to access the records. (*Id.*) He was told to turn himself in at the United States Marshal's office, which he did the following morning. (*Id.*)

**\*2** Respondents' story is slightly different. They contend that on June 20, 2009, at approximately 5:30 a.m., petitioner signed out of the CCC to go to work at his job at Conceptual Restoration in the Bronx. (Eichenholtz Dec., Ex. B). The work pass allowed him to be out of the CCC between 5:00 a.m. and 6:00 p.m. (*Id.*) When petitioner failed to return to the CCC by 6:00 p.m., the CCC contacted both the local police and local hospitals but he was nowhere to be found. (*Id.*) Effective as of 6:00 p.m., petitioner was declared on escape status. (*Id.*)

On June 22, 2009, petitioner was taken into custody and housed at the MDC Brooklyn. (Colvin Dec.[FN4] 3; Garcia Dec.[FN5] 7). According to the government, petitioner was charged with "Escape from Unescorted Community Programs and Activities and Open Institutions (Minimum) and from Outside Secure Institutions-*without* Violence, Code 200." (Garcia Dec. ¶ 6) (emphasis in original). The

government contends that a notice of this Bureau of Prisons ("BOP") charge was served on defendant on June 24, 2009, and he signed a form stating that he received the notice on that day. (Eichenholtz Dec., Ex. C).

FN4. Citations to "Colvin Dec." refer to the Declaration of Crista M. Colvin, dated Oct. 14, 2009.

FN5. Citations to "Garcia Dec." refer to the Declaration of Daniel Garcia, dated October 14, 2009.

According to the government, residents of the CCC who violate the rules have a right to a Center Discipline Committee ("CDC") hearing relating to the violation. (Garcia Dec. ¶¶ 3-4). The initial hearing was held on June 25, 2009. (*Id.* ¶ 9). However, because BOP regulations require at least 24 hours notice and petitioner only received the notice 21 hours prior to the hearing, a new hearing was set for July 13, 2009. (*Id.* ¶ 10) According to the government, petitioner chose not to be represented by a staff member at the hearing, chose not to present any witnesses, and simply made a statement in which he admitted that he had gone to a bar after work, gotten into an altercation and chosen not to return to the CCC in accordance with his curfew, (Eihenholtz Dec., Ex. E). Based on the CDC's finding that petitioner had committed the charges, a recommendation was made that petitioner be transferred to a more secure facility and that he lose available good conduct time. (*Id.*) Daniel Garcia, MDC Brooklyn's Disciplinary Hearing Officer, reviewed the CDC's recommendation to ensure that the proper procedures had been followed. (Garcia Dec. ¶¶ 8-10).

Petitioner disputes the government's claim that he received a copy of the incident report, asserting that as of the date of the Petition, "Strong still has never received a copy of the report." (Pet'n at 4). Petitioner contends that when he questioned his Unit Manager as to why he did not receive a report and was not afforded a hearing, the Unit Manager responded: " 'Strong if you or anyone else violates the half way house rules your hearing is held in absentia and your [sic] returned to prison.' " (*Id.*) Accordingly, because petitioner contends that he was not afforded the procedural

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 276206 (E.D.N.Y.)
(Cite as: 2010 WL 276206 (E.D.N.Y.))

protections required in a prison disciplinary proceeding, he brings this mandamus petition seeking an order restoring his good time, his original release date of December 7, 2009, and restoring him to the work release program. (*Id.* at 6).

*DISCUSSION*

A. *Requirements for Mandamus Relief*

**\*3** Under 28 U.S.C. § 1361, the district court has "original jurisdiction in any action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff." Before a writ of mandamus may issue, petitioner must demonstrate that there is: "(1) a clear right in the plaintiff to the relief sought; (2) a plainly defined and peremptory duty on the part of the defendant to do the act in question; and (3) no other adequate remedy available." *Anderson v. Bowen,* 881 F.2d 1, 55 (2d Cir.1989); *see also Aguiar v. Laird,* No. 07 CV 1081, 2008 WL 795303, *2 (E.D.N.Y. Mar. 24, 2008) (defining the conditions that the plaintiff must demonstrate: 1) he must show that there is "no other adequate means to attain the relief he desires"; 2) he must demonstrate that his right to mandamus is "clear and indisputable:" and 3) the court must be satisfied that the writ is appropriate under the circumstances) (internal quotations omitted).

Mandamus "is an extraordinary remedy that is 'granted only in the exercise of sound discretion.' " *Miller v. French,* 530 U.S. 327, 340, 120 S.Ct. 2246, 147 L.Ed.2d 326 (2000) (citation omitted); *see also In re Dow Corning Corp.,* 261 F.3d 280, 285 (2d Cir.2001) (noting that the remedy of mandamus is "rarely granted"). Indeed, the common law writ of mandamus, as codified in 28 U.S.C. § 1361, only provides a remedy "if [the petitioner] has exhausted all other avenues of relief and only if the [respondent] owes him a clear nondiscretionary duty." *Kerr v. United States Dist., Court,* 426 U.S. 394, 402-03, 96 S.Ct. 2119, 48 L.Ed.2d 725 (1976). To this end, a federal court's jurisdiction under the statute is "limited to actions seeking to compel the performance of a non-discretionary duty." *Duamutef v. INS,* 386 F.3d 172, 180 (2d Cir.2004); *see also Defeo v. Lapin,* No. 08 CV 7513, 2009 WL 1788056, *2 (S.D.N.Y. June 22, 2009). Thus, a court must dismiss a petition for a writ of mandamus if the petition seeks to compel a discretionary action by a government agency. *Defeo v. Lapin,* 2009 WL 1788056, at *2 (holding that the court lacked jurisdiction to issue a writ of mandamus where petitioner sought an order compelling the director of the BOP to file a motion for a reduction in petitioner's sentence on the grounds that such a decision was discretionary on the part of the BOP); *see also Wilbur v. United States ex rel. Kadrie,* 281 U.S. 206, 218, 50 S.Ct. 320, 74 L.Ed. 809 (1930) (holding that a writ of mandamus may not compel "the exercise of judgment or discretion in a particular way").

B. *Exhaustion of Administrative Remedies*

As an initial matter, the government contends that the petition should be dismissed because petitioner has failed to exhaust his administrative remedies.

Under the Prison Litigation Reform Act ("PLRA"), "no actions shall be brought with respect to prison conditions under section 1983 [of Title 42], or any other Federal law, by a prisoner confined in jail, prison, or any other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). "Complete pre-suit exhaustion is required." *Barney v. Bureau of Prisons,* No. 02 CV 5284, 2004 WL 2810108, at *6 (E.D.N.Y. Dec.8, 2004); *see also Williams v. United States,* No. 02 CV 6523, 2004 WL 906221, at *5 (S.D.N.Y. Apr.28, 2004). Thus, before filing suit, an inmate must challenge the condition to the highest level of administrative review. *Id.* at *1. The exhaustion requirement applies to "all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Id.* at 532; *see also Baez v. Bureau of Prisons,* No. 02 CV 9216, 2004 WL 1777583, at *4 (S.D.N.Y. May 11, 2004). The purpose behind the exhaustion requirement is to afford corrections officials time to address complaints internally. *See Porter v. Nussle,* 534 U.S. 516, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002).

**\*4** The government represents that the BOP has

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 276206 (E.D.N.Y.)
(Cite as: 2010 WL 276206 (E.D.N.Y.))

established a procedure which allows inmates to seek administrative review of any complaint regarding their incarceration. (*See* Gvt. Mem. at 5); *see also* 28 C.F.R. § 542.10; *Baez v. Bureau of Prisons,* 2004 WL 1777583, at *4 (discussing the BOP procedures when an inmate seeks to challenge any issue relating to an aspect of his confinement). The BOP Administrative Remedy Program requires that an inmate first attempt to resolve his dispute informally through the staff and the staff is required to try to resolve the issue. *See* 28 C.F.R. § 542.13(a); *see also Baez v. Bureau of Prisons,* 2004 WL 1777583, at *2. If that method is not successful, the inmate may, within 20 days of the event, seek the Warden's review by submitting a Form BP-9, which is a written "Administrative Remedy Request to the Warden." *See* C.F.R. § 542.15(a). If the inmate's BP-9 request is denied, the inmate may file a Form BP-10 appeal to the Regional Director of the BOP. 28 C.F .R. § 542.15(a). Disciplinary sanctions can be challenged initially through the filing of a BP-10 Form. 28 C.F.R. § 542.14(d)(2). If the Regional Director denies the appeal, that decision in turn may be appealed through a BP-11 appeal to the General Counsel's Office within 30 days of the Regional Director's decision. 28 C.F.R. § 542 .15(a); *see Baez v. Bureau of Prisons,* 2004 WL 1777583 at *2. Until the BOP's Central Office considers the appeal, no administrative remedy is considered to be **fullyexhausted**.

In opposing Mr. Strong's petition, the government acknowledges that petitioner filed a BP-10 on July 30, 2009, appealing the sanctions imposed as a result of his escape from the CCC. (Colvin Dec. ¶ 5). Before filing a BP-11, however, petitioner commenced this instant lawsuit. (*Id.* ¶ 6). Thus, petitioner has failed to completely exhaust his administrative remedies. *See Barney v. Bureau of Prisons,* 2004 WL 2810108, at *6. Moreover, even if petitioner has since taken steps to completely exhaust his administrative remedies under Section 1997e, this would nonetheless be insufficient because petitioner must have pursued all institutional remedies before filing suit; "it is not enough to take steps toward exhaustion or even to exhaust a claim, during the pendency of the case." *Baez v. Bureau of Prisons,* 2004 WL 1777583, at *5.

Accordingly, it is respectfully recommended that the petition be dismissed based on Mr. Strong's failure to exhaust all administrative remedies prior to filing this

petition.

**C) Requirements for Mandamus Relief**

**1) Disciplinary Procedures are Discretionary**

The government contends that even if petitioner had exhausted his administrative remedies, a writ of mandamus is not warranted because the BOP has discretion to decide how to implement its disciplinary procedures and therefore, petitioner's " 'right to relief is [not] clear and indisputable.' " (Gvt. Mem. at 7-9 (quoting *In re FCC,* 217 F.3d 125, 134 (2d Cir.2000)). The government asserts that the procedures for disciplinary action are established by BOP regulation and require that an inmate be given notice of the charges and a hearing. *See* 28 C.F.R. § 541.17. The procedures also allow for an inmate to be present during the hearing. *Id.* However, the procedures are subject to modification in the exercise of BOP discretion when institutional concerns and individual circumstances require deviation. *Id.* Thus, when an inmate escapes, the hearing may be held in absentia with notice served on the inmate when he is taken back into custody. *Id.* § 541.17(d).

**\*5** To the extent that petitioner's claim is based on a perceived deviation from agency procedure, the BOP is afforded discretion to modify the procedures and therefore, no clearly defined peremptory duty exists for which a writ of mandamus may issue.

**2) No Due Process Violation**

Petitioner alleges that the government violated his right to procedural due process. (Pet'n at 4-7). To make out such a claim, petitioner must first prove the existence of a protected interest, and then prove government deprivation of that interest without due process of law. *See, e.g., Tellier v. Fields,* 208 F.3d 69, 79-90 (2d Cir.2000). The government argues that petitioner fails on both prongs of the test. (Gvt. Mem. at 9-13).

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 276206 (E.D.N.Y.)
(Cite as: 2010 WL 276206 (E.D.N.Y.))

The Court agrees that petitioner's removal from his work release program did not implicate a liberty interest upon which petitioner may base his due process claim. As the court in *Tellier v. Scott*, No. 94 CV 3459, 2004 WL 224499, at * 3 (S.D.N.Y. Feb. 5, 2004), noted: "the violation of a BOP regulation itself does not constitute a violation of due process." Rather, the question for the court is whether a liberty interest has been created by statute or regulation such that a due process right exists.

Congress has given the BOP broad discretion to "designate the place of a prisoner's imprisonment." 18 U.S.C. § 3621(b). It follows that no liberty interest exists that would apply to plaintiff's placement in a half way house or rehabilitation program. *See Castellar v. Federal Bureau of Prisons*, No. 07 CV 3952, 2009 WL 1674642, * 1 (E.D.N.Y. May 29, 2009); *see also Sealey v. Giltner*, 116 F.3d 47, 52 (2d Cir.1997) (noting that an inmate's confinement only implicates a protected interest if it constitutes a "deprivation [that] is atypical and significant and the state has created the liberty interest by statute or regulation"). Given that petitioner has no liberty interest or right to be placed in a work release program, he cannot claim a due process violation based on the BOP's decision to remove him from that program. *See Castellar v. Federal Bureau of Prisons*, 2009 WL 1674642, * 1.

Even if petitioner could establish a liberty interest that was implicated here, his due process claim still must fail because the procedures that were followed did comport with the requirements of due process. In *Hewitt v. Helms*, 459 U.S. 460, 103 S.Ct. 864, 74 L.Ed.2d 675 (1983), the Supreme Court indicated that in the context of disciplinary process for inmates, constitutional due process requires that the inmate receive notice of the charges against him and an opportunity to be heard. As long as a disciplinary sanction is based on some evidence, it satisfies the standard for due process, *See, e.g., Superintendent, Mass. Corr. Inst. v. Hill*, 472 U.S. 445, 454-56, 105 S.Ct. 2768, 86 L.Ed.2d 356 (1985).

Here, the government argues that the BOP paperwork indicates that petitioner was taken into custody at the Brooklyn MDC on June 24, 2009, where petitioner was given prompt notice of the charges. (Gvt. Mem. at 12). Along with the notice, petitioner was given an incident

report completed by one of the supervisors at petitioner's work release program detailing the evidence against him, including that petitioner failed to report back to the facility at 6:00 p.m. and had neither been arrested nor admitted to a hospital. (Eichenholtz Dec., Ex. B). The notice, which petitioner signed for, further states that there would be a hearing on June 25, 2009 at 12:46 p.m. (*Id.,* Ex. C). Moreover, there were two hearings held in this case: one on June 25, 2009, and a second hearing held July 13, 2009 because petitioner had received less than 24 hours notice of the first proceeding. (*Id.,* Ex. D). In the report prepared by the hearing committee, petitioner is reported to have explained at the hearing that he "went to a bar after work" and subsequently "decided not to return to the facility." (*Id.,* Ex. E) (quoting "Summary of Inmate Statements" section in report). These statements in the report are actually initialed by petitioner, demonstrating that he had an opportunity to be heard, and was given an opportunity to review his statements, before the committee rendered its decision.

**\*6** Accordingly, in light of the documents presented by the BOP, it appears that petitioner does not have a clear right to any of the relief that he seeks and therefore he cannot satisfy the requirements needed before a writ of mandamus may issue. *See Anderson v. Bowen*, 881 F.2d at 55.

*CONCLUSION*

For the reasons stated above, this Court respectfully recommends that the petition for a writ of mandamus be denied.[FN6] Any objections to this Report and Recommendation must be filed with the Clerk of the Court, with a copy to the undersigned, within ten (10) days of receipt of this Report. Failure to file objections within the specified time waives the right to appeal the District Court's order. *See* 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(e), 72; *Small v. Secretary of Health & Human Servs.*, 892 F.2d 15, 16 (2d Cir.1989). The Clerk is directed to mail copies of this Report and Recommendation to the parties.

FN6. By Motion dated August 28, 2009, petitioner seeks discovery relating to similar incidents involving other BOP inmates,

Slip Copy, 2010 WL 276206 (E.D.N.Y.)
(Cite as: 2010 WL 276206 (E.D.N.Y.))

including, *inter alia,* "[a]ll BOP forms BP-37 which is the form for an inmate to sign if he waives his right to be present for a hearing in front of the DHO;" "[a]ll incident reports written by the Brooklyn and Bronx half-way houses that resulted in the inmates['] return to custody ...''; and "[a]ll the DHO reports on the hearings conducted for inmates that were returned for rule violations from the half way house." Given the Court's recommendation that the petition be denied, the Court has not reviewed petitioner's motion for discovery and denies it as moot.

SO ORDERED.

E.D.N.Y.,2010.
Strong v. Lapin
Slip Copy, 2010 WL 276206 (E.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2007 WL 2789499 (N.D.N.Y.)
(Cite as: 2007 WL 2789499 (N.D.N.Y.))

**C** Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
Dashon [FN1] HALLOWAY, Plaintiff,

FN1. Upon information and belief, the correct spelling of Plaintiff's name is "Deshon" as reflected in both his Complaint, Dkt. No. 1, and the Department of Correctional Services' Inmate Locator Website, *available at* http://nysdocslookup.docs.state.ny .us.

v.
Glenn S. GOORD, et al, Defendants.
**No. 9:03-CV-1524 (LEK/RFT).**

Sept. 24, 2007.

Deshon Holloway, Dannemora, NY, pro se.

Hon. Andrew M. Cuomo, Attorney General of the State of New York, New York State Department of Law, Stephen M. Kerwin, Esq., Assistant Attorney General, of Counsel, Albany, NY, for Defendants.

*DECISION AND ORDER*

LAWRENCE E. KAHN, U.S. District Judge.

**\*1** This matter comes before the Court following a Report-Recommendation filed on August 29, 2007 by the Honorable Randolph F. Treece, United States Magistrate Judge, pursuant to 28 U .S.C. § 636(b) and L.R. 72.3 of the Northern District of New York. Report-Rec. (Dkt. No.

87). After ten days from the service thereof, the Clerk has sent the entire file to the undersigned, including the objections by Plaintiff Deshon Halloway, which were filed on September 14, 2007. Objection (Dkt. No. 88).

It is the duty of this Court to "make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b). "A [district] judge ... may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." *Id.* This Court has considered the objections and has undertaken a de novo review of the record and has determined that the Report-Recommendation should be approved for the reasons stated therein.

Accordingly, it is hereby

**ORDERED,** that the Report-Recommendation (Dkt. No. 87) is **APPROVED** and **ADOPTED** in its **ENTIRETY;** and it is further

**ORDERED,** that the defendants motion for summary judgment (Dkt. No. 80) is **GRANTED** and the Complaint (Dkt. No. 1) is **DISMISSED;** it is further **ORDERED,** that the Clerk serve a copy of this Order on all parties.

**IT IS SO ORDERED.**

*REPORT-RECOMMENDATION and ORDER*

RANDOLPH F. TREECE, United States Magistrate Judge.

*Pro se* Plaintiff Deshon Holloway brings this civil rights action, pursuant to 42 U.S.C. § 1983, alleging the above named Defendants violated his due process rights pursuant to the Fourteenth Amendment when he was transferred

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 2789499 (N.D.N.Y.)
(Cite as: 2007 WL 2789499 (N.D.N.Y.))

from Elmira Correctional Facility to Upstate Correctional Facility without first receiving a hearing. According to Plaintiff, when he was housed at Elmira, he was serving a keeplock disciplinary sentence in his cell, whereas upon his transfer to Upstate, he served the remainder of that sentence in a Special Housing Unit (SHU). *See generally* Dkt. No. 1, Compl.

Presently before the Court is Defendants' Motion for Summary Judgment, to which, despite being granted multiple extensions of time, Plaintiff has failed to respond. Dkt. Nos. 80, Defs.' Mot. Summ. J., filed on Jan. 17, 2007; 81, Order, dated June 5, 2007 (*sua sponte* extending Plaintiff's time to respond to July 9, 2007); 83, Order, dated July 3, 2007 (granting Plaintiff's request and extending his response time to July 31, 2007).

Instead of submitting opposition to the Motion, Plaintiff filed a letter, dated July 15, 2007, seeking permission to withdraw his action. Dkt. No. 84. Court staff inquired whether Defendants would consent to Plaintiff's voluntary withdrawal, to which Defendants tendered consent only upon the proviso that such dismissal be with prejudice. Dkt. Nos. 85, Notice to Defs.' Counsel, dated July 20, 2007; 86, Defs.' Resp., dated Aug. 21, 2007. In light of the ample passage of time since the initiation of this lawsuit and the filing of Defendants' Motion, and in light of the Defendants' posture to withhold any consent to discontinue lest it be on the merits, the Court finds it prudent to address Defendants' Motion on the merits.

## I. FACTS

### A. Effect of Plaintiff's Failure to Respond

**\*2** Defendants filed their Motion for Summary Judgment on January 17, 2007, setting Plaintiff's response deadline for February 12, 2007. Dkt. No. 80. In accordance with the Local Rules of Practice for the Northern District of New York, Defendants provided Plaintiff with notice of the consequences that may befall him should he elect not to respond to such Motion.[FN2] Dkt. No. 80; N.D.N.Y.L.R. 56.2. Approximately six months later, on June 5, 2007, this Court, in view of the fact that Plaintiff had not filed a

response, *sua sponte* extended his time to respond and further emphasized the consequences of his failure to do so.[FN3]

FN2. Specifically, Defendants included in their Notice of Motion the following warning:

PLEASE NOTE that, pursuant to Rule 56(e) of the Federal Rules of Civil Procedure, when a motion for summary judgment is made and properly supported, you may not simply rely upon your complaint, but you must respond by affidavits or as otherwise provided in that rule, setting forth specific facts showing that there is a genuine issue of material fact for trial. Any factual assertions in the moving parties' affidavits will be accepted by the Magistrate-Judge as being true unless you submit affidavits or other documentary evidence contradicting defendants' assertions. If you do not so respond, summary judgment, if appropriate, may be entered against you. If summary judgment is granted against you, your case will be dismissed and there will be no trial.

Dkt. No. 80 (emphasis in original).

FN3. Specifically, the Court issued an Order stating:

*Plaintiff is warned that failure to oppose Defendants' Motion will result in this Court accepting the facts set forth by Defendants as true.See* N.D.N.Y.L.R. 7.1(a)(3) (*"Any facts set forth in the Statement of Material Facts shall be deemed admitted unless specifically controverted by the opposing party."* (emphasis in original)). *Plaintiff is further warned that failure to respond may, if appropriate, result in the granting of Defendants' Motion, in which there will be no trial.See* N.D .N.Y.L.R. 7.1(b)(3) ("Where a properly filed motion is unopposed and the

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 2789499 (N.D.N.Y.)
(Cite as: 2007 WL 2789499 (N.D.N.Y.))

Court determines that the moving party has met its burden to demonstrate entitlement to the relief requested therein, the nonmoving party's failure to file or serve any papers as required by this Rule shall be deemed as consent to the granting or denial of the motion, as the case may be, unless good cause is shown.").

Dkt. No. 81 at pp. 1-2 (emphasis in original).

Pursuant to this District's Local Rules, "[w]here a properly filed motion is unopposed and the Court determines that the moving party has met its burden to demonstrate entitlement to the relief requested therein, the non-moving party's failure to file or serve any papers ... shall be deemed as consent to the granting or denial of the motion, as the case may be, unless good cause is shown ." N.D.N.Y.L.R. 7.1(b)(3); *see also Douglas v. New York State Div. of Parole,* 1998 WL 59459, at *1 (N.D.N.Y. Feb. 10, 1998) (noting that plaintiff's failure to oppose defendants' dispositive motion, and his failure to show good cause for the omission, may alone justify granting the motion). "The fact that there has been no response to a summary judgment motion does not, of course, mean that the motion is to be granted automatically." *Champion v. Artuz,* 76 F.3d 483, 486 (2d Cir.1996). Even in the absence of a response, Defendants are entitled to summary judgment only if the material facts demonstrate their entitlement to judgment as a matter of law. *Id.;* FED. R. CIV. P. 56(c); N.D.N.Y.L.R. 7.1(b)(3). Because Plaintiff has failed to raise any question of material fact, the Court will accept the facts as set forth in Defendants' Rule 7.1 Statement of Facts, supplemented by Plaintiffs' verified Complaint, as true. *See* Dkt. Nos. 1, Compl.; 80-9, Defs.' 7.1 Statement; *see also Lopez v. Reynolds,* 998 F.Supp. 252, 256 (W.D.N.Y.1997).

**B. Uncontested Facts**

At all times relevant to the Complaint, Plaintiff was an inmate in the custody of the New York State Department of Correctional Services (DOCS). On January 5, 2001, Holloway was transferred from Elmira Correctional Facility, a maximum security prison, to Upstate

Correctional Facility, a maximum security prison. Defs.' 7.1 Statement at ¶ 2; Dkt. No. 80-2, Donald Selsky Decl., dated Oct. 13, 2006, Ex. B (Pl.'s Transfer History). This transfer is the subject of his civil rights claims.

As indicated on Holloway's Transfer History Report, the reason for Plaintiff's transfer was his "unsuitable behavior." Selsky Decl., Ex. B. This is not the first time Plaintiff was transferred to another facility due to his unsuitable behavior.[FN4] In fact, Plaintiff's transfer to Elmira from Southport Correctional Facility was also due to his unsuitable behavior. *Id.* (Transfer, dated November 28, 2000). Upon his arrival at Elmira, Plaintiff had an aggregate disciplinary keeplock sentence of approximately 270 days, stemming from six Disciplinary Hearings Plaintiff previously received during a span of six months. Defs.' 7.1 Statement at ¶ 6. These disciplinary sentences were based on various Misbehavior Reports Plaintiff received while incarcerated at Marcy Correctional Facility and Mid-State Correctional Facility. *Id.* at ¶¶ 7-10. For each of the six Misbehavior Reports issued, Plaintiff received a separate Disciplinary Hearing resulting in six separate guilty determinations, each with its own separate sentence. *Id.* Plaintiff only filed appeals in three of these Hearings, all of which were affirmed. *Id.* at ¶¶ 8 & 11-12.[FN5] Plaintiff makes no allegations as to the inadequacy of any of these Hearings and none of the Hearing Officers who presided over the six Disciplinary Hearings is named as a Defendant.

FN4. In reviewing Plaintiff's Transfer History, we note at least four transfers due to his "unsuitable behavior" between May 1998 and December 2000. Dkt. No. 80-2, Donald Selsky Decl., dated Oct. 13, 2006, Ex. B (Pl.'s Transfer History).

FN5. Indeed Plaintiff's Disciplinary History is startling and certainly is not confined to the six instances noted above. Focusing only on the disciplinary sentences to be served upon his arrival at Upstate, we offer the following synopsis. Two of the sentences stem from Misbehavior Reports Plaintiff was issued while at Marcy, dated April 15, 1999, and May 14, 1999. Defs.' 7.1 Statement at ¶ 7; Selsky Decl.,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 2789499 (N.D.N.Y.)
(Cite as: 2007 WL 2789499 (N.D.N.Y.))

Ex. A (Holloway Disciplinary History). The Hearing determinations for these two Reports, which included, *inter alia,* an aggregate keeplock sentence of 180 days, were affirmed on appeal. Defs.' 7.1 Statement at ¶ 8. While at Mid-State, and again as relevant to the aggregate sentence to be served at Upstate, Plaintiff received four separate Misbehavior Reports on August 15, 1999, September 2, 1999, October 12, 1999, and October 22, 1999. *Id.* at ¶ 9. On each, he was provided a Hearing, found guilty, and received a sentence of, *inter alia,* thirty days keeplock (per infraction); he only appealed the Hearing determination regarding the October 12th Misbehavior Report, and such was affirmed on appeal. *Id.* at ¶¶ 10-12.

**\*3** Prior to his transfer to Upstate, Holloway was held in long-term keeplock at Elmira for approximately one month and eight days. *Id .* at ¶ 14. The cell Plaintiff was confined in could also be used for a general population inmate or an inmate transitioning to general population from SHU. Dkt. No. 80-5, Dan Kress Decl., dated Jan. 11, 2007, at ¶ 2. Under the keeplock confinement, Plaintiff was locked in his cell for twenty-three hours a day. Dkt. No. 80-6, James Thompson Decl., dated Jan. 10, 2007, at ¶ 3. A cell-confined inmate in this circumstance requires additional services by prison staff such as meal delivery and cell visitation by medical staff. *Id.* Though use of a general population cell for such restricted confinement is feasible on a short-term basis, "[a]s a long-term proposition, ... it [is] an inefficient use of the department's resources[.]" *Id.* On the other hand, Upstate is a prison specially designed to handle cell-confined inmates and, given the length of Plaintiff's keeplock sentence of approximately 240 days, it was more practical for Plaintiff to be transferred to Upstate to serve out the remainder of that keeplock sentence. *Id.* at ¶ 4. For these reasons, on December 27, 2000, Defendant Dan Kress, Corrections Counselor at Elmira, recommended that Holloway be transferred to Upstate to serve his 240-day keeplock sentence. Defs. 7.1 Statement at ¶ 16. This recommendation was approved by Defendant James Thompson, Senior Counselor at Elmira and by John Carvill [FN6] in DOCS' Office of Classification and Movement, who issued the order that Plaintiff be transferred to Upstate from Elmira; as aforementioned, such transfer took place on January 5, 2001. *Id.* at ¶ 17.

Defendants Glenn Goord, then-Commissioner of DOCS, Floyd Bennett, then-Superintendent of Elmira, Thomas Ricks, then-Superintendent of Upstate, and John Glasheen, then-Assistant Director of the Office of Classification and Movement, were not involved in the decision to transfer Plaintiff to Upstate. *Id.* at ¶ 33.

[FN6.] John Carvill is not a Defendant in this action.

While serving his sentence at Upstate, Plaintiff was treated the same as any other inmate sentenced to keeplock confinement at Upstate. *Id.* at ¶ 27. After his arrival at Upstate, Plaintiff incurred, in just four months, over a year's worth of additional keeplock for disciplinary violations. *Id.* at ¶ 18. He also accumulated seventy-four months of SHU time for more serious violations involving violent conduct on staff and an unhygienic act. *Id.* at ¶ 19. Pursuant to Department Regulations, Plaintiff began serving all of this additional SHU time at Upstate on May 5, 2001. *Id.* at ¶ 20.

## II. DISCUSSION

### A. Standard of Review

Summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits ... show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Anderson v. Liberty Lobby, Inc .,* 477 U.S. 242, 247 (1986); *accord F.D.I.C. v. Giammettei,* 34 F.3d 51, 54 (2d Cir.1994). The moving party has the burden of demonstrating that there is no genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986); *Thomas v. Roach,* 165 F.3d 137, 142 (2d Cir.1999). "When a motion for summary judgment is made and supported ... an adverse party may not rest upon the mere allegations or denials of the ... pleading, but the adverse party's response, by affidavits or as otherwise provided in [Federal Rule of Civil Procedure 56(e) ], must set forth specific facts showing that there is a genuine issue for trial." *St. Pierre v. Dyer,* 208 F.3d 394, 404 (2d Cir.2000)

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 2789499 (N.D.N.Y.)
(Cite as: 2007 WL 2789499 (N.D.N.Y.))

(quoting FED. R. CIV. P. 56(e)). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment[.]" *Rexnord Holdings, Inc. v. Bidermann,* 21 F.3d 522, 525 (2d Cir.1994) (alteration and emphasis in original) (citation omitted). However, it is well settled that on a motion for summary judgment, the court must construe the evidence in the light most favorable to the non-moving party. *Tenenbaum v. Williams,* 193 F.3d 581, 593 (2d Cir.1999).

**\*4** Furthermore, in a *pro se* case, the court must view the submissions by a more lenient standard than that accorded to "formal pleadings drafted by lawyers." *Haines v. Kerner,* 404 U.S. 519, 520-21 (1972); *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994) (a court is to read a *pro se* party's "supporting papers liberally, and ... interpret them to raise the strongest arguments that they suggest"). Indeed, the Second Circuit has stated that "[i]mplicit in the right to self-representation is an obligation on the part of the court to make reasonable allowances to protect *pro se* litigants from inadvertent forfeiture of important rights because of their lack of legal training." *Traguth v. Zuck,* 710 F.2d 90, 95 (2d Cir.1983). Any ambiguities and inferences drawn from the facts must be viewed in the light most favorable to the non-moving party. *LaFond v. Gen. Physics Servs. Corp.,* 50 F.3d 165, 171 (2d Cir.1995). This liberal standard, however, does not excuse a *pro se* litigant from following the procedural formalities of summary judgment. *Showers v. Eastmond,* 2001 WL 527484, at \*2 (S.D.N.Y. May 16, 2001).

More specifically, this District's Local Rules provide that *"[a]ny facts set forth in the [moving party's] Statement of Material Facts shall be deemed admitted unless specifically controverted by the opposing party."* N.D.N.Y.L.R. 7.1(a)(3) (emphasis in original). Local Rule 7.1(a)(3) further requires that the non-movant shall file a Statement of Material Facts which mirrors the movant's statement in matching numbered paragraphs and which sets forth a specific reference to the record where the material fact is alleged to arise. *Id.* The courts of the Northern District have adhered to a strict application of Local Rule 7.1(a)(3)'s requirement on summary judgment motions. *Giguere v. Racicot,* 2002 WL 368534, at \*2 (N.D.N.Y. Mar. 1, 2002) (citing, *inter alia, Bundy Am. Corp. v. K-Z Rental Leasing, Inc.,* 2001 WL 237218, at \*1

(N.D.N.Y. Mar. 9, 2001)).

Furthermore, this Circuit adheres to the view that nothing in Rule 56 imposes an obligation on the court to conduct a search and independent review of the record to find proof of a factual dispute. *Amnesty Am. v. Town of West Hartford,* 288 F.3d 467, 470 (2d Cir.2002). As long as the local rules impose a requirement that parties provide specific record citations in support of their statement of material facts, the court may grant summary judgment on that basis. *Id.* at 470-71.

In this case, as previously discussed, Holloway did not file a response to the Defendants' Motion for Summary Judgment. Consequently, this Court has accepted the properly supported facts contained in the Defendants' 7.1 Statement as true for purposes of this Motion. With this standard in mind, the Court now addresses the sufficiency of Holloway's claims.

### B. Due Process and Plaintiff's Intrastate Prison Transfer

Holloway asserts he should have received a hearing prior to his transfer to Upstate and in the absence of such hearing, his due process rights were violated. Defendants Kress and Thompson were directly involved in the decision to transfer Plaintiff, thus we consider Plaintiff's due process claim to be asserted against them. Plaintiff's claim, however, is wholly without merit.

**\*5** To state a due process claim under § 1983, an inmate must first establish that he enjoys a protected liberty interest. *Arce v. Walker,* 139 F.3d 329, 333 (2d Cir.1998) (citing *Kentucky Dep't of Corr. v. Thompson,* 490 U.S. 454, 460 (1989)). Inmates' liberty interests are typically derived from two sources: (1) the Due Process Clause of the Fourteenth Amendment; and (2) state statute or regulations. *Id.*

With regard to liberty interests arising directly under the Due Process Clause, the Supreme Court has "narrowly circumscribed its scope to protect no more than the 'most

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 2789499 (N.D.N.Y.)
(Cite as: 2007 WL 2789499 (N.D.N.Y.))

basic liberty interests in prisoners.' " *Arce v. Walker,* 139 F.3d at 333 (quoting *Hewitt v. Helms,* 459 U.S. 460, 467 (1983)). The Due Process clause does not protect against "every change in the conditions of confinement having a substantial adverse impact" on inmates if those changes are "within the normal limits or range of custody which the conviction has authorized the state to impose." *Sandin v. Conner,* 515 U.S. 472, 478 (1995). Instead, the Due Process Clause protects against restraints or conditions of confinement that "exceed[ ] the sentence in ... an unexpected manner." *Id.* at 484 (quoted in *Arce v. Walker,* 139 F.3d at 333).

It is well-settled that an inmate has no right under the Due Process clause to be incarcerated in any particular correctional facility, and transfers among facilities need not be preceded by any particular due process procedure. *See Wilkinson v. Austin,* 545 U.S. 209, 221-22 (2005) (citing *Meachum v. Fano,* 427 U.S. 215, 224-25 (1976)) (noting that the Constitution does not "guarantee that [a] convicted prisoner will be placed in any particular prison" nor does "the Due Process Clause in and of itself protect a duly convicted prisoner against transfer from one institution to another within the state prison system[ ]"); *see also Fox v. Brown,* 2007 WL 586724, at *9-10 (N.D.N.Y. Feb. 21, 2007).* Though Holloway complains that his restrictions at Upstate were much greater than that experienced at Elmira, the fact that "life in one prison is much more disagreeable than in another does not itself signify that a Fourteenth Amendment liberty interest is implicated when a prisoner is transferred to the institution with the more severe rules." *Meachum v. Fano,* 427 U.S. at 225; *see also Olim v. Wakinekona,* 461 U.S. 238, 244-45 (1983) (citing, *inter alia, Meachum v. Fano,* 427 U.S. 215 (1976) & *Montanye v. Haymes,* 427 U.S. 236 (1976)) for the proposition that inmates have no constitutional right to be housed in a particular prison or a particular dormitory within a prison). Thus, the Due Process Clause itself clearly does not afford Holloway the protection sought.

Our inquiry does not end there, however, since liberty interests may also arise under state statutes and regulations. *Arce v. Walker,* 139 F.3d at 334 (citing *Kentucky Dep't of Corr.,* 490 U .S. at 460). To assert a state created liberty interest, an inmate must establish that his confinement or restraint (1) created an "atypical and significant hardship on the inmate in relation to the

ordinary incidents of prison life," *Sandin v. Connor,* 515 U.S. at 484, *and* (2) that the "state has granted its inmates, by regulation or by statute, a protected liberty interest in remaining free from that confinement or restraint," *Frazier v. Coughlin,* 81 F.3d 313, 317 (2d Cir.1996). Regardless of whether Plaintiff can establish that he was subjected to an atypical and significant hardship, it is patently clear that New York has **not** created, by regulation or statute, any liberty interest in remaining at one particular prison. Indeed, it is the DOCS who possesses sole discretion to determine "where a [state] inmate will be housed." *Grullon v. Reid,* 1999 WL 436457, at *10 (S.D.N.Y. Jun. 24, 1999) (citing *United States v. Williams,* 65 F.3d 301, 307 (2d Cir.1995)); *see also Smolen v. Lanier,* 2007 WL 2027841, at *2 (W.D.N.Y. July 11, 2007). Furthermore, not only do New York State Regulations permit keeplock sentences to be served in SHU, but further contemplate that assignments to SHU will be subject to the same property, visiting, package, commissary, telephone, and correspondence limitations typically experienced in SHU confinement. N.Y. COMP.CODES R. & REGS. tit. 7 §§ 301.6 & 302.2.

*6 Thus, regardless of whether Plaintiff alleges his due process rights were violated when he was transferred to another institution or when he was forced to serve his keeplock sentence in SHU, since Holloway had no liberty interest in remaining at one specific facility to serve his keeplock sentence or to remain in cell confinement to serve such sentence, there was no need to provide him with a hearing prior to his transfer to another prison and into SHU. Accordingly, this Court recommends **granting** Defendants' Motion for Summary Judgment and **dismissing** Defendants Kress and Thompson from this action.

### B. Personal Involvement

As to the remaining Defendants, Plaintiff alleges that 1) Defendant Goord failed to stop Plaintiff's transfer to Upstate and knew of or should have known of his subordinates' acts, yet failed to take action, Compl. at ¶¶ 48-50; 2) Defendant Glasheen approved the transfer and failed to provide Plaintiff with a hearing prior to such transfer, Compl. at ¶¶ 51-53; 3) Defendant Bennett failed to stop Plaintiff's transfer to Upstate and failed to provide

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 2789499 (N.D.N.Y.)
(Cite as: 2007 WL 2789499 (N.D.N.Y.))

Plaintiff with a hearing prior to such transfer, Compl. at ¶¶ 54-57; and 4) Defendant Ricks failed to transfer Plaintiff from Upstate back to Elmira and failed to provide Plaintiff with a hearing prior to keeping him confined at Upstate, Compl. at ¶¶ 58-60.

It is well settled that the personal involvement of a defendant is a prerequisite for the assessment of damages in a § 1983 action, *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977), and furthermore, the doctrine of respondeat superior is inapplicable to § 1983 claims, *Polk County v. Dodson,* 454 U.S. 312, 325 (1981) (citing *Monell v. New York City Dep't of Soc. Servs.,* 436 U.S. 658 (1978)); *Johnson v. Glick,* 481 F.2d 1028, 1033 (2d Cir.1973).

Despite Plaintiff's allegations to the contrary, and in light of his failure to oppose Defendants' Motion, it is uncontested that Defendants Goord, Glasheen, Bennett, and Ricks played no part in the decision to transfer Plaintiff. To the extent Plaintiff seeks to hold any one of these Defendants liable on the basis of supervisory liability,[FN7] such claim similarly fails since, as explained above, Plaintiff's transfer to Upstate without a hearing did not violate his due process rights. Therefore, this Court recommends **dismissing** these Defendants as well.

> FN7. The Second Circuit has stated that a supervisory defendant may have been personally involved in a constitutional deprivation within the meaning of § 1983 if he: (1) directly participated in the alleged infraction; (2) after learning of the violation, failed to remedy the wrong; (3) created a policy or custom under which unconstitutional practices occurred or allowed such policy or custom to continue; or (4) was grossly negligent in managing subordinates who caused the unlawful condition or event. *Williams v. Smith,* 781 F.2d 319, 323-24 (2d Cir.1986) (citations omitted). Pointedly, "mere 'linkage in the prison chain of command' is insufficient to implicate a state commissioner of corrections or a prison superintendent in a § 1983 claim." *Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003) (quoting *Ayers v. Coughlin,* 780 F.2d 205, 210 (2d Cir.1985)); *see*

*also Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (defendant may not be held liable simply because he holds a high position of authority).

### III. CONCLUSION

For the reasons stated herein, it is hereby

**RECOMMENDED,** that Defendants' Motion for Summary Judgment (Dkt. No. 80) be **GRANTED** and the entire Complaint **DISMISSED;** and it is further

**ORDERED,** that the Clerk of the Court serve a copy of this Report-Recommendation and Order upon the parties to this action.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have ten (10) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. *FAILURE TO OBJECT TO THIS REPORT WITHIN TEN (10) DAYS WILL PRECLUDE APPELLATE REVIEW.Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec'y of Health and Human Servs .,* 892 F.2d 15 (2d Cir.1989)); *see also*28 U.S.C. § 636(b) (1); FED. R. CIV. P. 72, 6(a), & 6(e).

N.D.N.Y.,2007.
Halloway v. Goord
Not Reported in F.Supp.2d, 2007 WL 2789499 (N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2000 WL 876855 (W.D.N.Y.)
(Cite as: 2000 WL 876855 (W.D.N.Y.))

Only the Westlaw citation is currently available.

United States District Court, W.D. New York.
Julio GIANO, Plaintiff,
v.
Walter KELLY, Hans Walker, J. Kihl, Albert S. Hall,
Thomas A. Coughlin, and R. Batherick, Defendants.
No. 89-CV-727(C).

May 16, 2000.

**Prisoners'** Legal Services of New York (Cheryl Maxwell, Esq., of Counsel), Plattsburgh, New York, for Plaintiff.

Eliot Spitzer, Attorney General of the State of New York (Mary C. Baumgarten, Assistant New York State Attorney General, of Counsel), Buffalo, New York, for Defendants.

DECISION AND ORDER

CURTIN, District J.

INTRODUCTION

**\*1** Plaintiff Julio Giano ("Giano"), a **prisoner** in the custody of the New York State Department of Correctional Services ("DOCS"), was confined in administrative segregation ("AS") [FN1] at Attica Correctional Facility ("Attica") between October 1988 and August 1990. Giano claims that the defendants, DOCS Commissioner Thomas A. Coughlin III ("Coughlin") and other officials at Attica, never engaged in meaningful, periodic reviews of his AS confinement and thus deprived him of liberty without due process. Defendant Coughlin denies any personal involvement in the alleged denial of Giano's rights, and all defendants assert that they are

entitled to qualified immunity from liability. Defendants also contest the merits of Giano's claims. They contend that: (1) that the conditions of Giano's confinement were not so atypical as to implicate a liberty interest protected by due process; (2) they provided meaningful reviews of Giano's status; and (3) he would have remained in AS regardless of the reviews that they accorded him; hence, he was not harmed by any violation of his right to due process.

FN1. As discussed below, there was no discrete AS unit at Attica. AS **prisoners** were housed with disciplinary **prisoners** in the Special Housing Unit ("SHU"). Parties and witnesses used the term to describe both the status of AS **prisoners** and their housing location.

On May 12, 13, 14, and 15, 1997, this court conducted a bench trial on Giano's claim. The parties have submitted proposed findings of fact and conclusions of law, as well as supporting memoranda of law. Now, upon the testimony and evidence submitted, and on all proceedings held hereto, this court finds that Giano's AS confinement implicated a liberty interest protected by due process, that defendants failed to meaningfully review Giano's AS status and therefore denied him due process, and that Giano's time in AS was prolonged as a consequence of defendants' failure to meaningfully review his status. This court also finds that Coughlin was personally involved in the denial of Giano's rights, that defendants are not entitled to qualified immunity, and that Giano is entitled to compensation.

PROCEDURAL HISTORY

Giano filed his complaint in June 1989. He was granted permission to file an amended complaint, which he filed in September 1991 (Item 59). The claims in the amended complaint related both to Giano's initial transfer to AS and to the subsequent review of his status. However, nine of the ten claims have been dismissed. In September 1992, this court granted summary judgment on Giano's first six

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 876855 (W.D.N.Y.)
(Cite as: 2000 WL 876855 (W.D.N.Y.))

claims which related to the hearing held when he was first transferred to AS. The claims were dismissed based on collateral estoppel, since they had been determined in a prior state court proceeding (Item 71). Giano's eighth claim was dismissed upon the stipulation of the parties in August 1995 (Item 144).

Giano then moved for partial summary judgment on his ninth and tenth claims, and defendants cross-moved for summary judgment on those claims. This court granted summary judgment to defendants on the ninth claim, which alleged denial of equal protection, finding that that claim had also been determined in the state court proceeding. *Giano v. Kelly,* 869 F.Supp. 143, 147 (W.D.N.Y.1994). However, the court denied summary judgment to both sides on the tenth claim, which alleged that defendants failed to provide meaningful, periodic reviews of Giano's status, finding that material factual issues precluded summary judgment on that claim. *Id.* at 149-50.

**\*2** Following the Supreme Court's decision in *Sandin v. Connor,* 515 U.S. 472 (1995), defendants again moved for summary judgment on Giano's tenth claim. This court denied the motion, finding that Giano's AS confinement was an "atypical and significant hardship" as defined in *Sandin,* which implicated a liberty interest protected by due process (Item 160 at 8). This court also reiterated its prior holding that there were material issues of fact as to whether defendants engaged in meaningful, periodic reviews of Giano's status. *Id.* at 9-10 (citing *Giano,* 869 F.Supp. at 148).

Defendants then moved for partial summary judgment on Giano's seventh claim: that conditions in AS amounted to cruel and unusual punishment in violation of the Eighth Amendment. On May 7, 1997, this court granted defendants' motion, holding that Giano had not alleged facts that would support a finding that AS conditions objectively violated Eighth Amendment standards (Item 177 at 5-6).

DISCUSSION

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

I. Liberty Interest

To prevail on his claim, Giano must prove that: (1) his AS confinement implicated a liberty interest protected by **due process**; (2) defendants denied him **due process** by failing to review his confinement in a meaningful fashion; and (3) he would have been released from AS had there been a meaningful review of his status. In a prior decision, this court held that Giano's AS confinement did implicate a liberty interest (Item 160 at 8). Defendants urge the court to reconsider that holding. Given the Second Circuit's admonition to "examine the specific circumstances" when a *Sandin* liberty interest is at issue, this court will reconsider its prior holding in light of the testimony and evidence adduced at trial. *Brooks v. DiFasi,* 112 F.3d 46, 49 (2d Cir.1997). The **liberty interest** question is a threshold issue; if no such interest was implicated by Giano's AS confinement, the court would **end** its **inquiry** and defendants would prevail.

A. *Sandin v. Connor*

The Fourteenth Amendment provides that the state may not deprive a person of liberty without due process. A constitutionally protected liberty interest may arise directly from the Due Process Clause or from state law. *Hewitt v. Helms,* 459 U.S. 460, 466 (1983). In *Hewitt,* the Supreme Court held that a state statute or regulation creates a liberty interest if it is couched in "language of an unmistakably mandatory character, requiring that certain procedures 'shall,' 'will,' or 'must' be employed," and if it requires a specific substantive predicate to the deprivation. 459 U.S. at 471-72. However, application of *Hewitt* to prison rules proved to be unworkable. As the Supreme Court later noted in *Sandin:* "By shifting the focus of the liberty interest inquiry to one based on the language of a particular regulation, and not the nature of the deprivation ... [*Hewitt* ] encouraged **prisoners** to comb regulations in search of mandatory language on which to base entitlements to various state-conferred privileges." 515 U.S. at 481. *Hewitt* 's application to prison rules not only prompted states to codify prison procedures reluctantly (for fear that they would create protected liberty interests), but it also forced courts to squander valuable judicial resources by becoming involved in the day-to-day management of prisons. *Id.*

Not Reported in F.Supp.2d, 2000 WL 876855 (W.D.N.Y.)
(Cite as: 2000 WL 876855 (W.D.N.Y.))

**\*3** As a result, the Court in *Sandin* held:

States may under certain circumstances create liberty
interests which are protected by the Due Process Clause.
But these interests will be generally limited to freedom
from restraint which, while not exceeding the sentence
in such an unexpected manner as to give rise to
protection by the Due Process Clause of its own force ...
nonetheless imposes atypical and significant hardship
on the **inmate** in relation to the ordinary incidents of
prison life.

515 U.S. at 483-84 (citation omitted). This atypicality
requirement is not a substitute for the *Hewitt* requirement,
but an additional component in the analysis. Thus, Giano's
AS confinement implicated due process only if it was an
atypical and significant hardship and if DOCS regulations
conferred a liberty interest in remaining free from such
confinement. *See Sealey v. Giltner,* 197 F.3d 578, 584-85
(2d Cir.1999); *Frazier v. Coughlin,* 81 F.3d 313, 317 (2d
Cir.1996). Defendants argue alternatively that DOCS
regulations are not couched in language that confers a
liberty interest, and that the conditions of Giano's
confinement were not so atypical as to implicate a liberty
interest.

B. DOCS regulations

Defendants argue that "[n]o New York statute or
regulation gives an **inmate** an entitlement to avoid [AS] or
to remain in general population ("GP") ...." Item 188, pp.
7-8. However, it is clear that DOCS regulations are
couched in language that creates a liberty interest. First,
the regulations provide that an **inmate** may be confined in
AS only if his presence in GP poses a threat to the safety
and security of the facility. 7 N.Y.C.R.R. § 301.4(b). An
**inmate** may not be placed in AS unless this standard is
met. Second, the regulations set forth procedures which
must be followed when an **inmate** is transferred to AS.
The **inmate** must receive a hearing similar to that
provided to disciplinary SHU **inmates**. *Id.* § 301.4(a).
That is: (1) the **inmate** must receive written notice, in his

native language, of the reason for his confinement, *id.* §
254 .2; (2) an employee assistant must meet with the
**inmate** if he does not understand English, or is confined
to SHU pending the hearing, *id.* § 251-4.1; (3) the hearing
must be conducted by an impartial hearing officer who
was not involved in the incident; *id.* § 254.1; (4) the
**inmate** must be permitted to attend the hearing unless he
is disruptive; and must be permitted to submit documents
and call witnesses, unless the hearing officer finds that
they are redundant or irrelevant, *id.* §§ 254.5, 254.6(b);
(5) the hearing must be electronically recorded and must
be completed within 14 days, *id.* §§ 251-5(b), 254.6(b);
and (6) the hearing officer must render a written decision
setting forth the basis for his determination, and the
**inmate** must receive a copy of the determination and be
informed of his right to an administrative appeal, *id.* §§
254.7, 254.8. All of these requirements are mandatory.
While, for example, a hearing officer has some discretion
to deny a request to present redundant testimony, he may
not ignore procedures defined in the regulations (*e.g.,*
denying a request to hear any witnesses at all).

**\*4** In light of the foregoing, the court finds that the DOCS
regulations are couched in mandatory language and
require a substantive predicate for AS confinement.
Therefore, the DOCS regulations meet the *Hewitt* criteria
for creation of a liberty interest. *See McClary v. Kelly,* 4
F.Supp.2d 195, 211-212 (W.D.N.Y.1998); *Edmonson v.
Coughlin,* 21 F.Supp.2d 242, 248 (W.D.N.Y.1998); *cf.
Tellier v. Scott,* 49 F.Supp.2d 607, 610-11 (S.D.N.Y.1998)
(noting similarity of Federal and New York AS
regulations, and finding that Federal regulation creates a
liberty interest).

In support of their position, defendants cite *Frazier,* 81
F.2d at 317. In essence, defendants argue that after
*Sandin,* New York's regulations may not serve as the
predicate for a liberty interest. However, *Frazier* did not
hold that a liberty interest could never be implicated by
DOCS regulations. Rather, the court in *Frazier* held that
a liberty interest could no longer be based solely on the
language of those regulations, as had been the case under
*Hewitt,* and that the plaintiff must also establish that his
confinement was a atypical. *Id.* Defendants also rely on
*Rodriguez v. Phillips,* 66 F.3d 470, 478 (2d Cir.1995),
where the court of appeals observed that "*Sandin* may be
read as calling into question" prior decisions that found a

© 2010 Thomson Reuters. No Claim to Orig. US Gov.
Works.

Not Reported in F.Supp.2d, 2000 WL 876855 (W.D.N.Y.)
(Cite as: 2000 WL 876855 (W.D.N.Y.))

liberty interest implicated by short-term confinement in AS. *Id.* at 480. However, that observation is based on the obvious fact that a brief stint in AS cannot be considered "atypical" under *Sandin.* As the Second Circuit recently noted, "[w]e have never held that New York **prisoners** have no liberty interest in avoiding long-term [AS]." *Brooks v. DiFasi,* 112 F.3d 46, 49 (2d Cir.1997).

In *Sealey,* the Second Circuit explicitly rejected the argument that DOCS AS regulations never implicate a liberty interest. Stating that "*Sandin* does not go that far," the court reasoned as follows.

[DOCS] regulations specify that "[AS] results from a determination by the facility that the **inmate's** presence in [GP] would pose a threat to the safety and security of the facility" .... [Since] the Supreme Court acknowledged that a liberty interest exists when state law requires a substantive factual predicate for atypical restricted confinement, it is difficult to see why such an interest should not arise when such confinement is imposed for administrative reasons after determination that a required factual predicate has been established. If an **inmate** is to be placed in atypical confinement (considering both the conditions and the duration) after being determined, for example, to be a threat to prison safety, he should have some procedural due process surrounding the determination that he poses such a threat. That is the teaching of *Hewitt* and if *Sandin* had meant to override *Hewitt* to the extent of precluding a protected liberty interest for all [AS] confinements, we would expect to see more pointed language to that effect.

**\*5**_Sealey,_ 197 F.3d at 585 (internal citations omitted).

Nevertheless, defendants "urge this Court to follow the precedent established in other circuits and reject the argument that confinement to [AS] imposes atypical or significant hardship which would create a liberty interest." Item 188, p. 11. However, in most of the cases cited by defendants, the holding is not so broad. For example, the court in *Griffin v. Vaughn,* 112 F.3d 703, 709 (3d Cir.1997), simply held that the plaintiff "was neither committed nor confined to administrative custody for an atypical period of time." Similarly, the court in *Mackey v. Dyke,* 111 F3d 460, 463 (6th Cir.), *cert. denied,* 522 U.S. 848 (1997), held that 117 days' AS confinement was not so atypical as to implicate a liberty interest under *Sandin.*

*Rimmer-Bey v. Brown,* 62 F.3d 789 (6th Cir.1995), is also inapposite. *Rimmer-Bey* involved Michigan's correctional policy in which an **inmate** accused of a rule infraction is given a hearing and, if found guilty, serves a short time in disciplinary SHU and then is reclassified as AS. Plaintiff Rimmer-Bey had been found guilty of stabbing an officer. After thirty days in disciplinary SHU, he was converted to AS. The court rejected his argument that a new liberty interest was implicated when he was reclassified as AS, holding that he received adequate due process at the time he was found guilty of the disciplinary infraction. *Id.* at 790-91.

Two of the cases cited by defendants could be read as suggesting that AS by definition never implicates a liberty interest under *Sandin. Pichardo v. Kinker,* 73 F.3d 612, 613 (5th Cir.1996); *Taylor v. Reynolds,* 76 F.3d 380 (table), 1996 WL 28842 (6th Cir.1996). However, such a holding is directly contrary to *Sealey.* Therefore, the court does not find those decisions to be persuasive authority. Instead, this court finds that DOCS AS regulations are couched in language that implicates a liberty interest under *Sandin.*

C. "ATYPICAL AND SIGNIFICANT HARDSHIP"

To determine whether Giano's AS confinement was an atypical and significant hardship in relation to ordinary prison life, this court must consider both the duration and extent of the deprivation "since especially harsh conditions endured for a brief interval and somewhat harsh conditions endured for a prolonged interval might both be atypical." *Sealey,* 197 F.3d at 586;*cf. Arce v. Walker,* 139 F.3d 329, 336-37 (2d Cir.1998); *Brooks,* 112 F.3d at 48. The same analysis is required for AS and disciplinary SHU. In either case, the focus is on the duration and extent of the deprivation. *Sealey,* 197 F.3d at 582.

1. *Duration of AS confinement.*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 876855 (W.D.N.Y.)
(Cite as: 2000 WL 876855 (W.D.N.Y.))

Giano argues that this court must consider the potential duration of his AS confinement in deciding whether that confinement was atypical. Since **inmates** are confined to AS for an undefined period, Giano reasons that the potential duration of his confinement was the length of his prison sentence. Defendants argue that the court must consider the actual length of Giano's confinement. The Second Circuit resolved this issue in *Scott v. Albury,* 138 F.3d 474, 477-78 (2d Cir.1998), holding that the *Sandin* analysis is based on the actual length of the **inmate's** SHU confinement.

2. *"Ordinary incidents of prison life"*

**\*6** The parties also disagree as to how this court should identify the "ordinary incidents of prison life ...." *Sandin,* 515 U.S. at 484. Defendants note that prior to arriving at Attica, Giano spent most of his prison term in protective custody, keeplock, or disciplinary SHU. Thus, defendants argue that SHU conditions were the "ordinary incidents" of Giano's prison life.

Defendants' argument turns the logic of *Sandin* on its head. That is, defendants imply that an **inmate** condemned to spend his entire life in SHU could not claim a liberty interest, since for him, such a regimen would be "typical." Under *Sandin,* it is clear that the court must assess atypicality in relation to the experience of **inmates** generally, not to the specific conditions experienced by a particular plaintiff.

The definition of the "ordinary incidents of prison life," however, is still open to some dispute. The Second Circuit recently identified three "subsidiary issues":

First, to what type of confinement is the challenged confinement to be compared? Second ... is the comparison to conditions at the **inmate's** prison, all prisons in the state system, or all prisons in the nation? Third, if the conditions of confinement and their duration ... are deemed to impose a significant hardship,

what base is to be used in determining whether the hardship is imposed so infrequently as to render the challenged confinement atypical?

*Sealey,* 197 F.3d at 588. *Sealey* did not provide definitive answers to any of these questions. However, the court in *Sealey* did note that the trial court had compared Sealey's AS conditions to conditions in GP at the prison where he was housed, and held that that comparison was adequate to sustain the trial court's findings on the *Sandin* issue. *Sealey,* 197 F.3d at 588-89.

In the present case, testimony and evidence focused on a comparison of AS conditions which Giano endured with typical conditions in Attica's GP. This court will base its *Sandin* analysis on that comparison.[FN2] Although they disagree as to the criteria to be applied and legal conclusion to be drawn, the parties are in substantial agreement as to the differences between AS and GP at Attica.

> FN2. For *Sandin* purposes, the relevant time frame is the period when Giano was confined in AS. The court uses the present tense to indicate conditions that have remained constant since Giano's AS confinement, and the past tense where there is a possibility that conditions have changed since his release from AS.

AS **inmates** are housed in SHU and are subject to most restrictions that apply to disciplinary SHU **inmates**. Stipulation, Item 193 ("Stip."), ¶ 4. DOCS regulations define SHU as "single occupancy cells grouped so as to provide separation from [GP]." 7 N.Y.C.R.R. § 300.2(b). While any **inmate** is isolated from the outside world, SHU **inmates** experience significantly more isolation than GP **inmates**.

Most GP **inmates** have job assignments, vocational training, or classroom instruction. Thus, GP **inmates** spend a significant part of the day engaged in some form of organized, meaningful activity. Many GP **inmates** also participate in supportive programs, such as drug or alcohol

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 876855 (W.D.N.Y.)
(Cite as: 2000 WL 876855 (W.D.N.Y.))

counseling or the alternatives to violence program-all of which typically occur in a group setting. GP **inmates** also interact during meals, religious services, recreation time, meetings of **inmate** organizations, and special events, such as film programs and library "call-outs." With respect to recreation time, GP **inmates** have group recreation approximately five to six hours on weekdays and six to seven hours on weekends, during which they can engage in team sports and have access to basketball, baseball, football, and weightlifting equipment. Stip., ¶¶ 13, 15, 17, 19, 22, 23, 25.

**\*7** By contrast, SHU **Inmates** are confined to their cells approximately 23 hours per day. They are permitted to leave their cells for one hour of "recreation" per day, two showers per week, legal visits, and one non-legal visit per week. SHU **inmates** eat meals alone in their cells and are not permitted to participate in any group activities. They do not have work assignments and cannot attend vocational programs, academic classes, religious services, or group counseling sessions. Medical or mental health services are provided by staff during rounds of the unit, or in a "call-out," in which the **inmate** is escorted to an interview room. During "call-outs," SHU **inmates** are kept separate from each other. The only educational opportunity for SHU **inmates** is the cell study program, in which books and material are brought to the cells. Stip., ¶¶ 18, 22, 24, 26, 28, 46, 64-66. Furthermore, an SHU **inmate's** hour of "recreation" differs little from the other twenty-three hours in his day. At the time of Giano's confinement, SHU exercise cells were ten by twenty feet, with concrete walls and a mesh ceiling. The **inmate** was locked in the cell by himself and had no equipment of any kind (Stip., ¶ 10). The exercise cells were exposed to the elements and, according to Giano, were often "unbearably hot" in the summer and often filled with snow and ice in the winter (T. 39).

An **inmate's** contact with the outside world is also much more restricted in SHU than it is in GP. At the time of Giano's AS confinement, there was no limit on the weekly number of visits or telephone calls for GP **inmates**. An SHU **inmate**, however, was limited to one nonlegal visit per week and could make a telephone call only if he obtained permission from prison officials in the event of an emergency (T. 41). SHU **inmates** were also subject to

restrictions regarding the personal items that they could keep in their cells, purchases from the prison commissary, and the contents of packages from friends or families. Stip., ¶¶ 35-39, 56-57.

Giano also testified that SHU was often very noisy, since the only form of contact between **inmates** was to yell back and forth (T. 42). He testified that cells were often "filthy," and that the unit was often dark, because, "a lot of the windows are covered up because either they've been broken or [the staff does not want SHU **inmates**] making any visual contact with [GP] **inmates**, who normally work on the grounds." (Id.)

Here, the court recognizes that while most GP **inmates** have work assignments, classes, or vocational programs, there are also a number of **inmates** at any given time who do not have access to such programs because of staffing or space limitations. The court also recognizes that GP **inmates** spend a significant part of each day locked in their cells and are subject to occasional facility "lock downs." Thus, at one time or another, any DOCS **inmate** can expect to endure the types of deprivation that occur in SHU. However, while most **inmates** experience periods of inactivity or cell confinement, long-term isolation and idleness are far less typical outside of SHU. Moreover, defendants admit that few, if any, GP **inmates** would be confined to their cells like Giano was, with no social interaction for as long as one year at a time.

**\*8** Many courts have taken notice of the often-debilitating effects of long-term segregation in prisons. As the court observed in *McClary:* "A conclusion ... that prolonged isolation from social and environmental stimulation increases the risk of developing mental illness does not strike this Court as rocket science." 4 F.Supp.2d at 208;*see also Davenport v. DeRobertis,* 844 F.2d 1310, 1316 (7th Cir.), *cert. denied,*488 U.S. 908 (1988) (noting that there is "plenty of medical and psychological literature concerning the ill effects" of segregation of prison **inmates**); "Solitary Confinement: Legal and Psychological Conditions," 15 *New England J.Crim. & Civ. Confinement* 301 (1989). Although Giano does not claim that he suffered such symptomology during his time in AS, the often-devastating effect of prolonged isolation

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 876855 (W.D.N.Y.)
(Cite as: 2000 WL 876855 (W.D.N.Y.))

and inactivity on the segregated **inmates** is a factor that this court cannot ignore, particularly in cases such as the present one, in which segregated confinement continued for more than one year.

In *Sealey,* the Second Circuit emphasized that there is a "point ... beyond which confinement in harsh conditions constitutes atypicality." 197 F.3d at 587. The court in *Sealey,* however, did not specifically identify when that point is reached. *Id.* Atypicality depends on both the duration and degree of deprivation. Since the degree of deprivation will vary from case to case, there likely will not be a *per se* cutoff point after which a confinement becomes atypical.[FN3]

> [FN3.]*Sealey* upheld the trial court's finding that 101 days in SHU was not atypical, *id.;* and it is probably safe to presume that SHU terms of that length or less will not implicate a liberty interest under *Sandin.* In a footnote, the court prefaced a hypothetical with the statement, "for example, if conditions were of sufficient harshness that confinement for 365 days constituted atypicality ...." *Sealey,* at 587 n. 7. Although that statement certainly cannot be considered as defining a "cutoff point," it might conceivably reflect the Second Circuit's notion of the approximate duration of SHU confinement that is so atypical as to implicate a liberty interest under *Sandin.*

Giano was housed in Attica's SHU from November 1, 1988 until August 5, 1990. Stip. ¶ 7. Although he was temporarily transferred to other facilities four times during this period, Stip. ¶ 6, the duration of his AS confinement at Attica must be considered in the aggregate for *Sandin* purposes. *See Sealey,* 197 F.3d at 586. Thus, excluding the time at the other facilities, Giano experienced SHU conditions for well in excess of one year. It is that length of time in AS, then, that is relevant for *Sandin* purposes.

While in AS, Giano was denied virtually all meaningful social contact with other **inmates**. In addition, Giano had no access to structured activities, such as a job assignment, classroom instruction, group recreation, or religious observances. For all practical purposes, his life was

confined to a cell roughly ten feet by ten feet, save for an hour per day when he was confined to a cell approximately twice as large for "recreation." Contact with the outside world was similarly restricted. Although GP **inmates** are locked in their cells for about half of each day and are subjected to occasional facility "lock downs," those cell confinements are for much shorter periods of time, and it would clearly be atypical for a GP **inmate** to be subjected to the deprivations which Giano endured for anywhere near as long as the time he spent in AS. Given the degree of deprivation which Giano endured and the duration of that deprivation, this court finds that his AS confinement imposed atypical and significant hardship on him in relation to the ordinary incidents of prison life, *Sandin,* 515 U.S. at 483-84, and implicated a liberty interest protected by due process.

II. Due Process

A. Events Prior to Giano's Confinement in Administrative Segregation

**\*9** The court must now determine whether defendants afforded Giano due process in their periodic review of his AS status. In order to address this question, it is necessary to clarify defendants' reasons for maintaining Giano in AS. Witnesses and exhibits in the bench trial referred to several key events that had some bearing on Giano's AS confinement: (1) his conviction for murder, burglary, and robbery; (2) an attempted escape from Nassau County Court and a successful escape from Sing Sing Correctional Facility; (3) an assault at Shawangunk Correctional Facility, in which another **inmate** stabbed Giano ("the stabbing"); and (4) an **inmate** disturbance at Shawangunk ("the disturbance"). Some familiarity with these incidents is essential to an understanding of defendants' rationales for placing and keeping Giano in AS.

1. *Giano's criminal convictions.*

On February 19, 1985, Giano was convicted, at a jury trial, of second-degree murder, first-degree burglary, and first-degree robbery (T. 51). He was given consecutive sentences of 25 years to life on the murder conviction, and

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 876855 (W.D.N.Y.)
(Cite as: 2000 WL 876855 (W.D.N.Y.))

8 1/3 to 25 years for both the robbery and burglary convictions. The jury found that Giano and Curtis Harris had forcibly robbed Giano's former girlfriend, Vickey Ketsoflou, in her apartment and that Giano had killed Ketsoflou. Giano had planned the robbery and convinced Harris, whom he had met in prison while serving a prior sentence, to assist him (T. 52).

*2. Giano's history of escapes.*

On September 21, 1984, while awaiting trial on the above charges, Giano and Harris attempted to escape from Nassau County Court. As they entered an elevator in the courthouse, they sprayed ammonia in the eyes of several court officers. During the ensuing struggle, they seized a gun from one of the officers, and Harris shot an officer in the head. Another officer was severely beaten. The escape was thwarted when one of the officers shot Harris. Giano subsequently pled guilty to second-degree attempted murder and was sentenced to an additional 6 1/2 to 19 1/2 years (T. 13, 56).

On December 9, 1986, Giano and two other **inmates** escaped from Sing Sing. Giano planned the escape. After a fire was set in one of the prison buildings, creating a diversion, the escapees ran to a perimeter fence and used contraband wire clippers to cut through barbed wire. They climbed down a slope to train tracks using a 35-foot-long rope that Giano had made out of shoelaces he obtained from other **inmates**. Giano remained at large for two days (T. 63-67). Superintendent Kelly testified that it was, to his knowledge, the only successful escape from Sing Sing (T. 201). Giano was convicted of first-degree escape and sentenced to two to four years' imprisonment consecutive to his other sentences (T. 14). He also received a five-year term in SHU as a disciplinary sanction for violating DOCS rules. *Id.*

*3. Assault on Giano*

After serving some of his SHU time at Sing Sing, Giano was transferred to Shawangunk, where he remained in SHU. In July 1988, because of a shortage of cells on the unit, Giano was given an early release from SHU and placed in the Close Supervision Unit ("CSU") (T. 73, 106). CSU is specifically designed to house **inmates** considered to be security risks. It is a small unit with only 64 cells, and is almost entirely self-contained. CSU **inmates** are permitted out of their cells during the day and may interact with each other; however, they have no contact with **inmates** in other parts of the facility and their activities are closely monitored throughout the day. At that time, Shawangunk's CSU was the only such unit in the DOCS system (T. 122-25).

**\*10** Giano was placed on "walk in" keeplock status in CSU. "Walk in" keeplock **inmates** can go to work assignments, classes, or other programs, but they must remain in their cells at other times (T. 15). Giano was released from "walk in" keeplock on September 7, 1988; however, he remained in CSU. Five days later, Giano was stabbed by another **inmate** (T. 107). He suffered a serious puncture wound to his lung and was sent to an outside hospital for treatment. On returning to Shawangunk, he was placed in involuntary protective custody ("IPC") (T. 117).

When interviewed by DOCS officials and a State Police investigator, Giano refused to identify his assailant (T. 26, Pltf's Exh. 27). At trial, he testified that it was "common practice in prison to pass the word on of any **inmate** who cooperates with the administration," and that, given the length of his sentence, he would have put his life in serious danger if he identified his assailant (T. 23). This testimony is consistent with the explanation that he gave at his IPC hearing (Pltf's Exh. 30 at 3), and at least two DOCS officials confirmed that Giano's fears were well-founded (T. 215, 320-21). However, Melvin Richardson, an **inmate** who had witnessed the stabbing, informed authorities that the perpetrator was another **inmate** named John Ramsey (T. 143, Pltf's Exhs. 12, 26, 27). Ramsey was subjected to a disciplinary hearing and found guilty of the assault (Defs' Exh. 2). At the hearing, a DOCS official described an interview in which Giano, although declining to name his assailant, explained that the assault occurred because the assailant thought Giano had accused him of making a homosexual approach on an officer (T. 320).

*4. **Inmate** disturbance*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 876855 (W.D.N.Y.)
(Cite as: 2000 WL 876855 (W.D.N.Y.))

On October 4, 1988, **inmates** engaged in a "sit-in" demonstration in a mess hall at Shawangunk. The demonstration led to a violent confrontation with guards, which ultimately resulted in an extended "lock down" of one cell block (T. 118-19, 131-32). At the time, Giano was housed in IPC, and he had no access to any of the **inmates** involved in the disturbance (T. 119). However, the officials apparently suspected that Giano's stabbing may have been related to the disturbance in some way. As discussed below, a subsequent investigation did not substantiate those suspicions.

B. Placement in Administrative Segregation at Attica

As is customary when an **inmate** is placed in IPC, Shawangunk submitted a request to transfer Giano to another facility (T. 267). As a result of this request, Giano was transferred to Attica on October 6, 1988. At the time of the transfer, Attica officials were aware of Giano's escape from Sing Sing, the courthouse escape attempt, and the stabbing (T. 200-01). However, although Shawangunk authorities had been informed prior to the transfer that Ramsey was Giano's assailant (T. 117-18, Pltf's Exh. 26), that information apparently was not provided to Attica.

Upon arriving at Attica, Giano was placed in SHU. When Deputy Superintendent Hans Walker ("Walker") conducted rounds in SHU a few days after Giano's arrival, Giano asked Walker why he had to stay in SHU. Walker, who was not familiar with Giano's case, then asked Attica Superintendent Walter Kelly ("Kelly") why Giano was in SHU (T. 211-21). Walker and Kelly then spoke by telephone with Commissioner Coughlin.

**\*11** There is some dispute as to the substance of that conversation. According to Giano, Walker told him that Coughlin threatened to keep Giano in SHU "if I didn't cooperate with the incident, the stabbing, identify my assailant, and give any particulars I know regarding the sit-in ...." (T. 36.) Defendants deny that Coughlin had any involvement in the decision to maintain Giano in AS. However, Kelly and Walker agree that they discussed the Shawangunk disturbance and the stabbing, and that

Coughlin questioned whether the incidents were related (T. 166, 211-13). Since Kelly and Walker had little information regarding either incident, Coughlin suggested asking Giano about them (T. 212). When Walker again spoke with Giano, he denied any involvement in the disturbance and also denied that the stabbing had anything to do with the disturbance (T. 212-15). None of the witnesses at the trial suggested that there was a connection between the Shawangunk incidents, and there is no evidence to suggest that they were connected or that Giano was involved in the disturbance.[FN4]

> [FN4.] Shawangunk Superintendent Louis F. Mann testified that he had no reason to believe that the stabbing and disturbance were related (T. 120). Defendants apparently never discussed this question with Mann, and it is not clear why they thought there might be a connection between the incidents.

On October 17, 1988, Giano was served with a notice stating that he was confined in AS because he had been stabbed at Shawangunk, and because his "notoriety from 2 escapes mak[es] him a high escape risk" (Pltf's Exh. 16 at 2). On November 1, 1988, Hearing Officer Joseph Kihl ("Officer Kihl") conducted a hearing to review Giano's AS confinement. Giano denied any involvement in the disturbance and disclaimed any connection between the disturbance and the stabbing (*id.* at 10-12). At the hearing, Giano contended that Coughlin ordered his AS confinement in order to coerce Giano into cooperating with the investigation of the Shawangunk incidents (*id.*). Walker confirmed that he discussed Giano's status with Kelly and Coughlin and, upon Coughlin's suggestion, had asked Giano about the Shawangunk incidents. However, Walker denied that Coughlin ordered Giano's placement in AS or that the placement was because of the Shawangunk disturbance. Walker stated that Giano was placed in AS because of the escape attempts, the stabbing, and his refusal to identify his assailant (*id.* at 15-23). Deputy Hall then testified that he authorized the AS placement, and that the critical factors in that decision were Giano's escape from a maximum security facility and the stabbing (*id.* at 36).

At the conclusion of the November 1998 hearing, Officer

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 876855 (W.D.N.Y.)
(Cite as: 2000 WL 876855 (W.D.N.Y.))

Kihl held that Giano presented a security risk to the facility and upheld his AS confinement "with 7 day review" (*id.* at 53). After submitting and losing an administrative appeal, Giano filed a state court proceeding, challenging Officer Kihl's determination. The proceeding was transferred to the Appellate Division, Fourth Department, which affirmed Officer Kihl's decision. *Giano v. Coughlin,* 559 N.Y.S.2d 210 (1990).

C. Periodic Review of Giano's Confinement

1. *Disciplinary SHU and Administrative Segregation SHU*

**\*12** DOCS regulations define the bases for admission to SHU. "Disciplinary" and "AS" admissions are the bases for admission that are most pertinent to the present discussion. Disciplinary admission is based on a determination that the **inmate** violated DOCS Standards of **Inmate** Behavior. 7 N.Y.C.R.R. § 301.2. AS admission is based on a determination "that the **inmate's** presence in [GP] would pose a threat to the safety and security of the facility." *Id.* § 301.4(b). Disciplinary SHU is imposed as punishment for wrongdoing, whereas AS does not purport to be punishment. Disciplinary SHU is imposed for a definite period of time as determined at the **inmate's** hearing, while AS confinement lasts until the Superintendent decides to release the **inmate** from SHU. *Id.* §§ 301.2(a), 304(d).

2. *Regulations and mandatory procedures*

The regulations provide for an initial hearing to review an **inmate's** transfer to AS, *id.* § 301.4(a), and also provide:

[ I]**nmates** assigned to [AS] status shall have such status reviewed every seven days for the first two months, and every 30 days thereafter, by a three-member committee consisting of a representative of the facility executive staff, a security supervisor, and a member of the guidance and counseling staff. The results of such review shall be forwarded, in writing, to the superintendent for final determination.

*Id.* § 301.4(d). However, the regulations do not describe procedures to be followed by the Committee or the Superintendent in reviewing AS cases. DOCS witnesses agreed that review by the AS Committee is much less formal than the review is at an initial hearing. For example, the Committee is not required to inform the **inmate** that a meeting will take place. Further, the **inmate** is not entitled to appear before or submit information to the Committee, and there are no steps that Committee members are required to take to ascertain relevant facts, such as review of the **inmate's** institutional records. Although the regulation requires that the AS Committee forward "results" of its review to the Superintendent, it does not specify the content of the "results." Apparently, the content of the results need only consist of the conclusion ("retain" or "release") and a rationale that can be repeated in rote fashion following each session. There is no requirement that the **inmate** receive notice of the Committee's recommendation or the Superintendent's determination (T. 186-90, 246-55, 274, 301-04, 339-51, 360-62).

The Attica AS Committee's recommendations were recorded in memoranda to Kelly. All of the memoranda in Giano's case are virtually identical. Each memorandum states:

*Giano, Julio 85-A-3468:***Inmate** was initially placed in [AS] upon his arrival at this facility from Shawangunk Correctional Facility due to incidents he was involved in in Shawangunk that posed a serious threat to the security of that facility or any other facility in which he is housed.

(Pltf's Exh. 17). Each memorandum also includes a line that reads: "RECOMMENDATION: Retain _____ Release: _____," with three checkmarks after the word "retain," followed by the signatures of the committee members for the week (*id.*).[FN5]

FN5. The first memo in Plaintiff's Exhibit 17 is dated February 21, 1989. Kelly testified that he did not recall whether Giano's status was

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 876855 (W.D.N.Y.)
(Cite as: 2000 WL 876855 (W.D.N.Y.))

reviewed prior to that date (T. 194-97). However, Hall testified that the Committee reviewed Giano's status weekly, beginning in November 1988 (T. 239). Defendants' counsel stated that the missing memoranda had been "destroyed in the ordinary course of business." (*Id.*) Some memoranda include additional information. Memoranda issued during times when Giano was out to court reflect that fact (*e.g.,* Exhs. 17, at 23, 25, 27, 38, 40, 42). Also, later memoranda include the entry, "Transfer denied 11-15-89-Code # 28." (Id. at 55-92.)

**\*13** These memoranda are of little use in discerning what the AS Committee did during its weekly review of Giano's status. They do not indicate that the Committee ever considered any new information or that it considered any factor other than the "incidents he was involved in in Shawangunk." Indeed, the memoranda do not specify what the Shawangunk "incidents" were. Clearly, the stabbing was one such incident; however, there is no testimony or evidence suggesting that Giano was involved in any other incident at Shawangunk that might justify AS confinement. The fact that the memoranda consistently refer to incidents in the plural suggests the possibility that the Committee concluded that Giano participated in the disturbance at Shawangunk despite the lack of any evidence suggesting that he was involved in that disturbance.

Four members of the AS Committee testified at the trial. Each Committee member stated that his or her weekly recommendations to continue Giano in AS were based on factors not mentioned in the memoranda to Kelly. Hall testified that the most significant factors to him were the stabbing, the escape from Sing Sing, the courthouse escape attempt, and a petition that Giano had circulated among SHU **inmates**.[FN6] Hall stressed that the stabbing was never successfully explained. He stated that he "had no way of knowing whether or not that was a closed situation or ... [whether] other people or other groups ... might have some interest in" assaulting Giano again (T. 244).

FN6. DOCS prohibits **inmate** petitions (T. 244-45, 269-71; Def's Exh. 6).

Correction Counselor Jerry Algier stressed that the Sing Sing escape showed Giano's ability to plan a complex criminal endeavor and convince other **inmates** to join him. Algier also noted that Giano was able to elude capture for two days. He stated that the courthouse escape attempt was also significant because of the serious injuries to the court officers (T. 307-08). Algier claimed that he would not have voted to release Giano from AS if Giano had disclosed the identity of his assailant, since the stabbing incident was "one small part in the whole overall review." (T. 312-13).

Correction Counselor Barbara Cudney testified that, for her, the key factors were the escapes, Giano's above-average intelligence, and the fact that he showed no remorse for killing his former girlfriend. She felt that the escapes showed that Giano was able to manipulate his environment and involve other **inmates** in his plans, and stressed that it is considerably more difficult to escape from a maximum security prison (T. 332-34, 344). Cudney insisted that the Shawangunk incidents were not a significant factor to her.

> I was aware of a problem at Shawangunk, but the problems there didn't make him any less of a risk [at] our facility. In other words, no matter what had happened at Shawangunk ... the attempted escape and the escape ... were facts that were not going to change.

(T. 334). Cudney stressed that the stabbing, if relevant at all, would have suggested a need for protective custody, and not IPC (T. 344).

**\*14** Counselor Deborah Watkins testified that the critical factors for her were Giano's pattern of criminal behavior, the fact that an officer was shot during the courthouse escape attempt, and that Giano successfully escaped from a maximum security prison. She noted that most prison escapes are actually "walkaways" from medium security facilities, in which the **inmate** does not have to cross barriers such as prison walls. Watkins also was concerned because Giano's stabbing injury was so serious and happened so soon after his release from keeplock (T.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 876855 (W.D.N.Y.)
(Cite as: 2000 WL 876855 (W.D.N.Y.))

363-65).

The Committee members' testimony suggests that they focused on factors that were quite relevant to the rationale for AS confinement: the safety and security of the facility. Giano's escape from Sing Sing, the violent outcome of the courthouse escape attempt, his ability to enlist other **inmates** in his plans, and the nature of the crime which put him in DOCS custody are factors that would raise a concern for security in the mind of any prison staff. However, none of these factors was mentioned in any of the weekly memoranda to Superintendent Kelly. Indeed, Committee members downplayed the significance of the only factor mentioned in the memoranda, the Shawangunk "incidents." None of the witnesses offered an explanation as to why they failed to mention any other factor in their memoranda to Kelly.

Also, although each Committee member testified as to his or her recollection of why he or she voted to retain Giano in AS, the witnesses did not indicate that they discussed these reasons during Committee meetings. Algier testified that he had no recollection of what the Committee discussed in reviewing Giano's case (T. 304). Cudney spoke in generalities of "the factors that had led to being retained in [AS] to decide if those factors were appropriate to keep them there or to remove them" (T. 330). Watkins testified that, as a relatively new staff person, she tended to ask questions rather than offer information at Committee meetings (T. 360). However, Watkins gave no details as to any questions that she asked during the review of Giano's status. Hall testified that the Committee discussed "the fact that [the stabbing] had occurred," (T. 249), but he did not indicate whether it discussed any other factors.

Common sense might suggest that Committee members would have discussed their respective rationales during the meetings. However, common sense might also suggest that the memoranda to Kelly would describe those rationales; yet the record does not reflect what the Committee actually discussed. It is possible that each member had a different reason for voting to keep Giano in AS, as one witness acknowledged (T. 350), and members do not appear to have been overly concerned with identifying the particular reasons why the Committee recommended each

week that Giano remain in AS (*cf.* T. 244).

There is no contemporaneous record of Kelly's review of the weekly AS recommendations, or of his weekly decisions to retain Giano in AS. However, Kelly testified that he did review the AS Committee's recommendations on a weekly basis and routinely approved them. Kelly testified it was not his practice to request further information from the Committee, and that he had no way of knowing what the Committee considered, apart from the rationale in the memoranda (T. 186-89). However, Kelly also testified that he considered the escape from Sing Sing when he reviewed Giano's status. Although not familiar with the details of that escape, Kelly considered it significant since, to his knowledge, no other **prisoner** ever escaped from Sing Sing, and since the escape made Giano a "high profile" **inmate** who might exert undue influence on other **inmates** (T. 169, 199-201). Kelly acknowledged that the stabbing was an important factor, particularly since he did not know the circumstances that led to the stabbing. "I don't know if it was over drugs, I don't know if it was over money, I don't know if it was over escapes, I don't know if it was racial" (T. 202).

**\*15** Two aspects of the review process are striking. There was apparently an extraordinary degree of unanimity among Attica staff. AS Committee members never disagreed as to a recommendation (T. 349), and Kelly testified that he could not recall ever disagreeing with a Committee recommendation (T. 184). Also, there is no indication that Kelly or the Committee ever considered anything that occurred subsequent to Giano's placement in AS. There is no discussion of Giano's behavior or attitude while in AS of any changes in the facility environment that might have made it more or less risky to release him or of any new facts bearing on the case.

To some degree, it was logical for the AS Committee and Kelly to presume that the situation remained the same from week to week, particularly since Giano's confinement was based on past events that were not subject to change. However, eighteen months is a relatively long time for any situation to remain exactly the same, and one might expect the passage of so much time to have some impact on Giano's situation (for example, on his attitude or on his status in the prison community). Yet, there is no indication

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 876855 (W.D.N.Y.)
(Cite as: 2000 WL 876855 (W.D.N.Y.))

that the Committee or Kelly considered or inquired about any possible change in the factors bearing on Giano's AS confinement.

Also, it appears that neither Kelly nor the AS Committee ever considered critical information concerning the stabbing despite the fact that the information was readily available during most of Giano's time in AS. This available information would have revealed that Giano's assailant had been identified and that Giano had given Shawangunk officials an explanation as to why the assault occurred. Furthermore, Kelly or the Committee could have learned that in December 1988, Algier submitted Giano's request for permission to correspond with a Shawangunk **inmate** (Pltf's Exh. 25). Shawangunk denied the request in part because Giano's "assailant is still housed here." (Id.) On December 27, Algier sent Giano a memo stating that the correspondence request was denied "due to security reasons" (Pltf's Exh. 32). Algier admitted at trial that he must have read Shawangunk's response before sending the memo and that, as a result, he knew by December 27, 1988, that Giano's assailant had been identified (T. 314). However, he never relayed this information to the AS Committee (T. 324). Also, although Shawangunk's response was part of Giano's guidance unit file which Committee members claimed to review on a regular basis (T. 299-301, 329, 355-56, 371), there is no indication that the Committee ever discussed the response or the fact that Giano's assailant had been identified (T. 314). Similarly, the Committee never requested information about the stabbing from Shawangunk even though it was readily available (T. 318, 320). Kelly also never contacted or asked his staff to contact Shawangunk (T. 173) and admitted at trial that he still did not know any of the circumstances related to the stabbing (T. 202).

D. Meaningful Review

**\*16** Due process rights are limited in the prison context, see *Wolff v. McDonnell,* 418 U.S. 539, 560 (1974), and decisions of prison officials should be afforded great deference. See *Bell v. Wolfish,* 441 U.S. 520, 547 (1979). In the context of AS, due process "requires only an informal nonadversary review of evidence." *Hewitt,* 459 U.S. at 474. As the Supreme Court explained in *Hewitt*.

[A] prison's internal security is peculiarly a matter normally left to the discretion of prison administrators. In assessing the seriousness of a threat to institutional security, prison administrators necessarily draw on more than the specific facts surrounding a particular incident; instead, they must consider the character of the **inmates** confined in the institution, recent and longstanding relations between **prisoners** and guards, **prisoners** *inter se,* and the like. In the volatile atmosphere of a prison, an **inmate** easily may constitute an unacceptable threat to the safety of other **prisoners** and guards even if he himself has committed no misconduct; rumor, reputation, and even more imponderable factors may suffice to spark potentially disastrous incidents. The judgment of prison officials in this context, like that of those making parole decisions, turns largely on purely subjective evaluations and on predictions of future behavior; indeed, the administrators must predict not just one **inmate's** future actions, as in parole, but those of an entire institution. Owing to the central role of these types of intuitive judgments, a decision that an **inmate** or group of **inmates** represents a threat to the institution's security would not be appreciably fostered by the trial-type procedural safeguards suggested by respondent.

*Id.* at 474 (internal citations omitted).

Therefore, in reviewing a **prisoner's** AS status, due process does not require that prison officials hold a formal hearing in which the **prisoner** is permitted to testify, submit evidence, call witnesses, or confront his accusers. Further, there need not be a finding that the **prisoner** committed a misdeed in order to support the decision to confine him to AS. *Hewitt,* 459 U.S. at 476. However:

An **inmate** must merely receive some notice of the charges against him and an opportunity to present his views to the prison official charged with deciding whether to transfer him to [AS]. Ordinarily, a written statement by the **inmate** will accomplish this purpose, although prison officials may find it more useful to permit oral presentations in cases where they believe a written statement would be ineffective. So long as this occurs, and the decisionmaker reviews the charges and

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 876855 (W.D.N.Y.)
(Cite as: 2000 WL 876855 (W.D.N.Y.))

then-available evidence against the **prisoner**, the Due Process Clause is satisfied.

*Id.*

Due process requirements do not cease upon the initial review of an **inmate's** transfer to AS. Unlike disciplinary SHU confinement, which is for a defined period of time, AS lasts until the Superintendent orders the **inmate's** release. Given the indefinite duration of AS, "[p]rison officials must engage in some sort of periodic review of the confinement of such **inmates**." *Hewitt,* 459 U.S. at 477 n. 9. Since the prison officials in *Hewitt* employed AS only as a temporary basis for confining the **inmate** in SHU, pending investigation of misbehavior charges, 459 U.S. at 463-65, the Supreme Court did not elaborate on the procedures required in periodic review of long-term AS cases. However, the basic parameters of what is required in such a review is evident.

**\*17** Since initial review of AS confinement can be informal and non-adversarial, subsequent reviews do not require procedures such as the presence of the accused or live testimony. Also, the reviewer need not always consider new information, since the original reasons for placing the **inmate** in AS may continue to be compelling. However, AS may not be used as a pretext for confining an **inmate** in SHU when he no longer presents a threat to the security of the facility. *See Hewitt,* 459 U.S. at 477 n. 9. Thus, the decisionmaker must determine if the reason for AS confinement remains valid and must review "then-available" evidence. *Id.* at 476. In this context, "then" must be taken to refer to the point at which review occurs. Therefore, if new relevant evidence becomes available following initial review of the **inmate's** AS confinement, the decisionmaker is obligated to consider that evidence.

Also, the **inmate** is entitled to notice of the reason for his confinement and an opportunity to respond to that reason. *Id.* So long as the reason does not change, the **inmate** need not be informed each time his confinement is reviewed. However, if the reason for AS confinement changes, the **inmate** should be informed of the new reason and given

an opportunity to respond to that reason. As the Second Circuit recently held in a related context, "[w]hen procedural due process requires an explanation of the ground for termination of a liberty interest, it requires a statement of the actual ground, and if an initial ground is changed, the person deprived of liberty is entitled to know the new ground." *Kim v. Hurston,* 182 F.3d 113, 119 (2d Cir.1999).

*Hewitt* presumed that the review would be conducted by "the prison official charged with deciding" whether to maintain the **inmate** in AS. 459 U.S. at 476. Prison facilities, like those in New York, may delegate the responsibility of reviewing relevant information and recommending whether to release an **inmate** from AS. However, *Hewitt* requires that the decision-making official base the decision on the available evidence and on a rationale consistent with the defined function of AS.

Giano does not contest defendants' assertion that the Attica AS Committee met weekly and forwarded a memo to Superintendent Kelly which recommended that he be retained in AS. However, Giano argues that the Committee meetings and memoranda were a *pro forma* exercise, in which no meaningful consideration of his status ever took place. As this court noted in its prior decision, "simply because reviews are held on a weekly basis does not ensure that the reviews are meaningful." *Giano,* 869 F.Supp. at 150. This court identified:

Several things could have been done that would have illustrated that the defendants genuinely contemplated Giano's continued confinement without placing an undue burden upon the government. For example, **inmates** in disciplinary segregation status are provided with information regarding the reasons for and the length of their confinement. Giano could have been given this information. In addition, Giano could have been informed of the dates and results of his reviews. Furthermore, Giano could have been informed of what he needed to do to effectuate his efforts toward positive adjustment. Finally, after a specified period of time, perhaps Giano could have been given an opportunity to present information that would have shown that he is no longer a threat to the facility. If some or all of these suggestions are utilized, the Supreme Court's concern of

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 876855 (W.D.N.Y.)
(Cite as: 2000 WL 876855 (W.D.N.Y.))

administrative segregation being a pretext for indefinite confinement could be alleviated.

**\*18**_Id._ (internal citations omitted).

Defendants admit that they did not inform Giano of pending AS Committee meetings. Not only was Giano not permitted to appear before the Committee, but he also claims he was not given an opportunity to submit information to the Committee. For their part, defendants admit that there was no formal mechanism that would have enabled AS **inmates** to submit information to the Committee. However, defendants also point out that Hall, who chaired the AS Committee, made weekly rounds of SHU, and that Giano's correction counselor made SHU rounds more frequently. Defendants assert that Giano knew that Hall and his counselor were members of the AS Committee and could have requested that they convey relevant information to Committee meetings. However, although defendants acknowledge that Giano often discussed his AS status during rounds, they could not point to an instance in which staff actually provided the AS Committee with any information or statement from Giano. Thus, while the staff theoretically could have transmitted information from Giano to the Committee, this never actually occurred.

In addition, Giano did not regularly receive information regarding the Committee's recommendations. Although he occasionally received copies of the Committee's memoranda to Kelly, this was not done consistently, and defendants concede that the memoranda did not record the actual bases for the Committee's recommendations. Giano also was not notified of Kelly's determinations to continue his AS confinement or the reasons for Kelly's decisions. There is also no indication that Giano ever learned how much longer he was likely to remain in AS or what he could do to hasten his release from AS.

Other facts also suggest that the Committee's review of Giano's AS status was not meaningful. The Committee's memoranda, which are the only contemporaneous records of Committee deliberations, consistently stated a rationale that did not reflect the concerns expressed by Committee members at trial. For his part, Kelly never requested any

additional information beyond that contained in the memoranda. Moreover, neither Kelly nor the Committee ever considered any information beyond what was available at the time of Giano's initial transfer to AS.

Perhaps most importantly, the rationale given in the memoranda, _i.e.,_ "the Shawangunk incidents," proved to be an unsupportable basis for keeping Giano in AS. Again, there were two incidents at Shawangunk which affected Giano's AS status: the mess hall disturbance and the stabbing. Defendants concede that Giano had no part in the disturbance. As for the stabbing, such an incident would typically be a basis for confining an **inmate** like Giano in protective custody, not in AS. Defendants contend that AS was proper for Giano because they did not know the identity of his assailant. Yet, defendants could have learned the assailant's identity simply by contacting Shawangunk. Had they done so, they would have learned that officials at Shawangunk knew who Giano's assailant was. Defendants also contend that they did not know why the assault occurred. However, an inquiry directed to Shawangunk officials would have also revealed that Giano had described the reasons for the assault to an official who testified at the assailant's disciplinary hearing. Records of that hearing were available to Attica officials upon request (T. 321). Given Giano's explanation for the assault which has not been contested and the fact that Ramsey was housed at a different facility than Giano, it is evident that a renewed attack on Giano was unlikely. The stabbing was, therefore, not an adequate basis for keeping Giano in AS.

**\*19** It is not the role of this court to second-guess the Committee or Kelly's deliberations. However, this court must apply the minimal due process requirements set forth in _Hewitt._ Under _Hewitt,_ defendants were required to consider whether there was a continued basis for confining Giano in AS based on information that was readily available. The court finds that they failed to do so. This court holds that defendants denied Giano due process by failing to review the basis for his AS confinement in a meaningful fashion.

III. Causation

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 876855 (W.D.N.Y.)
(Cite as: 2000 WL 876855 (W.D.N.Y.))

This court's findings that Giano was denied his liberty and was denied due process are not sufficient to support an award of substantial damages. "[W]here a denial of due process has been followed by a liberty deprivation, unless the deprivation was caused by the violation the plaintiff is limited to nominal damages." *Patterson v. Coughlin,* 905 F.2d 564, 568 (2d Cir.1990) (citing *Carey v. Piphus,* 435 U.S. 247, 263 (1978)).

In *Patterson,* the procedural violation involved a hearing officer's unjustified refusal to call two witnesses, who were no longer available. The court reasoned: "[I]f Patterson would have been found guilty of assault and confined to SHU even if his witnesses had been called, his confinement in SHU must be considered a justified deprivation of liberty, not a deprivation caused by the State's failure to permit him to call those witnesses." *Patterson,* 905 F.2d at 568.

Defendants argue that they would have continued Giano in AS regardless of the information available to them. This may be true. However, the standard is not what defendants would have decided; it is what an objective, neutral decision-maker would have decided. Defendants' adamant insistence that they would not have released Giano regardless of what they knew, and the ease with which they adjusted their after-the-fact rationale for Giano's confinement, suggest that they were far from neutral decision makers.

[A]n impartial decisionmaker is one who, *inter alia,* does not prejudge the evidence and who cannot say, with the utter certainty advanced by these defendants, how he would assess evidence he has not yet seen. *See, e.g., Francis v. Coughlin,* 891 F.2d 43, 46 (2d Cir.1989) ("it would be improper for prison officials to decide the disposition of a case before it was heard").

*Patterson,* 905 F.2d at 570.

The question, then, is whether an impartial decisionmaker, reviewing the facts "then available," would have determined that Giano's release from AS would create a risk to the safety or security of the facility. The present case is distinguishable from *Patterson* in one significant respect. Giano does not and cannot argue that his initial confinement in AS was the result of procedural violations. That claim was dismissed on the basis of the state court's determination of Giano's Article 78 petition. One can presume that the decision that Giano remained a security risk was based on the facts that were ascertained at the time of his initial hearing, at least during his initial period of confinement in AS. *Hewitt,* 459 U.S. at 477 & n. 9. However, it was incumbent on defendants to verify that the facts continued to support a finding that Giano was a security risk during the time he remained confined in AS. *See id.*

**\*20** Giano's initial placement in AS was based on the Shawangunk incidents and on his prior escape attempts. Giano had no involvement in the Shawangunk disturbance, and it should have been apparent by the time that Giano's correspondence request was denied that the stabbing was not attributable to factors that were likely to implicate security at Attica. Thus, neither of the Shawangunk incidents would justify maintaining Giano in AS. However, it is clear that Giano's prior escape attempts represented a serious threat to prison security. Superintendent Kelly testified that, to his knowledge, Giano is the only **inmate** ever to have escaped from Sing Sing. The Nassau County escape attempt involved the use of firearms and serious injury of a court officer. This court therefore finds that a reasonable decisionmaker would have continued Giano's AS confinement for a significant period of time, based on the prior escape attempts.

With the passage of time, however, it was incumbent on Attica officials to determine whether Giano remained a threat to security. Normally, the plaintiff bears the burden of showing that he would not have been confined to SHU but for the procedural violation. *Patterson,* 905 F.2d at 568 (citing *McCann v. Coughlin,* 698 F .2d 112, 126-27 (2d Cir.1983)). However, that burden shifts where "the record's silence is the result of the State's violation of [plaintiff's] due process rights," since "it would be inappropriate to rule that the defendants should prevail where they have made proof impossible." *Id.* at 569, 570. In such a case, it is defendants' burden to show that the plaintiff would have been confined to SHU had there been no procedural violation. *Id.* (citing *Memphis Community School District v. Stachura,* 477 U.S. 299, 310-11

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 876855 (W.D.N.Y.)
(Cite as: 2000 WL 876855 (W.D.N.Y.))

(1986)).

In the present case, as in *Patterson,* defendants' denial of due process effectively eliminated evidence which would and should have been available. Contemporaneous records are not a *per se* due process requirement. *Ponte v. Real,* 471 U.S. 491, 499 (1985), and the unavailability of such records is not a basis, in itself, for shifting the burden to defendants. However, because of the *pro forma* nature of the AS Committee memoranda, Kelly's failure to record reasons for his decisions, and defendants' failure to consider new information at any point in his confinement, it is virtually impossible to assess how the passage of time, or any other factor, affected the rationale for retaining Giano in AS. If defendants had maintained an accurate record of the factors underlying their decisions or if the memoranda had discussed facts other than the Shawangunk incidents, it might be possible to assess the continued viability of their belief that Giano's presence in GP would threaten security. There is, however, no contemporaneous record that would enable the Court to decide this question, and "the record's silence is the result of the State's violation of [Giano's] due process rights." *Patterson,* 905 F.2d at 569.

**\*21** There is no bright line marking the date after which the justification for Giano's AS confinement became invalid. Given the seriousness of the escape incidents, it is reasonable to assume that his stay in AS would not likely be a short one. This court finds that it is likely that a reasonable prison official would have continued Giano's confinement in AS for up to one year based on the threat to prison security implicated by his escape attempts. However, with the passage of one year in AS, it would also have been reasonable to investigate whether changed circumstances might warrant releasing Giano from AS. One year is quite a long time and, if nothing else, a one-year confinement in AS may have led Giano to reassess the implications of his behavior. Giano's AS confinement may have also functioned as a deterrent against other **inmates** cooperating with Giano on illegal schemes. In short, defendants have not met their burden of demonstrating that a reasonable decisionmaker would have maintained Giano in AS for more than one year, based on available evidence.

This court holds, therefore, that defendants' denial of due process did not cause a deprivation of Giano's liberty during the first year of his AS confinement, from October 6, 1988 until October 5, 1989. However, defendants' denial of due process did cause a deprivation of Giano's liberty from October 6, 1989, until his transfer from Attica on August 5, 1990.

IV. Personal Involvement

Defendants argue that former Commissioner Coughlin cannot be held liable since he was not personally involved in any deprivation of Giano's rights. 42 U.S.C. § 1983 provides for redress against state actors who "subject or cause to be subjected" individuals to deprivation of Constitutional rights, privileges or immunities. Liability under § 1983 can not be premised on a theory of *respondeat superior. Monell v. Dept. of Soc. Serv. of City of New York,* 436 U.S. 658, 692 (1978). In order to establish liability, a plaintiff must prove that the defendant was personally involved in the deprivation of his or her rights.

[A] defendant may be personally involved in a constitutional deprivation ... in several ways. The defendant may have directly participated in the infraction.... A supervisory official, after learning of the violation through a report or appeal, may have failed to remedy the wrong. A supervisory official may be liable because he or she created a policy or custom under which unconstitutional practices occurred, or allowed such a policy or custom to continue. Lastly, a supervisory official may be personally liable if he or she was grossly negligent in managing subordinates who caused the unlawful condition or event.

*Williams v. Smith,* 781 F.2d 319, 323-324 (2d Cir.1986) (internal citations omitted).

Giano claims that Coughlin ordered his AS confinement in order to coerce him into disclosing information regarding the Shawangunk incidents. However, the evidence adduced at trial does not support this claim. Walker denied that Coughlin ordered Giano's placement in AS (T.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 876855 (W.D.N.Y.)
(Cite as: 2000 WL 876855 (W.D.N.Y.))

216). Kelly was not directly asked about Coughlin's involvement; however, his description of their telephone conference does not suggest that Coughlin ordered Giano's placement in AS (T. 166-67). Giano has not presented any credible evidence to support his claim that Coughlin ordered his placement in AS.

**\*22** Nonetheless, it is clear that Coughlin took an active interest in Giano's case at the precise time that he was transferred to Attica and put in AS. Although Walker denied that Coughlin ordered Giano's SHU placement, he admitted that their telephone conference was "in reference to Mr. Giano and what we should do with him, where we should house him in Attica" (T. 211-12). Kelly and Walker confirmed that Coughlin asked whether Giano had any information about the Shawangunk disturbance and whether Giano disclosed the identity of the **inmate** who had stabbed him (T. 166, 212-13). Walker also testified that Coughlin directed him to ask Giano whether there was any connection between the disturbance and the stabbing (T. 212-13). It was shortly after Walker's inquiry that Giano was informed that he was on AS status (Pltf's Exh. 16). Giano then wrote a letter to Coughlin disclaiming any connection between the stabbing and the disturbance and disclaiming any knowledge about the disturbance (Pltf's Exh. 1). Following his hearing, Giano wrote a second letter to Coughlin protesting his confinement in AS (Pltf's Exh. 2). Giano wrote additional letters to Coughlin in January 1989 and again in March 1989 (Pltf's Exhs. 6, 7). He began the second letter, "it has now been approximately 6 months since, by your orders, I have been in punitive segregation without any privileges or property...." (Pltf's Exh. 7, at 1). Finally, in December 1989, Giano sent Coughlin a memorandum, again protesting his confinement in AS (Pltf's Exh. 8). Giano also named Coughlin in the state court proceeding challenging his AS confinement. *Giano v. Coughlin,* 559 N.Y.S.2d 210 (1990).

Defendants deny that Coughlin read the letters from Giano, or that he was aware that he was a respondent in Giano's article 78 Petition. However, the evidence is compelling that Coughlin knew of Giano's continued confinement in AS. Of course, knowledge that an **inmate** is confined in AS does not convert to knowledge that the **inmate's** due process rights have been violated. In *Farmer v. Brennan,* 511 U.S. 825, 834, (1994), the Supreme Court

rejected a plaintiff's argument that an official may be held liable based on a finding that the official "should have known" of the constitutional violation. However, the court held that liability was established if the official "knows of and disregards an excessive risk" that the violation will occur. "[T]he official must both be aware of facts from which the inference could be drawn ..., and he must also draw the inference." *Farmer,* 511 U.S. at 837. Although *Farmer* was an Eighth Amendment and not a due process case, the standard enunciated in that case is applicable here.

Coughlin knew that DOCS regulations called for periodic review of the reasons for AS **inmates'** confinement. Indeed, Coughlin authorized the regulations that defined AS confinement, and defined the process for review of AS cases. He was thus quite aware that Giano would remain in AS until Kelly ordered his release. Coughlin also took an active interest in Giano's case at the time that he was admitted to AS, and suggested that Attica officials ask Giano about the Shawangunk incidents which were to be the basis for Giano's confinement. Also, Giano repeatedly complained to Coughlin that he remained in AS without any recourse, and sued him over this issue. This court therefore finds that Coughlin was aware of and disregarded a significant risk that Giano was being held in AS with no meaningful review of his status. *McCann,* 698 F.2d at 125 (2nd Cir.1983); *Wright v. Smith,* 21 F.2d 496, 501 (2d Cir.1994). Coughlin may be held liable for violation of Giano's due process rights.

**\*23** Defendants do not raise the issue of Hall's or Kelly's personal involvement. However, that issue merits a brief comment. As chair of the AS Committee, Hall had the responsibility for recommending whether to release Giano. However, the decision whether to do so rested with Superintendent Kelly. 7 N.Y.C.R.R. § 301.4(d). A recent decision in this district held that AS Committee members are not liable for damages when an **inmate** is improperly retained in AS, since they are not personally involved in the decision whether to release such **inmates.** *Edmonson v. Coughlin,* 21 F.Supp.2d 242, 256 (W.D.N.Y.1998). That holding is logically compelling, and in most instances it is clear that members of the AS Committee should not be held liable. However, Giano has demonstrated that in fact the AS Committee determined his fate and that Hall effectively determined the outcome of Committee reviews.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 876855 (W.D.N.Y.)
(Cite as: 2000 WL 876855 (W.D.N.Y.))

Kelly testified that he "always" approved AS Committee recommendations, and that he never requested additional information from the Committee (T. 186-89). Also, at least one Committee member testified that she could not recall a single instance in which a Committee member voted contrary to Hall (T. 349). Under these circumstances, this court finds that Hall possessed *de facto* power to determine whether Giano remained in AS, and that he can be held liable for deprivation of Giano's liberty without due process. Although Kelly claims that he "rubber stamped" Committee recommendations, he cannot unilaterally relieve himself of his obligation under the DOCS regulations to decide whether to release Giano. *Edmonson,* 21 F.Supp.2d at 256 n. 8. Kelly is therefore also liable for deprivation of Giano's liberty without due process.

Although the other defendants participated in the AS Committee meetings in which Giano's continued confinement in AS was discussed, their involvement appears to have been limited to concurring with the recommendation that Giano remain in AS. Since it was ultimately Kelly's decision whether to continue or release Giano from AS, and since none of the Committee members other that Hall can be considered to have effectively determined Giano's status, the other AS Committee members did not have personal involvement in the denial of Giano's liberty, and they cannot be held liable.

V. Qualified Immunity

To establish a defense of qualified immunity, a defendant must show that, at the time of the alleged violation, plaintiff's rights were not clearly established by law or, if clearly established, that defendants acted in a manner which it was objectively reasonable to believe did not violate plaintiff's rights. *Anderson v. Creighton,* 483 U.S. 635, 639-41 (1987); *Williams v. Greifinger,* 97 F.3d 699, 703 (2d Cir.1996). In determining whether a particular right was clearly established at the time defendants acted, the court must examine "whether the right was defined with reasonable specificity; whether decisional law of the Supreme Court and [the Second Circuit] supports its existence; and whether, under preexisting law, a defendant official would have reasonably understood that his acts

were unlawful." *Rodriguez v. Phillips,* 66 F.3d 470, 476 (citing *Jermosen v. Smith,* 945 F.2d 547, 550 (2d Cir.1991)). The "very action in question" need not "have previously been held unlawful"; but "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson,* 483 U.S. at 640. When a plaintiff's rights are clearly established, a defendant is entitled to qualified immunity if "a reasonable officer could have believed [his actions] to be lawful, in light of clearly established law and the information the [officer] possessed." *Hunter v. Bryant,* 502 U.S. 224, 227 (1991) (citing *Anderson,* 483 U.S. at 641). Whether a decision was reasonable is an "objective (albeit fact-specific) question," *Anderson,* 483 U.S. at 641, which should be resolved as a matter of law, unless material facts relevant to the determination are at issue. *Id.* at 228.

**\*24** Defendants are correct in arguing that, "no authority has invalidated New York's procedure for periodic review" of AS confinements (Item 188 at 21-22). However, the thrust of Giano's claim is not that DOCS regulations define a constitutionally defective review process. Giano does not claim that he was entitled to appear, testify before, or submit evidence to the AS Committee, or that he was entitled to notice of Committee recommendations or of Kelly's determinations. Such procedural rights are inconsistent with *Hewitt* 's mandate that the review process be "informal." 59 U.S. at 476. Admittedly, *Hewitt* did not define specific procedural components to the AS review process. However, the court in *Hewitt* did hold that AS "may not be used as a pretext for indefinite confinement of an **inmate**," and that prison officials must engage in periodic review of AS cases. 459 U.S. at 477 n. 9. Thus, *Hewitt* clearly established an AS **inmate's** right to periodic review of his confinement.

Although the Supreme Court chose not to define specific components of that review, it was clear that the review must be sufficient to "to dispel any notions that the confinement was a pretext." *459 U.S. at 478 n. 9.* Thus, it was clearly established at the time of Giano's AS confinement that a *pro forma* review process which failed to take into consideration readily available information relevant to the reasons for the **inmate's** confinement amounted to a denial of due process. Nor can defendants claim that a reasonable officer would consider their

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 876855 (W.D.N.Y.)
(Cite as: 2000 WL 876855 (W.D.N.Y.))

actions reasonable in light of clearly established law and the information that defendants possessed. In sum, the court finds in Giano's favor because of defendants' failure to consider information available to them, their persistent invocation of a rote rationale, and their failure to inquire into the continuing validity of that rationale. In light of these findings, defendants are not entitled to qualified immunity.

VI. Damages

A. Compensatory Damages

The **Prisoners'** Litigation Reform Act, 42 U.S.C. § 1997e(e) provides: "[n]o Federal civil action shall be brought by a **prisoner** confined in a jail, prison, or other correctional facility for mental or emotional injury suffered while in custody without a prior showing of physical injury." Defendants argue that Giano is barred by the PLRA from claiming damages, since he has not proven that he suffered any physical injuries attributable to his AS confinement. Courts have reached contrary conclusions on whether § 1997e(e) was intended to apply to claims where physical injury is an unlikely consequence of the claimed violation, *i.e.,* First Amendment claims. *Cantrell v. Lightner,* 143 F.3d 1210, 1213 n. 3 (9th Cir.1998) (holding that § 1997e(e) does not apply to First Amendment claims); *Robinson v. Page,* 170 F.3d 747, 748-49 (7th Cir.1998) (holding that claim of mental or emotional harm from SHU confinement would be barred by § 1997e(e), but other unspecified "forms" of injury may sustain damage claim). At least one district court in this circuit has held that § 1997e(e) bars damages in a due process claim such as Giano's. *Wright v. Doe,* 54 F.Supp.2d 199, 207 (S.D.N.Y.1999).

**\*25** The PLRA was enacted on April 26, 1996, after the events giving rise to Giano's claims and after he filed this action. Clearly, application of the Act to the present case would "attach new legal consequences to the events completed before the enactment of the PLRA by denying plaintiffs a cause of action where they once had a legally cognizable claim." *Bolton v. Goord,* 992 F.Supp. 604, 625 (S.D.N.Y.1998) (internal quotations omitted) (citing, *inter alia, Landgraf v. USI Film Products,* 511 U.S. 244,

280-81 (1994)). Retroactive application of a statute is disfavored unless Congress has expressly stated its intention that the statute be applied retroactively. *See Landgraf,* 511 U.S. at 267-68; *Lindh v. Murphy,* 521 U.S. 320, 325 (1997).

In addressing other provisions of the PLRA that are not at issue in this case, the Second Circuit has held that the PLRA may not be applied retroactively to bar claims. *See Salahudin v. Mead,* 174 F.3d 271, 274 (2d Cir.1999) (holding that § 1997e(a) exhaustion requirement is not retroactive); *Blissett v. Casey,* 147 F.3d 218, 220-221 (2d Cir.1998) (holding that § 1997e(d) attorney fee provision does not apply retroactively to work performed prior to enactment of PLRA); *Dumatef v. O'Keefe,* 98 F.3d 22, (2d Cir.1996) (holding that *in forma pauperis* provision, 28 U.S.C. § 1915, is not retroactive). In each case, the court cited Congress' failure to explicitly provide for retroactivity of the PLRA provisions.

Congress was equally silent as to the retroactivity of § 1997e(e). Although the Second Circuit has not ruled on this provision, district courts that have addressed the issue have consistently found that § 1997e(e) is not retroactive. *Bolton,* 992 F.Supp. at 625-26; *Heisler v. Kralik,* 981 F.Supp. 830, 837 n. 3 (S.D.N.Y.1997); *Harris v. Lord,* 957 F.Supp. 471, 474 (S.D.N.Y.1997). The Tenth Circuit has also found that courts should not apply § 1997e(e) retroactively. *See Craig v. Eberly,* 164 F.3d 490, 492-93 (10th Cir.1998). This court therefore holds that § 1997e(e) does not apply retroactively, and that Giano need not prove physical injury in order to assert his damage claim.

"The evaluation of the injury suffered by a plaintiff ... is ... a question of fact to be decided by the factfinder after trial." *Patterson,* 905 F.2d at 570. In the present case, the facts which bore on the *Sandin* issue-the extent and duration of the deprivations that Giano underwent-are also relevant to the question of damages. Calculation of such damages cannot be subjected to an "accountant's methodology," *Sample v. Diecks,* 885 F.2d 1099, 1112 (3rd Cir.1989), and courts' assessments of damages attributable to SHU confinement have varied. However, the following citations suggest that a rate of between $80.00 and $100.00 per day of confinement is a reasonable measure of damages. *U.S. ex rel. Larkins v.*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 876855 (W.D.N.Y.)
(Cite as: 2000 WL 876855 (W.D.N.Y.))

*Oswald,* 510 F.2d 583, 589 (2d Cir.1975) ($80 per day); *Maxwell v. Mason,* 668 F.2d 361, 365 (8th Cir.1981) ($100 per day); *Charron v. Medium Security Institution,* 730 F.Supp. 987 (E .D. Mo.1989) ( $100 per day); *Patterson v. Coughlin,* 722 F.Supp. 9, (W.D.N.Y.1989), *aff'd in part and rev'd in part,*905 F.2d 564 (2d Cir.1990).

**\*26** This court holds that Giano's damages should be calculated at a rate of $100.00 per day of AS confinement. This figure is based on comparison of the deprivations which Giano endured compared with the conditions that he would have encountered upon release from AS, and the cited cases are used as a guide only and not to define the measure of the damages owed to Giano.

Giano's AS confinement is attributable to defendants' due process violations beginning on October 6, 1989. However, Giano was not housed at Attica between September 15, 1989 and December 15, 1989, and between February 1, 1990 and March 10, 1990 (Stip.¶ 7). Thus, the time that Giano spent in Attica's AS due to violation of his due process rights includes two periods: (1) from December 15, 1989 until January 31, 1990; and (2) from March 10, 1990 until August 5, 1990, when Giano was transferred from Attica. These two periods include a total of 194 days.[FN8] Therefore, the damages attributable to denial of due process amount to $100.00 per day times 194 days, which amounts to a total of $19,400.00.

> FN8.*1989:* December, 16 days. *1990:* January, 31 days; February, no days; March, 21 days; April, 30 days; May, 31 days; June, 30 days; July, 31 days; August, 4 days. Although Giano claims he was housed in SHU for at least part of his time at the other facilities, it is not clear whether this was due to his AS status or to his status as a temporary "visitor" at the other facility. Thus, that SHU confinement cannot be attributed to defendants' failure to meaningfully review his AS status.

It must be stressed that the award of damages in this case is not for the purpose of rewarding a "good" plaintiff or of punishing "bad" defendants. Giano was properly convicted and punished, and his incarceration is not at

issue in this case. Nor should the award of damages be taken to reflect a judgment regarding the propriety of Giano's actions prior to or following his incarceration. Rather, the award is intended to compensate Giano for deprivations that he endured due to violations of his right to due process. That right accrues to any **prisoner** regardless of his background or character. It must be stressed that the constitutional claim in this case is not for a "technical" violation, but implicates very serious and very real concerns. Giano spent over one year in Attica's SHU under very harsh conditions. His confinement was for an indefinite term, and his only hope for release from AS was premised on a meaningful review of the reasons for his AS confinement. Ironically, an **inmate** in disciplinary SHU is confined for a defined period of time based on a finding that he violated a prison rule, *i.e.,* by assaulting another **inmate**. However, the same **inmate** could be placed in AS based on a mere suspicion that he violated a prison rule, so long as his presence in GP is deemed a threat to prison safety or security, and kept in AS indefinitely. In light of the circumstances in this action, the doctrine of due process reveals how important it is for prison officials to conduct periodic and meaningful reviews of the bases for **inmates'** confinement in AS.

B. Punitive Damages

Courts may award punitive damages in situations where a defendant's conduct is "willful or malicious," or where defendants have demonstrated "reckless intent" or "callous indifference." *Memphis Community School District v. Stachura,* 447 U.S. 299, 306 (1986). In the present case, the record establishes that defendants Coughlin, Kelly, and Hall acted carelessly with respect to Giano's status in AS, but does not demonstrate that they acted maliciously or willfully. Therefore, the court denies plaintiff's request for punitive damages.

CONCLUSION

**\*27** For the reasons set forth herein, this court finds that defendants Coughlin, Kelly, and Hall are liable to plaintiff in the amount of $19,400.00 for the deprivation of his liberty without due process, and that plaintiff's claims

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 876855 (W.D.N.Y.)
(Cite as: 2000 WL 876855 (W.D.N.Y.))

against the remaining defendants must be dismissed. The
Clerk is directed to enter judgment in this case
accordingly.

So ordered.

W.D.N.Y.,2000.
Giano v. Kelly
Not Reported in F.Supp.2d, 2000 WL 876855 (W.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov.
Works.